## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

BREVARD EYE CENTER, INC.,

BREVARD SURGERY CENTER, INC.,

MEDICAL CITY EYE CENTER, P.A.,

THMIH, INC.,

      Debtors.

_____/

Chapter 11
Case No.: 6:17−bk−01828−KSJ

Jointly Administered with:

Case No.: 6:17−bk−01829− KSJ

Case No.: 6:17−bk−01830− KSJ

Case No.: 6:17−bk−01831− KSJ

## DEBTORS' MOTION TO APPROVE SETTLEMENT
## WITH SUMMITBRIDGE NATIONAL INVESTMENTS V LLC

Jointly administered Debtors, BREVARD EYE CENTER, INC. ("BEC"), BREVARD SURGERY CENTER, INC. ("BSC"), MEDICAL CITY EYE CENTER, P.A. ("MCEC"), and THMIH, INC. ("THMIH") (collectively, the "Debtors"), by and through their undersigned counsel, respectfully move pursuant to Federal Rule of Bankruptcy Procedure 9019 for entry of the proposed Order attached hereto as Exhibit "A", which approves the Settlement Agreement attached hereto as Exhibit "B" (the "Settlement Agreement") between the Debtors and SummitBridge National Investments V LLC ("SummitBridge") (collectively, the Debtors and SummitBridge shall be referred to as "Parties," and each individually, a "Party"). In support of the requested relief, the Debtors state as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Background

2.      This Chapter 11 bankruptcy proceeding was commenced on March 21, 2017 (the "Petition Date") with the filing of four voluntary Chapter 11 petitions. *See* ECF No. 1 in Case Numbers: 6:17-01828-KSJ (BEC); 6:17-01829-KSJ (BSC); 6:17-01830-KSJ (MCEC); and 6:17-01831-KSJ (THMIH). On March 24, 2017, the Court entered an Order authorizing the joint administration of the Debtors' cases.

3.      The Brevard Eye cases concern an ophthalmological surgery center and four separate optometry stores. All are owned by Dr. Rafael Trespalacios, a board certified highly skilled and well reputed ophthalmologic surgeon. Dr. Trespalacios is a corneal refractory specialist and handles the majority of corneal surgical procedures in Brevard County. On occasion he also handles emergency eye surgery at local hospitals.

4.      In March of 2017, prior to the Petition Date, SummitBridge directed Wells Fargo Bank to transfer funds from the Debtor's then operating accounts, in the total amount of $266,576.58 to SummitBridge pursuant to alleged Deposit Account Control Agreements (the "DACA Transfers"). At the time of the DACA Transfers, the funds that were transferred comprised most of the Debtors' cash.

5.      On March 20, 2017, the day before the Petition Date, SummitBridge filed a *Verified Complaint* against the Debtors, Dr. Trespalacios, and former CEO Steven Black in the Circuit Court in and for Orange County, Florida (the "State Court"), styled *SummitBridge National Investments V LLC v. Dr. Rafael Trespalacios*, et al., Case No. 2017-CA-2483 (the "State Court Action"), seeking, *inter alia*, foreclosure of mortgages and security agreements against real and personal property of the Debtors and Dr. Trespalacios in Orange and Brevard Counties.

6.      After the Petition Date, on May 24, 2017, the Debtors filed an adversary proceeding styled *Brevard Eye Center, Inc.*, et al. *v. SummitBridge National Investments V LLC*, Adv. Pro. No.

2

6:17-ap-00070-KSJ (the "Avoidance Adversary Proceeding"), seeking, *inter alia*, avoidance of certain liens and claims held by SummitBridge, the avoidance of the DACA Transfers, and the return of certain property from SummitBridge.

7.      On August 17, 2017, SummitBridge filed an *Emergency Motion to Dismiss or Convert Cases* seeking to dismiss or convert these Chapter 11 cases [ECF 240] ("SummitBridge's First Motion to Dismiss/Convert").

8.      On October 19, 2017, the Debtors filed their initial *Plan of Reorganization* [ECF 343].

9.      On November 14, 2017, after a three-day trial, Judge Roberta Colton denied without prejudice SummitBridge's First Motion to Dismiss/Convert [ECF 373].

10.     On December 19, 2017, after Judge Colton was assigned to sit in Tampa, this case was reassigned to Judge Karen Jennemann.

11.     On December 28, 2017, SummitBridge filed a *Renewed Motion to Dismiss or Convert Cases* [ECF 403] (the "Second Motion to Dismiss or Convert").

12.     On February 26, 2018, SummitBridge filed a *Motion for Derivative Standing to File and Pursue an Administrative Claim and To Enforce Leasehold and Other Rights on Behalf of the THMIH, Inc., or in the Alternative, for Appointment of Trustee for THMIH* [ECF 462] (the "Rent Motion").

13.     On April 9, 2018, SummitBridge filed an adversary proceeding styled *SummitBridge National Investments V LLC v. Brevard Eye Center, Inc.*, et al., Adv. Pro. No. 6:18-ap-00028-KSJ (the "Substantive Consolidation Adversary Proceeding"), seeking, *inter alia*, substantive consolidation of the Debtors.

14.     At hearing on April 11, 2018, the Court directed the Debtors and SummitBridge to proceed with a second mediation before the Honorable Caryl E. Delano.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336
31777209 v1

15.     SummitBridge and the Debtors have litigated numerous issues over a period of more than 14 months, there has been a three-day trial, and there have been about 20 hearings in this case. SummitBridge is the Debtors' largest, and by far most significant, creditor. Pursuant to the direction and order of the Court, the Parties and Judge Delano have spent two full days mediating and negotiating in Tampa.  Judge Delano has been extraordinarily generous with her time, and has placed significant pressure on all the parties to come to a global resolution on all issues.

16.     The parties have arrived at a global Settlement Agreement, a Settlement Agreement that resolves all pending issues between the Debtors and SummitBridge, as well as Dr. Trespalacios, will avoid continued protracted and expensive adversary and contested litigation in this Court and the State Courts, and will likely avoid a contested confirmation hearing. This settlement is a result of substantial and difficult negotiations.

## The Settlement Agreement

17.     The Parties have agreed to the terms set forth in the Settlement Agreement, attached hereto as Exhibit "B."[1] Interested parties should review the Settlement Agreement and all attachments for complete settlement terms. **The description of the Settlement Agreement in this Motion is being provided solely for the convenience of interested parties and for illustrative purposes only. Nothing contained in this Motion shall be construed as modifying or providing an interpretative aid with regard to the Settlement Agreement. To the extent of any inconsistencies between the terms of the Motion and the Settlement, the terms of the Settlement Agreement shall control. Accordingly, interested parties are directed to the Settlement Agreement attached as Exhibit B**

---

[1] The signature page of the Settlement Agreement contains a handwritten revision to the signature block of Aaronson Schantz Beiley P.A. ("Aaronson") to clarify that Aaronson is executing the Settlement Agreement with respect to its agreement to Paragraph 9 of the Exit Financing Supplement, which is attached to the Settlement Agreement as Exhibit A.  All parties have acknowledged and agreed, via email correspondence through counsel, that all signatures on the Settlement Agreement are authorized and valid with respect to the form of the Settlement Agreement that contains the handwritten revisions, which is the form attached hereto as Exhibit "B".

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336
31777209 v1

**and are strongly encouraged to carefully review it in its entirety for the terms of the Settlement Agreement.** Notwithstanding the foregoing, certain of the terms of the Settlement Agreement are described below.

18.     The Debtors will use best efforts to secure a Final Order[2] approving the Settlement Agreement in the form of the Settlement Approval Order, and the Debtors and SummitBridge will not disparage or undermine, in any court, the Settlement Agreement, the Settlement or approval of the Settlement.

19.     The Settlement Agreement shall become effective on the date the last of the following has occurred:

  a.     it has been executed by all of the Parties;

  b.     this Motion to Compromise has been filed;

  c.     the Bankruptcy Court has entered a Settlement Approval Order; and

  d.     the Settlement Approval Order has become a Final Order.

20.     Confirmation of a plan is not a condition precedent to the effectiveness of the Settlement, or the entry of the Settlement Approval Order. The Settlement Agreement and the Settlement Approval Order shall be enforceable irrespective of whether a plan is confirmed in these Bankruptcy Cases.

21.     SummitBridge's claims are allowed in the amount of $11,497,553.47 in each of the four bankruptcy cases of the Debtors (the "SummitBridge Allowed Claim"). SummitBridge holds a first priority lien and security interest on the Properties, subject only to the liens held on account of real estate taxes. SummitBridge also holds a first priority lien and security interest on all non-real estate property of the Debtors, including without limitations, accounts receivable, furnishing, fixtures

---

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreement.

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336
31777209 v1

and equipment (the "Other SummitBridge Collateral"), subject only to certain of the property owned by the Debtors as of the Debtors Petition Date that is subject to equipment leasing or equipment financing agreements.

22.     Upon the Effective Date of the Settlement Agreement, the parties will file stipulations for the dismissal with prejudice of the Avoidance Adversary Proceeding.

23.     Upon the Effective Date of the Settlement Agreement, SummitBridge shall withdraw the Second Motion to Dismiss or Convert, dismiss the Substantive Consolidation Adversary Proceeding, and withdraw the Rent Motion.

24.     Upon the Effective Date of the Settlement Agreement, the Operating Debtors shall jointly and severally enter into triple net leases with THMIH (requiring the payment by the tenant of all obligations of any sort (including insurance, real estate taxes, normal maintenance, etc., but excluding rent payments which shall commence on January 1, 2019)) in the form attached to the Settlement Agreement as Exhibit "C" (the "Leases") with respect to the Brevard County Properties commencing on the Effective Date of the Settlement Agreement. The original executed Leases shall be delivered to SummitBridge. On and after the Effective Date of the Settlement Agreement, the Leases and rents to be paid thereunder are absolutely and unconditionally transferred and assigned to SummitBridge, and shall not be property of the Debtors or their bankruptcy estates. To the extent required by SummitBridge, all of Debtors shall absolutely and unconditionally guaranty the Leases. The lease for the Merritt Island Property shall only relate to the portion of the buildings that are currently being used by Debtors. The leases shall be for a five-year term, shall include COL increases yearly, and may be extended for one single 5-year term on notice of 180 days or more prior to expiration.

25.     The Debtors may retain all rents paid by the existing third party tenant at the Merritt

6

Island Property in the amount of not more than $1,500.00 per month through the rent due for December 31, 2018 (but shall not be entitled to retain any pre-paid rent for any period after December 31, 2018). Any rent paid after December 31, 2018 with respect to the Merritt Island Property and rent relating to use and occupancy of such property for any period after December 31, 2018, shall not be accepted by the Debtors (except for any unpaid rent due through December 31, 2018) and, along with any rights to collect such rent, shall be the property of SummitBridge.

26.     Upon the Effective Date of the Settlement Agreement, the automatic stay is lifted, terminated and modified to permit SummitBridge to pursue its state law rights and remedies concerning the Properties, including without limitation, foreclosure of the Properties.

27.     On or before the earlier of the entry of foreclosure judgment or September 30, 2018 (without any possibility of extension), the Debtors will either (a) elect in writing (the "**Orlando Lease Option**") to enter into a lease (the "**Orlando Lease Option**") of the Orlando Property for $9,100.00 (subject to the same terms and conditions of the Brevard Properties leases (the "**Orlando Lease**")); or provide SummitBridge (or its designee or assignee) with peaceful possession of the Orlando Property, and the Debtors shall no longer be responsible for maintenance expenses accruing with respect to the Orlando Property after the delivery of peaceful possession by the Debtors, including taxes, insurance, utilities, and maintenance.  SummitBridge shall not be obligated with respect to, and the Debtors shall be responsible to pay (or to reimburse SummitBridge) for, all maintenance expenses relating to the Orlando Property for the period prior to the date that the Debtors deliver peaceful possession.  Prior to the Effective Date of this Settlement Agreement and delivery of peaceful possession of the Orlando Property, the Debtors, or any trustee, shall continue to maintain the Orlando Property in a commercially reasonable fashion.

28.     On the Effective Date of the Settlement Agreement, SummitBridge, THMIH and the

7

Operating Debtors shall enter into a Subordination Non-Disturbance and Attornment Agreement in the form attached to the Settlement Agreement as Exhibit "D" with respect to the Brevard County Properties which may be recorded in Brevard County property records by the Debtors, and with respect to the Orlando Property should the Debtors elect to lease the Orlando Property.

29.     The Debtors hereby agree to consent to the foreclosure of the Properties upon terms requested by SummitBridge. Attached to the Settlement Agreement as Exhibit "E" are agreed foreclosure judgments that SummitBridge may file to facilitate the foreclosure on the properties on or after the Effective Date of the Settlement Agreement. The Debtors shall promptly execute and deliver to SummitBridge any and all documents necessary in the view of SummitBridge to complete the foreclosures contemplated by this paragraph. The foreclosure judgments shall reference the Settlement Agreement and shall not include the retention of jurisdiction to enter deficiency judgments.

30.     Upon receipt of sale proceeds at the foreclosure of each of the Properties, SummitBridge's proofs of claim filed in the Bankruptcy Cases shall be reduced to reflect the net proceeds it receives for the applicable property sold; provided however, that such sale proceeds received by SummitBridge shall not impact or otherwise be applied to any obligations under or with respect to the Exit Notes or reduce the amount of the SummitBridge Allowed Unsecured Claim (defined in paragraph 21(e) of the Settlement Agreement) except to the extent provided in paragraph 21(g) of the Settlement Agreement, and provided, however, any subordinate lienholder shall retain its rights under state law, if any, to receive proceeds in connection with a foreclosure sale solely to the extent required by any subordination agreement and under applicable state law.

31.     The pre-petition real estate taxes on the Properties (or any certificate evidencing such taxes) shall be paid by SummitBridge in connection with the applicable foreclosure of the Properties.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336
31777209 v1

The post-petition real estate taxes on the Orlando Property, shall be paid by Debtors upon the delivery of peaceful possession of this Property pursuant to the Settlement Agreement. Debtors shall pay to SummitBridge an amount equal to the prorated 2018 real estate taxes less $6,501.00.

32.     Notwithstanding anything to the contrary in the Settlement Agreement, SummitBridge's pre-petition notes and mortgages (attached to SummitBridge's proofs of claim filed in the Bankruptcy Cases) shall remain in place to allow for the foreclosure of the Properties by SummitBridge. Accordingly, SummitBridge shall be entitled to assert in the foreclosure actions the SummitBridge Allowed Claim plus any interest, fees and other amounts that may be owed under applicable law under such pre-petition notes, mortgages and other agreements that are not included in the SummitBridge Allowed Claim. For purposes of the foreclosures of the Properties, SummitBridge may utilize for purposes of credit bidding any or all of the SummitBridge Allowed Claim, provided, however, that the amount of the SummitBridge Allowed Claim will be reduced as set forth in this paragraph by the net amount that SummitBridge receives or credit bids, as applicable, in connection with such sales. There shall be no reduction in the SummitBridge Allowed Unsecured Claim or the Exit Notes on account of credit bids and net proceeds of the foreclosures on the Properties if they total less than $4,500,000. After the first $4,500,000 of net proceeds or credit bids, as applicable, there will be a reduction to the extent of the excess amount of the credit bids or the net proceeds to the SummitBridge Unsecured Claim until it has been fully satisfied and, thereafter, to the extent applicable, the balance under Exit Note B and, thereafter, to the extent of additional amounts, Exit Note A.

33.     Except with respect to liens limited to newly acquired equipment under equipment leasing or equipment financing agreements, and liens that are subordinate in all respects to the liens of SummitBridge, until SummitBridge has been paid in full the amount provided for in any plan

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336
31777209 v1

confirmed in the Bankruptcy Cases, no liens or security interests, of any sort shall be granted with respect to any property of the Debtors or their bankruptcy estates without the consent of SummitBridge, which consent shall not be unreasonably withheld. As a condition to the granting of any such liens by the Debtors, the proposed lienholder shall execute a subordination/inter-creditor agreement in form and substance satisfactory to SummitBridge in its sole and absolute discretion.

34.    For the period between the Effective Date of the Settlement Agreement until the effective date of a Plan in the Bankruptcy Cases, if Debtors have adequate capital to make such payments and Dr. Trespalacios is working full time for Debtors, Dr. Trespalacios may receive gross compensation from the Debtors of up to $20,000 per month. However, if Dr. Trespalacios is paid any compensation during the foregoing time period, Debtors shall simultaneously pay SummitBridge an adequate protection payment, to be applied to reduce the SummitBridge Allowed Unsecured Claim (defined in paragraph 21(e)) in these cases equal to one-half of the gross compensation paid to Dr. Trespalacios.

35.    In connection with the State Court Action, Dr. Trespalacios will execute a consent judgment in the amount of $11,497,553.47 in the form attached to the Settlement Agreement as Exhibit "F". The consent judgment will be held by SummitBridge and only submitted to the State Court for entry upon a breach or default under the Settlement Agreement after seven days written notice. Upon a motion filed within such seven day notice period, the Bankruptcy Court shall retain jurisdiction to determine whether a default has occurred and whether judgment should be entered.

36.    Any plan confirmed in these Bankruptcy Cases (including the Plan) shall incorporate and be in all respects consistent with the following:

a.    For purposes of consideration of any issues in connection with confirmation of any plan in the Bankruptcy Cases (including issues under Sections 506 and 1129 of the Bankruptcy

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336
31777209 v1

Code), the Other SummitBridge Collateral has a value of no less than $1,000,000.

      b.      Pursuant to any plan confirmed in the Bankruptcy Cases, SummitBridge shall receive payment in connection with its lien on the Other SummitBridge Collateral pursuant to two notes secured by the Other SummitBridge Collateral, referred to herein as "Exit Note A" and "Exit Note B" and attached to the Settlement Agreement as Exhibits "G" and "H". Exit Note A and Exit Note B shall be executed and delivered by the Debtors to SummitBridge as a condition precedent to the effective date of any plan confirmed in the Bankruptcy Cases.

      c.      To secure payment of Exit Note A and Exit Note B, the Debtors shall execute a security agreement (reflecting security interest on all property of the Debtors) (the "New Security Agreement" in the form attached to the Settlement Agreement as Exhibit "I".

      d.      On the effective date of a plan confirmed in the Bankruptcy Cases, as a condition to the effective date, Dr. Trespalacios shall absolutely and unconditionally guaranty Exit Note A and Exit Note B (and if SummitBridge provides the Exit Financing, the Exit Financing Note) by executing and delivering to SummitBridge a Guaranty Agreement in the form attached to the Settlement Agreement as Exhibit "J" (the "New Guaranty Agreement").

      e.      SummitBridge shall also have an allowed general unsecured claim in the amount of $6,000,000 (the "SummitBridge Allowed Unsecured Claim"). The treatment of the SummitBridge Allowed Unsecured Claim under any plan confirmed in the Bankruptcy Cases shall be the same as all other general unsecured claims; provided, however, that any distribution to SummitBridge as a general unsecured creditor shall be applied to whichever of the then outstanding Exit Notes bears the highest interest rate and shall be applied in accordance with the terms of the applicable note.

      f.      The SummitBridge Allowed Unsecured Claim shall continue to be fully

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336
31777209 v1

enforceable and secured by the Properties until they have been foreclosed as contemplated by the Settlement Agreement.

g.        In connection with the foreclosures of the Properties, SummitBridge may utilize for purposes of credit bidding any or all of the SummitBridge Allowed Claim, provided, however, that the amount of the SummitBridge Allowed Claim will be reduced as set forth in this paragraph by the net amount that SummitBridge receives or credit bids, as applicable, in connection with such foreclosures. There shall be no reduction in the SummitBridge Allowed Unsecured Claim, Exit Note A or Exit Note B on account of credit bids and net proceeds of the foreclosures on the Properties if they total less than $4,500,000. After the first $4,500,000 of net proceeds or credit bids, as applicable, there will be a reduction to the extent of the excess amount of the credit bids or the net proceeds, as applicable, to the SummitBridge Allowed Unsecured Claim until it has been fully satisfied and, thereafter, to the extent applicable, the balance under Exit Note B and, thereafter, to the extent of any additional amounts, Exit Note A.

h.        If the Debtors elect to receive the $250,000 of exit financing offered by SummitBridge, as a condition to such financing, the treatment of the Claims of SummitBridge in connection with the plan in the Bankruptcy Cases shall be consistent in all respects with the Exit Financing Supplement attached to the Settlement Agreement as Exhibit "A", which shall be incorporated in its entirety into the plan. Any such election shall be made at the time that the Debtors file the applicable plan and disclosure statement. If the Debtors elect to receive the Exit Financing, the plan shall provide that: "Nothing in this Plan is intended to be inconsistent with, or shall in any way be interpreted in a manner inconsistent with, the Settlement Agreement approved pursuant to the Settlement Approval Order, Docket No. ____ and the Exit Financing Supplement attached to the Settlement Agreement as Exhibit "A", both of which are incorporated herein in their entirety. Nothing

12

contained in the Plan or the Confirmation Order shall be interpreted in a manner inconsistent with the Exit Financing Supplement." The confirmation order with respect to any such plan shall also contain the foregoing language.

37.     To the extent that there is voting to accept or reject a plan that incorporates the Exit Financing Supplement and the plan is consistent in all respects with Exit Financing Supplement and the Settlement Agreement, SummitBridge agrees: (a) to affirmatively support the plan by attending the Disclosure Hearing and the plan Confirmation hearing and affirmatively support the plan; (b) advocate for the overruling of any objections at the hearing that the Debtors also seek to have overruled; and (c) to vote each of its Claims to accept a plan by delivering its duly executed and completed ballot(s) accepting the plan on a timely basis following the commencement of solicitation and its actual receipt of the solicitation materials and ballot, (provided that the disclosure statement and the solicitation materials in each case are approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code).

38.     SummitBridge shall have no obligation to provide the Exit Financing or to support the plan if (i) the effective date of such plan does not occur on or before January 1, 2019, (ii) either the plan or the Confirmation Order do not contain the language referred to in paragraph 22 of the Settlement Agreement, or (iii) the plan is inconsistent in any manner with the Settlement Agreement or the Exit Financing Supplement.

39.     If a plan consistent with the Settlement Agreement is not confirmed with an effective date occurring on or prior to January 1, 2019, then the Bankruptcy Cases shall be dismissed. In the event of dismissal, SummitBridge shall not provide Exit Financing and the Debtors shall not execute the Exit Notes and associated security agreements. The order dismissing the Bankruptcy Cases shall provide for the bar on subsequent bankruptcy filings contained in paragraph "27" of the Settlement

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336
31777209 v1

Agreement.

40.     The Settlement Agreement shall be binding upon the Debtor Parties and any subsequently appointed Chapter 11 or Chapter 7 trustee and shall be enforceable by SummitBridge against the Debtor Parties and their bankruptcy estates both during these Bankruptcy Cases and, if applicable, after conversion to Chapter 7 or dismissal of the Bankruptcy Cases.

41.     If the Bankruptcy Cases are dismissed for any reason whatsoever, Debtors shall be prohibited from filing a new voluntary bankruptcy case for a period of two years from the date of dismissal, and in the event of any new voluntary bankruptcy filing by the Debtors during such two-year period, the new case or cases shall be dismissed, and SummitBridge shall have prospective relief from the automatic stay to pursue and enforce its rights and remedies.

42.     The Settlement Agreement also provides for releases among the Parties and of Dr. Trespalacios as well as other provisions common to settlement agreements. The attachments to the Settlement Agreement, including, *inter alia*, the Exit Financing Supplement, also contain terms material to the settlement.

### Relief Requested

43.     The Debtors recommend approval of the Settlement Agreement because it is fair and reasonable, falls within the range of possible litigation outcomes, and is in the best interest of the estates because full settlement precludes any risks associated with continued litigation on several fronts. The Debtors, therefore, respectfully requests that the Court enter an order granting this Motion and approving the Settlement Agreement.

44.     "Settlements are generally favored in bankruptcy proceedings, in that they provide for an often needed and efficient resolution of the bankruptcy case" *In re Mavrode*, 205 B.R. 716, 719 (Bankr. D.N.J. 1997); *see also In re Stein*, 236 B.R. 34, 37 (D. Or. 1999) ("Pursuant to Bankruptcy

14

Rule 9019(a), compromises are favored in bankruptcy …"). The Supreme Court has held that compromises and settlements in bankruptcy should be approved if they are "fair and equitable." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

45.    Bankruptcy Rule 9019(a) provides: "On motion … and after notice and a hearing, the court may approve a compromise or settlement."

46.    "[A]pproval of a settlement in a bankruptcy proceeding is within the sound discretion of the Court, and will not be disturbed or modified on appeal unless approval or disapproval is an abuse of discretion." *In re Arrow Air, Inc.*, 85 B.R. 886, 891 (Bankr. S.D. Fla. 1988). The test is whether the proposed settlement "falls below the 'lowest point in the range of reasonableness.'" *Id.* (internal citations omitted). *See also In re Martin*, 490 F.3d 1272, 1275 (11th Cir. 2007). If the settlement does not fall below the lowest point in the range of reasonableness, the Court should approve the settlement.

47.    In order to evaluate whether to approve a settlement, the Court must consider the factors set forth by the Eleventh Circuit in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990):

    a.    the probability of success in the litigation;

    b.    the difficulties, if any, to be encountered in the matter of collection;

    c.    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

    d.    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

48.    **Probability of Success.** The Debtors and SummitBridge are involved in two separate

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336
31777209 v1

adversary proceedings and several pending contested matters set for trial on July 25-26. Additionally, the State Court Action against Dr. Trespalacios remains pending. The Parties are each confident in their respective positions in connection with Avoidance Adversary Proceeding, the Second Motion to Dismiss or Convert, the Rent Motion, the Substantive Consolidation Adversary Proceeding, and plan confirmation, but the nature of such complex litigation is such that the ultimate results of each separate matter are uncertain.

49.    **Collection Difficulty.** Notwithstanding that SummitBridge may be collectible, it would likely appeal any significant ruling against it, making collectability a costly and uncertain prospect.

50.    **Complexity/Cost of Litigation.** The several disputes the Parties propose to compromise and resolve by way of the Settlement Agreement present legal and factual issues of substantial complexity that, if litigated to their conclusion, would take weeks and possibly months of Court time, impose extensive litigation costs upon the Debtors' bankruptcy estates and would delay administration of the case and confirmation of a plan. The cost savings achieved by the Parties' resolution weighs heavily in favor of settlement.

51.    **Interests of Creditors.** Analysis of the foregoing components makes clear that approval of the Settlement Agreement is in the best interests of the Debtors' estates and creditors. In particular, the Settlement Agreement provides an end to the costly and protracted litigation with SummitBridge and allows for exit financing to enable the Debtor to pay administrative creditors and fund operations.

52.    Applying each of these factors to the circumstances of this case, the Settlement Agreement falls well above the lowest point in the range of reasonableness, and accordingly, should be approved. The Settlement Agreement is the product of judicially mediated negotiations between

Aaronson Schantz Beiley P.A. | One Biscayne Tower | 2 S. Biscayne Blvd., 34th Floor | Miami, Florida 33131 | Ph 786.594.3000 | Fax 305.424.9336
31777209 v1

the Parties, including the exchange of legal theories, documents, multiple settlement drafts, multiple meetings, an exhaustive amount of telephone calls, and countless correspondence. The Settlement Agreement resolves all of the pending disputes between the Parties without the need for continued protracted, costly, and uncertain litigation, and will likely provide for a consensual plan confirmation process.

### Conclusion

53.    In sum, the Settlement Agreement avoids lengthy, burdensome, and expensive litigation and is a reasonable compromise of the claims asserted by and between SummitBridge and the Debtors. Accordingly, the Debtors assert that the Settlement Agreement satisfies all of the *Justice Oaks II* factors and request that the Settlement Agreement and the other relief requested in this Motion be approved in their entirety.

WHEREFORE, the jointly administered Debtors, BREVARD EYE CENTER, INC., BREVARD SURGERY CENTER, INC., MEDICAL CITY EYE CENTER, P.A., and THMIH, INC., respectfully request entry of the proposed Order attached hereto as Exhibit "A" granting the instant Motion, approving the Settlement Agreement, and for other and further relief the Court deems just and proper.

Respectfully submitted,

**Aaronson Schantz Beiley P.A.**

/s/ Geoffrey S. Aaronson
Geoffrey S. Aaronson, Esq.
Florida Bar No. 349623
gaaronson@aspalaw.com
Samuel J. Capuano, Esq.
Florida Bar No. 90946
scapuano@aspalaw.com
One Biscayne Tower
2 S. Biscayne Blvd., 34th Floor
Miami, Florida 33131

17

Ph: 786.594.3000
Fax: 305.424.9336
*Attorneys for Debtors*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing will be furnished through the Court's CM/ECF system on June 18, 2018 via email to all CM/ECF electronic notice parties as set forth on the electronic mail notice list below and via U.S. Mail to all parties on the attached service list.

- **Geoffrey S Aaronson** gaaronson@aspalaw.com
- **Steven M Berman** sberman@slk-law.com
- **Samuel J Capuano** scapuano@aspalaw.com
- **Ryan E Davis** rdavis@whww.com, thiggens@whww.com;thiggens@ecf.courtdrive.com
- **Kevin C Gleason** KGPAECMF@AOL.COM
- **Alan C Hochheiser** ahochheiser@mauricewutscher.com
- **Phillip M Hudson** pmhudson@arnstein.com, hpiloto@arnstein.com;cofalla@arnstein.com;mslopez@arnstein.com;ccontreras-martinez@arnstein.com;amclaughlin@arnstein.com
- **Brett A Hyde** brett@uslegalteam.com
- **Jill E Kelso** jill.kelso@usdoj.gov
- **Hector E Lora** hlora@mauricewutscher.com, litigation@mwbllp.com
- **Richard J McIntyre** rich@mcintyrefirm.com, nichola@mcintyrefirm.com;sandy@mcintyrefirm.com;blake@mcintyrefirm.com
- **Tamara D McKeown** tmckeown@aspalaw.com
- **Kevin H Morse** khmorse@arnstein.com
- **Harley E Riedel** hriedel.ecf@srbp.com, srbpecf@srbp.com
- **Richard A Robinson** rrobinson@burr.com, debankruptcy@burr.com
- **Lawrence M Schantz** lschantz@aspalaw.com
- **James E Shepherd** shepherd@fbl-law.com, service@fbl-law.com
- **Jonathan Sykes** jsykes@burr.com, ccrumrine@burr.com;lloving@burr.com
- **United States Trustee - ORL** USTP.Region21.OR.ECF@usdoj.gov

/s/ Geoffrey S. Aaronson
Geoffrey S. Aaronson, Esq.

AARONSON SCHANTZ BEILEY P.A. | ONE BISCAYNE TOWER | 2 S. BISCAYNE BLVD., 34TH FLOOR | MIAMI, FLORIDA 33131 | PH 786.594.3000 | FAX 305.424.9336
31777209 v1

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

BREVARD EYE CENTER, INC.                 Case No. 6:17-bk-01828-RAC
                                         Chapter 11

                                         Jointly Administered With

BREVARD SURGERY CENTER, INC.,            Case No.: 6:17-bk-01829-RAC

MEDICAL CITY EYE CENTER, P.A.,           Case No.: 6:17-bk-01830-RAC

THMIH, INC.,                             Case No.: 6:17-bk-01831-RAC

         Debtors.
_____/

**ORDER (I) APPROVING SETTLEMENT PURSUANT TO
BANKRUPTCY RULE 9019, (II) MODIFYING THE AUTOMATIC STAY, AND (III)
GRANTING RELATED RELIEF**

Upon the motion, dated June 18, 2018, of the jointly administered Debtors, BREVARD

EYE CENTER, INC. ("BEC"), BREVARD SURGERY CENTER, INC. ("BSC"), MEDICAL

CITY EYE CENTER, P.A. ("MCEC"), AND THMIH, INC. ("THMIH") (collectively, the

"Debtors"), for entry of an order pursuant to sections 105(a), 363(b) and 362(d) of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 4001(a) and 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (A) approving the Settlement[1] set forth in the Settlement Agreement, substantially in the form attached to the Motion, by and among (i) Brevard Eye Center, Inc., Brevard Surgery Center, Inc., Medical City Eye Center, P.A., and THMIH, Inc. (the "Debtors"), and (ii) SummitBridge National Investments V LLC ("SummitBridge"), creditor and party in interest (collectively, the "Parties"); and (B) modifying the automatic stay as to the Properties (the ("Settlement Motion"); and

Upon consideration of the Settlement Motion, any objections thereto, briefs and arguments of counsel, and due and proper notice of the Motion having been provided to all parties in interest, and it appearing that the notice of the Motion is sufficient, adequate, and timely under the circumstances of this case and that no other or further notices need be provided; and a reasonable opportunity to object or be heard regarding the motion having been given to all such parties; and a full and fair opportunity having been afforded to litigate all issues raised in all objections, or which might have been raised, and all objections having been fully and fairly litigated;

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted in all respects.

2.      The Settlement described in the Motion and Settlement Agreement is authorized and approved pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3.      The Debtors are authorized to enter into the Settlement Agreement, and take all actions reasonably necessary to consummate the Settlement Agreement and perform all obligations contemplated therein.

---

[1] Capitalized terms in this Order shall have the meaning given to such terms in the Settlement Agreement.

4.      To the extent it applies, the automatic stay imposed by section 362(a) of the Bankruptcy Code is modified to permit the enforcement and consummation of the Settlement Agreement in all respects.

5.      The automatic stay imposed by Section 362(a) is hereby immediately lifted, modified, and terminated to allow SummitBridge to exercise any or all of its rights and remedies under applicable law concerning the Properties, including, but not limited to, completion of foreclosure sales and issuances of certificates of title.

6.      All leases and purchases of property that are being entered into in connection with the Settlement Agreement are being entered into and consummated by the parties thereto in good faith within the meaning of Section 363(m) of the Bankruptcy Code and, accordingly, the Settlement Agreement and the parties thereto shall be afforded the protections of Section 363(m) of the Bankruptcy Code.

9.       In the event that the Bankruptcy Cases are dismissed, the Debtors are barred from filing new voluntary bankruptcy cases for a period of two years after the date of dismissal.

7.      The Court shall retain jurisdiction to (i) enforce and implement the terms and provisions of the Agreement and resolve disputes thereunder, and (ii) implement and enforce the provisions of this Order.

8.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

9.      This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a). To the extent applicable, the stays under Bankruptcy Rules 4001(a)(3) and 6004(h) are hereby waived.  The Settlement Motion

provides reasonable notice of the provisions of the Settlement Agreement and opportunity for a

hearing, and therefore, the procedural requirements of Bankruptcy Rule 4001(d), to the extent not

satisfied, are hereby waived.

###

Submitted by:

Richard A. Robinson, Esq.
Florida Bar No. 41238
Jonathan M. Sykes, Esq.
Florida Bar No. 73176
Burr & Forman LLP
200 South Orange Avenue
Suite 800
Orlando, Florida  32801
Telephone: 497-540-6600
Telefax: 407-540-6601
rrobinson@burr.com
jsykes@burr.com
*Attorneys for Creditor, SummitBridge National Investments V LLC*


Attorney Sykes is directed to serve a copy of this Order on all interested
parties and to file a proof of service within three days of entry of the Order.

# EXHIBIT "B"

## SETTLEMENT AGREEMENT

   This Settlement Agreement (the "**Settlement Agreement**") is entered into on June 18, 2018, by and among (i) Brevard Eye Center, Inc. ("**BEC**"), Brevard Surgery Center, Inc. ("**BSC**"), Medical City Eye Center, P.A. ("**MEC**" and together with BEC and BSC, the "**Operating Debtors**"), and THMIH, Inc. ("**THMIH**", and together with the Operating Debtors, collectively, the "**Debtors**"), and Dr. Rafael Trespalacios ("**Dr. Trespalacios**", and together with the Debtors and each of their bankruptcy estates, the "**Debtor Parties**"), on the one hand, and SummitBridge National Investments V LLC ("**SummitBridge**").

Recitals

   A.  WHEREAS, on March 20, 2017, SummitBridge filed a Verified Complaint against the Debtor Parties and Steven Black in the Circuit Court in and for Orange County, Florida (the "**State Court**"), styled *SummitBridge National Investments V LLC v. Dr. Rafael Trespalacios*, et al., case no. 2017-CA-2483 (the "**State Court Action**"), seeking, among other things, foreclosure of mortgages and security agreements against real and personal property of the Debtor Parties in Orange and Brevard Counties;

   B.  WHEREAS, on March 21, 2017 ("**Debtors Petition Date**"), the Debtors filed voluntary bankruptcy cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**"), which are being jointly administered under the lead case *In re Brevard Eye Center, Inc.*, case no. 6:17-bk-01828-KSJ (collectively, the "**Bankruptcy Cases**");

   C.  WHEREAS, on May 24, 2017, the Debtors filed the adversary proceeding in the Bankruptcy Cases, which is styled *Brevard Eye Center, Inc.*, et al. *v. SummitBridge National Investments V LLC*, adv. pro. no. 6:17-ap-00070-KSJ (the "**Avoidance Adversary Proceeding**"), seeking, among other things, avoidance of certain liens and claims held by SummitBridge and the return of certain property from SummitBridge;

   D.  WHEREAS, on August 17, 2017, SummitBridge filed in the Bankruptcy Cases the Emergency Motion to Dismiss or Convert Cases seeking to dismiss or convert these Chapter 11 cases ("**SummitBridge's First Motion to Dismiss/Convert**") [ECF 240];

   E.  WHEREAS, on October 19, 2017, the Debtors filed in the Bankruptcy Cases a Plan of Reorganization [ECF 343];

   F.  WHEREAS, on November 14, 2017, Judge Roberta Colton denied without prejudice SummitBridge's First Motion to Dismiss/Convert [ECF 373];

   G.  WHEREAS, on December 28, 2017, SummitBridge filed in the Bankruptcy Cases the Renewed Motion to Dismiss or Convert Cases at docket entry 403 in the Bankruptcy Case (the "**Second Motion to Dismiss or Convert**");

1

H.      WHEREAS, on February 26, 2018, SummitBridge filed in the Bankruptcy Cases the Motion for Derivative Standing to File and Pursue an Administrative Claim and To Enforce Leasehold and Other Rights on Behalf of the THMIH, Inc., or in the Alternative, for Appointment of Trustee for THMIH (the "**Rent Motion**"), at docket entry 462 in the Bankruptcy Case;

I.      WHEREAS, on April 9, 2018, SummitBridge filed the adversary proceeding in the Bankruptcy Cases, which is styled *SummitBridge National Investments V LLC v. Brevard Eye Center, Inc.*, et al., adv. pro. no. 6:18-ap-00028-KSJ (the "**Substantive Consolidation Adversary Proceeding**"), seeking, among other things, substantive consolidation of the Debtors;

J.      WHEREAS, the Debtors intend to reorganize pursuant to confirmation of an amended joint chapter 11 plan of reorganization to be filed in the Bankruptcy Cases (prior to and after confirmation, any chapter 11 plan concerning the Debtors or their bankruptcy estates, the "**Plan**" or the "**Plan of Reorganization**");.

K.      WHEREAS, the Parties have engaged in judicial mediation in an attempt to resolve all claims among them;

L.      WHEREAS, the Parties hereto have engaged in extensive negotiations with the assistance of counsel and the mediator, and have concluded that the execution and performance by them of this Settlement Agreement will avoid protracted and expensive litigation, and acknowledge that they are receiving a substantial and valuable benefit if the settlements contained herein are consummated; and

NOW, THEREFORE, for good and valuable consideration, including but not limited to the releases and other consideration provided for herein, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1.      Recitals.  The recitals set forth above constitute an integral part of this Settlement Agreement, evidencing the intent of the Parties in executing this Settlement Agreement, and describing the circumstances surrounding its execution. This Settlement is an effort to resolve, *inter alia,* all the matters set forth in the recitals.

2.      Definitions.  In addition to the defined terms above and hereafter in this Settlement Agreement, the following capitalized terms used in this Settlement Agreement shall have the meanings specified below:

a.      "Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §101, *et seq.*

b.      "Brevard County Properties" shall mean the real property that constitutes property of any or all of the bankruptcy estates of the Debtor Parties located in Melbourne and Merritt Island, Florida.  The Brevard County Properties include the real property located at 250 North Courtenay Parkway, Merritt Island, Florida 32953 (the "**Merritt Island Property**"), and the real property located at 665 S. Apollo Boulevard, Melbourne, Florida 32901 (the "**Melbourne Property**").

2

c.    "Claims" means any and all manner of claims, demands, rights, actions, potential actions, causes of action, liabilities, duties, damages, losses, surcharges, equities of the case, diminutions in value, obligations, judgments, decrees, matters, issues, suits and controversies of any kind or nature whatsoever, whether known or unknown, contingent or absolute, liquidated or not liquidated, accrued or accrued, suspected or unsuspected, disclosed or undisclosed, apparent or not apparent, foreseen or unforeseen, matured or not matured, which now exist, or heretofore or previously existed, or may hereafter exist, including, but not limited to, any claims arising under federal, state or foreign law, common law, bankruptcy law, statute, rule or regulation, or agreement, whether individual, class, direct, derivative, representative, on behalf of others, legal, equitable, regulatory, governmental or of any other type or in any other capacity.

d.    "Effective Date of this Settlement Agreement" shall mean the date on which the last "Condition Precedent" of paragraph 5 of this Settlement Agreement has occurred.

e.    "Exit Financing" shall have the meaning given to such term in the Exit Financing Supplement attached hereto as Exhibit "A".

**f.    "Exit Notes" shall have the meaning given to such term in the Exit Financing Supplement attached hereto as Exhibit "A".**

g.    "Final Order" means an order as to which the time to appeal has expired and there is no stay pending appeal of the order.

h.    "Orlando Property" shall mean the real property that constitutes property of any or all of the bankruptcy estates of the Debtors located in Orlando, Florida.  The Orlando Property includes the real property located at 214 East Marks Street, Orlando, Florida 32803.

i.    "Parties" means the Debtor Parties and SummitBridge.

j.    "Properties" shall mean the Brevard County Properties and the Orlando Property.

k.    "Settlement" shall mean the terms of this Settlement Agreement and the Exit Financing Supplement, which is incorporated herein by reference.

l.    "Settlement Approval Order" means the order substantially in the form attached hereto as Exhibit B, to be entered by the Bankruptcy Court, which, *inter alia,* (i) approves this Settlement Agreement and the transactions contemplated hereby, (ii) lifts, modifies and terminates the automatic stay immediately as to the Properties, (iii) bars the filing of a new voluntary bankruptcy case by the Debtors for a period of two years after dismissal of the Bankruptcy Cases pursuant to paragraph 9 thereof, and (iv) authorizes the use, sale and lease of the estate property pursuant to Section 363 of the Bankruptcy Code consistent with this Settlement Agreement and contains the protections afforded by Section 363(m) of the Bankruptcy Code.

m.    "Exit Financing Supplement" shall mean the document attached hereto as Exhibit "A".

3.    <u>Rule of Construction.</u>  Reference to the "Debtors", "SummitBridge" or any other individual or entity shall include its/their predecessors, successors and or assigns, and with regard to the Debtors, any such reference, shall include their bankruptcy estates, and the Debtors as reorganized pursuant to a chapter 11 plan on and after the Effective Date.

4.    <u>Settlement Approval Order.</u>  On or before June 18, 2018, the Debtors shall file with the Bankruptcy Court a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for approval of this Settlement Agreement and entry of the Settlement Approval Order (the "**Motion to Compromise**") in form and substance satisfactory to SummitBridge. The Debtors will use best efforts to secure a Final Order approving this Settlement Agreement in the form of the Settlement Approval Order (notwithstanding the filing of any objections to approval of the Settlement Agreement on any ground whatsoever), and the Debtors and SummitBridge will not disparage or undermine, in any court, this Settlement Agreement, the Settlement or approval of the Settlement.  This Settlement Agreement shall be null and void and of no force and effect unless it is signed by all of the Parties on or before June 18, 2018 and the Motion to Compromise is filed on or before June 18, 2018.

5.    <u>Conditions Precedent.</u>  This Settlement Agreement shall become effective on the date the last of the following has occurred:

(a)    This Settlement Agreement is executed by all of the Parties on or before June 18, 2018;

(b)    The Motion to Compromise is filed on or before June 18, 2018;

(c)    The Bankruptcy Court enters the Settlement Approval Order on or before July 31, 2018; and

(d)    The Settlement Approval Order has become a Final Order.

**Confirmation of a plan in the Bankruptcy Cases is not a condition precedent to the effectiveness of the Settlement, or the entry of the Settlement Approval Order.  This Settlement Agreement and the Settlement Approval Order shall be enforceable irrespective of whether a plan is confirmed in these Bankruptcy Cases.**

6.    <u>Allowance of SummitBridge's Senior Secured Claims in The Bankruptcy Cases.</u> SummitBridge's claims are allowed in the amount of $11,497,553.47 in each of the four bankruptcy cases of the Debtors (the "**SummitBridge Allowed Claim**").  SummitBridge holds a first priority lien and security interest on the Properties, subject only to the liens held on account of real estate taxes.  SummitBridge also holds a first priority lien and security interest on all non-real estate property of the Debtors, including without limitations, accounts receivable, furnishing, fixtures and equipment (the "**Other SummitBridge Collateral**"), subject only to certain of the property

4

owned by the Debtors as of the Debtors Petition Date that is subject to equipment leasing or equipment financing agreements.

7. <u>Dismissal of the Avoidance Adversary Proceeding.</u>  Upon the Effective Date of this Settlement Agreement, the parties will file stipulations for the dismissal with prejudice of the Avoidance Adversary Proceeding.

8. <u>Withdrawal of the Second Motion to Dismiss or Convert, Dismissal of the Substantive Consolidation Adversary Proceeding and Withdrawal of the Rent Motion.</u>  Upon the Effective Date of this Settlement Agreement, SummitBridge shall withdraw the Second Motion to Dismiss or Convert, dismiss the Substantive Consolidation Adversary Proceeding, and withdraw the Rent Motion.

9. <u>Triple Net Leases.</u>  Upon the Effective Date of this Settlement Agreement, the Operating Debtors shall jointly and severally enter into triple net leases with THMIH requiring the payment by the tenant of all obligations of any sort (including insurance, real estate taxes, normal maintenance, etc.) in the form attached hereto as Exhibit "C" (the "**Leases**") with respect to the Brevard County Properties commencing on the Effective Date of this Settlement Agreement. Exhibit "C" is the form of the Lease for the Melbourne Property, and the form of the Lease for the Merritt Island Property will be in the same form as Exhibit "C," except that it will be modified to the extent necessary to reference the location of the Merritt Island Property instead of the Melbourne Property. For purposes of this Settlement Agreement, the Leases shall include the Orlando Lease if the Orlando Lease Option is exercised.  The original executed Leases shall be delivered to SummitBridge.  On and after the Effective Date of this Settlement Agreement, the Leases and rents to be paid thereunder are absolutely and unconditionally transferred and assigned to SummitBridge, and shall not be property of the Debtors or their bankruptcy estates. To the extent required by SummitBridge, all of Debtors shall absolutely and unconditionally guaranty the Leases.  The lease for the Merritt Island Property shall only relate to the portion of the building that are currently being used by Debtors (approximately 4,786 square feet on the first floor).  The Leases shall be for a five-year term, shall include COL increases yearly, and may be extended for one single 5-year term on notice of 180 days or more prior to expiration.  Absent the express written consent of SummitBridge, the Leases shall not be assigned or sublet by any of the parties thereto, which consent will not be unreasonably withheld. For avoidance of doubt, any assignment or sublease proposed by a party for a use in any manner concerning marijuana, or for use other than the current use (namely, ophthalmology and eye care), will not be permitted. The Debtors shall not amend or modify the Leases in any respect without prior written consent of SummitBridge.

10. <u>Merritt Island Third Party Rent.</u>  The Debtors may retain all rents paid by the existing third party tenant at the Merritt Island Property in the amount of  not more than  $1,500.00 per month though the rent due for December 31, 2018 (but shall not be entitled to retain any pre-paid rent for any period after December 31, 2018).  Any rent paid after December 31, 2018 with respect to the Merritt Island Property (except for any unpaid rent due through December 31, 2018 relating to any period of occupancy prior thereto) and rent relating to use and occupancy of such property for any period after December 31, 2018, shall not be accepted by the Debtors and, along with any rights to collect such rent, shall be the property of SummitBridge.

31767497 v1

11.    <u>Lifting of the Automatic Stay Upon the Effective Date of the Settlement Agreement.</u>  Upon the Effective Date of this Settlement Agreement, the automatic stay is lifted, terminated and modified to permit SummitBridge to pursue its state law rights and remedies concerning the Properties, including without limitation, foreclosure of the Properties.

12.    <u>The Orlando Property.</u>  On or before the earlier of the entry of foreclosure judgment or September 30, 2018 (without any possibility of extension), the Debtors will either (a) elect in writing (the "**Orlando Lease Option**") to enter into a lease (the "**Orlando Lease Option**") of the Orlando Property for $9,100.00 (subject to the same terms and conditions of the Brevard Properties leases (the "**Orlando Lease**")); or provide SummitBridge (or its designee or assignee) with peaceful possession of the Orlando Property, and the Debtors shall no longer be responsible for maintenance expenses accruing with respect to the Orlando Property after the delivery of peaceful possession by the Debtors, including taxes, insurance, utilities, and maintenance. SummitBridge shall not be obligated with respect to, and the Debtors shall be responsible to pay (or to reimburse SummitBridge for), all maintenance expenses relating to the Orlando Property for the period prior to the date that the Debtors deliver peaceful possession.  Prior to the Effective Date of this Settlement Agreement and delivery of peaceful possession of the Orlando Property, the Debtors, or any trustee, shall continue to maintain the Orlando Property in a commercially reasonable fashion.

13.    <u>Foreclosures Shall be Subject to the Leases.</u>   On the Effective Date of this Settlement Agreement, SummitBridge, THMIH and the Operating Debtors shall enter into a Subordination Non-Disturbance and Attornment Agreement (the "SNDA") in the form attached hereto as Exhibit "D" with respect to the Brevard County Properties which may be recorded in Brevard County property records by the Debtors, and, if the Orlando Lease Option is timely exercised, with respect to the Orlando Property, in substantially the same form attached hereto as Exhibit "D"  (the "**Orlando SNDA**") which may be recorded in the Orange County property records by the Debtors.  The SNDA, Orlando SNDA, the Leases, and the Orlando Lease shall be subject to, and subordinate to, any existing liens on the Properties that are currently subordinate in lien priority to liens of SummitBridge on the Properties and will not impact the rights of any such subordinate lienholders.  The Debtors understand that a lienholder currently subordinate to SummitBridge with respect to the Properties may have the right to foreclose out either in the State Court Action or otherwise (and effectively eliminate) the Leases and the Orlando Lease, and terminate the Debtors' right to use and occupancy of the Properties, but despite that possibility and the possibility that the Debtors may not be able to continue to use any of the Properties, including the Orlando Property, after entry of the Settlement Approval Order and the timely exercise of the Orlando Lease Option, the Debtors will use best efforts to secure a Final Order approving this Settlement Agreement in the form of the Settlement Approval Order (notwithstanding the filing of any objections to approval of the Settlement Agreement on any ground whatsoever, including but not limited to an objection by a subordinate lienholder on the Orlando Property), and the Debtors and SummitBridge will not disparage or undermine, in any court, this Settlement Agreement, the Settlement or approval of the Settlement.

14.    <u>Consent to Foreclosure.</u>  The Debtors hereby agree to consent to the foreclosure and sale of the Properties in the State Court Action upon terms requested by SummitBridge.

Attached hereto as Exhibit "E" is a proposed draft of a stipulation and consent to foreclosure with a proposed draft of a stipulated consent foreclosure judgment that SummitBridge may file and submit in the State Court Action to facilitate the foreclosure of the Properties on or after the Effective Date of this Settlement Agreement. The Debtors shall promptly execute and deliver to SummitBridge any and all documents necessary in the view of SummitBridge to complete the foreclosure and sale of the Properties contemplated by this paragraph, including, but not limited to, a stipulation and consent to foreclosure judgment with a proposed stipulated and consent foreclosure judgment in substantially the same form as the drafts attached hereto as Exhibit "E." The Debtors further stipulate and consent to, and hereby waive, with prejudice, any defenses, objections or challenges to, any other action, and the execution and delivery of any other document or pleading, necessary in the view of SummitBridge to complete foreclosure and sale of the Properties, including, but not limited to, the filing and recordation of a notice of lis pendens against the Properties, an amended complaint adding additional parties or lienholders, the amendment or modification of the proposed drafts attached hereto as Exhibit "E," the credit bidding of any or all of the SummitBridge Allowed Claim, the transfer of the State Court Action or the commencement of a new foreclosure action in the Circuit Court in and for Brevard County, Florida, any actions required by a title insurance company to fully insure the transfer of title by foreclosure, and any actions required by a court of law to foreclose and sell the Properties. The foreclosure judgments shall reference this Settlement Agreement and shall not include the retention of jurisdiction to enter deficiency judgments.

15.    <u>SummitBridge's Entitlement to Sale Proceeds.</u>  Upon receipt of sale proceeds on account of the foreclosure sale of each of the Properties, SummitBridge's proofs of claim filed in the Bankruptcy Cases shall be reduced to reflect the net proceeds it receives for the applicable property sold; provided however, that such sale proceeds received by SummitBridge shall not impact or otherwise be applied to any obligations under or with respect to the Exit Notes or reduce the amount of the SummitBridge Allowed Unsecured Claim (defined in paragraph 21(e) hereof) except to the extent provided in paragraph 21(g) of this Settlement Agreement, and provided, however, any subordinate lienholder shall retain its rights under state law, if any, to receive proceeds in connection with a foreclosure sale solely to the extent required by any subordination agreement and under applicable state law.

16.    <u>Real Estate Taxes.</u>  The payment of pre-petition real estate taxes on the Properties (or any certificate evidencing such taxes) shall be the responsibility of the purchaser of the Properties at the foreclosure sale of the Properties.  The post-petition real estate taxes on the Brevard County Properties shall be paid by Debtors on the effective date of a Plan.  The post-petition real estate taxes on the Orlando Property shall be paid by Debtors upon the delivery of peaceful possession of the Orlando Property pursuant to this Settlement Agreement in an amount equal to the prorated 2018 real estate taxes <u>through the date of delivery of peaceful possession, less $6,501.00</u>.

17.    <u>Continuing Enforceability of SummitBridge's Pre-Petition Loan Documents.</u> Notwithstanding anything to the contrary in the Settlement Agreement, SummitBridge's pre-petition notes and mortgages (attached to SummitBridge's proofs of claim filed in the Bankruptcy Cases) shall remain in place to allow for the foreclosure of the Properties by SummitBridge. Accordingly, SummitBridge shall be entitled to assert in the foreclosure actions any or all of the

SummitBridge Allowed Claim plus any interest, fees and other amounts that may be owed under applicable law under such pre-petition notes, mortgages and other agreements that are not included in the SummitBridge Allowed Claim. SummitBridge may utilize for purposes of credit bidding at the foreclosure sales of the Properties any or all of the SummitBridge Allowed Claim, provided, however, that the amount of the SummitBridge Allowed Claim will be reduced as set forth in this paragraph by the net amount that SummitBridge receives or credit bids, as applicable, in connection with such sales. There shall be no reduction in the SummitBridge Allowed Unsecured Claim or the Exit Notes on account of credit bids and net proceeds of the foreclosures on the Properties if they total less than $4,500,000.  After the first $4,500,000 of net proceeds or credit bids, as applicable, there will be a reduction to the extent of the excess amount of the credit bids or the net proceeds to the SummitBridge Allowed Unsecured Claim until it has been fully satisfied and, thereafter, to the extent of additional amounts, the balance under Exit Note B and, thereafter, to the extent of additional amounts, the balance under Exit Note A.

18.    <u>Prohibition on Liens.</u>  Except with respect to liens limited to newly acquired equipment under equipment leasing or equipment financing agreements, and liens that are subordinate in all respects to the liens of SummitBridge, until SummitBridge has been paid in full the amount provided for in any plan confirmed in the Bankruptcy Cases, no liens or security interests, of any sort shall be granted with respect to any property of the Debtors or their bankruptcy estates without the consent of SummitBridge, which consent shall not be unreasonably withheld. As a condition to the granting of any such liens by the Debtors, the proposed lienholder shall execute a subordination/inter-creditor agreement in form and substance satisfactory to SummitBridge in its sole and absolute discretion.

19.    <u>Compensation of Dr. Trespalacios and Adequate Protection Payments to SummitBridge Between the Effective Date of the Settlement Agreement and the Effective Date of a Plan in the Bankruptcy Cases.</u>  For the period between the Effective Date of this Settlement Agreement until the effective date of a Plan in the Bankruptcy Cases, if Debtors have adequate capital to make such payments and Dr. Trespalacios is working full time for Debtors, Dr. Trespalacios may receive gross compensation from the Debtors of up to $20,000 per month. However, if Dr. Trespalacios is paid any compensation during the foregoing time period, Debtors shall simultaneously pay SummitBridge an adequate protection payment, to be applied to reduce the SummitBridge Allowed Unsecured Claim (defined in paragraph 21(e)) in these cases equal to one-half of the gross compensation paid to Dr. Trespalacios.

20.    <u>Consent Judgment Against Dr. Trespalacios in the State Court Action.</u>  In connection with the State Court Action, Dr. Trespalacios will execute a stipulation and consent to judgment in the amount of $11,497,553.47 in substantially the same form as the proposed draft stipulation and consent with proposed draft judgment attached hereto as Exhibit "F".  The stipulation and consent judgment will be held by SummitBridge and only filed and submitted in the State Court Action for entry upon a breach or default under this Settlement Agreement after seven days written notice.  Upon a motion filed within such seven day notice period, the Bankruptcy Court shall retain jurisdiction to determine whether a breach or default has occurred and whether judgment should be entered.

21.   <u>Treatment of SummitBridge's Claims in These Cases Under Any Plan.</u>  Any plan confirmed in these Bankruptcy Cases (including the Plan) shall incorporate and be in all respects consistent with the following:

(a)  For purposes of consideration of any issues in connection with confirmation of any plan in the Bankruptcy Cases (including issues under Sections 506 and 1129 of the Bankruptcy Code), the Other SummitBridge Collateral has a value of no less than $1,000,000.

(b)  Pursuant to any plan confirmed in the Bankruptcy Cases, SummitBridge shall receive payment in connection with its lien on the Other SummitBridge Collateral pursuant to two notes secured by the Other SummitBridge Collateral, referred to herein as "**Exit Note A**" and "**Exit Note B**" and attached hereto as Exhibits "G" and "H".  Exit Note A and Exit Note B shall be executed and delivered by the Debtors to SummitBridge as a condition precedent to the effective date of any plan confirmed in the Bankruptcy Cases.

(c)  To secure payment of Exit Note A and Exit Note B, the Debtors shall execute a security agreement (reflecting security interest on all property of the Debtors) (the "**New Security Agreement**" in the form attached hereto as Exhibit "I".

(d)  On the effective date of a plan confirmed in the Bankruptcy Cases, as a condition to the effective date, Dr. Trespalacios shall absolutely and unconditionally guaranty Exit Note A and Exit Note B (and if SummitBridge provides the Exit Financing, the Exit Financing Note) by executing and delivering to SummitBridge a Guaranty Agreement in the form attached hereto as Exhibit "J" (the "**New Guaranty Agreement**").

(e)  SummitBridge shall also have an allowed general unsecured claim in the amount of $6,000,000 (the "**SummitBridge Allowed Unsecured Claim**").   The treatment of the SummitBridge Allowed Unsecured Claim under any plan confirmed in the Bankruptcy Cases shall be the same as all other general unsecured claims; provided, however, that any distribution to SummitBridge as a general unsecured creditor shall be applied to whichever of the then outstanding Exit Notes bears the highest interest rate and shall be applied in accordance with the terms of the applicable note.

(f)  The SummitBridge Allowed Unsecured Claim shall continue to be fully enforceable and secured by the Properties until they have been foreclosed as contemplated by this Settlement Agreement.

(g)  In connection with the foreclosures of the Properties, SummitBridge may utilize for purposes of credit bidding any or all of the SummitBridge Allowed Claim, provided, however, that the amount of the SummitBridge Allowed Claim will be reduced as set forth in this paragraph by the net amount that SummitBridge receives or credit bids, as applicable, in connection with such foreclosures. There shall be no reduction in the SummitBridge Allowed Unsecured Claim, Exit Note A or Exit Note B on account of credit bids and net proceeds of the foreclosures on the Properties if they total less than $4,500,000.  After the first $4,500,000 of net proceeds or credit bids, as applicable, there will be a reduction to the extent of the excess amount of the credit bids or the net proceeds, as applicable, to the SummitBridge Allowed Unsecured

Claim until it has been fully satisfied and, thereafter, to the extent of any additional amounts, the balance under Exit Note B  and, thereafter, to the extent of any additional amounts,  the balance under Exit Note A.

22.    <u>Exit Financing Election Pursuant to Exit Financing Supplement.</u>  If the Debtors elect to receive the $250,000 of exit financing offered by SummitBridge, as a condition to such financing, the treatment of the Claims of SummitBridge in connection with the plan in the Bankruptcy Cases shall be consistent in all respects with the Exit Financing Supplement attached hereto as Exhibit "A", which shall be incorporated in its entirety into the plan.  Any such election shall be made at the time that the Debtors file the applicable plan and disclosure statement.  If the Debtors elect to receive the Exit Financing, the plan shall provide that:

> Nothing in this Plan is intended to be inconsistent with, or shall in any way be interpreted in a manner inconsistent with, the Settlement Agreement approved pursuant to the Settlement Approval Order, Docket No. ____ and the Exit Financing Supplement attached to the Settlement Agreement as Exhibit "A", both of which are incorporated herein in their entirety.  Nothing contained in the Plan or the Confirmation Order shall be interpreted in a manner inconsistent with the Exit Financing Supplement.

The confirmation order with respect to any such plan shall also contain the foregoing language.

23.    To the extent that there is voting to accept or reject a plan that incorporates  the Exit Financing Supplement and the plan is consistent in all respects with Exit Financing Supplement and this Settlement Agreement, SummitBridge agrees: (a) to affirmatively support the plan by attending the Disclosure Hearing and the plan Confirmation hearing and affirmatively support the plan; (b) advocate for the overruling of any objections at the hearing that the Debtors also seek to have overruled; and (c) to vote each of its Claims to accept a plan by delivering its duly executed and completed ballot(s) accepting the plan on a timely basis following the commencement of solicitation and its actual receipt of the solicitation materials and ballot, (provided that the disclosure statement and the solicitation materials in each case are approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code).

24.    SummitBridge shall have no obligation to provide the Exit Financing or to support the plan if (i) the effective date of such plan does not occur on or before January 1, 2019, (ii) either the plan or the Confirmation Order do not contain the language referred to in paragraph 22 of this Settlement Agreement, or (iii) the plan is inconsistent in any manner with this Settlement Agreement or the Exit Financing Supplement.

25.    <u>Dismissal If the Effective Date of a Plan Does Not Occur Prior to January 1, 2019.</u> If a plan consistent with this Settlement Agreement is not confirmed with an effective date occurring on or prior to January 1, 2019, then the Bankruptcy Cases shall be dismissed. In the event of dismissal, SummitBridge shall not provide Exit Financing and the Debtors shall not execute the Exit Notes and associated security agreements.  The order dismissing the Bankruptcy Cases shall provide for the bar on subsequent bankruptcy filings contained in paragraph "27" hereof.

26.     <u>Binding Nature of the Settlement Agreement on the Debtors' Estates.</u>    This Settlement Agreement shall be binding upon the Debtor Parties and any subsequently appointed Chapter 11 or Chapter 7 trustee and shall be enforceable by SummitBridge against the Debtor Parties and their bankruptcy estates both during these Bankruptcy Cases and, if applicable, after conversion to Chapter 7 or dismissal of the Bankruptcy Cases.

27.     <u>Bar on Subsequent Bankruptcy Filings.</u>  If the Bankruptcy Cases are dismissed for any reason whatsoever, Debtors shall be prohibited from filing a new voluntary bankruptcy case for a period of two years from the date of dismissal, and in the event of any new voluntary bankruptcy filing by the Debtors during such two-year period, the new case or cases shall be dismissed, and SummitBridge shall have prospective relief from the automatic stay to pursue and enforce its rights and remedies.

28.     <u>Release of SummitBridge.</u>  Upon the Effective Date of this Settlement Agreement, on behalf of the Debtor Parties, the Debtor Parties hereby unconditionally, absolutely and irrevocably release and discharge SummitBridge of all Claims, manners of action, causes of action, suits, debts, accounts, promises, warranties, damages and consequential damages, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate or matured, in law or in equity which the Debtor Parties now have or ever had against SummitBridge upon or by reason of any manner, cause or thing whatsoever on or at any time prior to the date of this Settlement Agreement, including, but not limited, Claims concerning, arising out of, or relating to the facts, circumstances, events, transactions or transfers alleged or which could have been alleged in the Avoidance Adversary Proceeding, it being the intention of the Debtor Parties to reserve nothing whatsoever hereunder, and each of them, their peace and freedom from each and every of the released claims of whatever character and description; provided, however, (1) nothing in this paragraph shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of this Settlement Agreement; and (2) the foregoing shall only release SummitBridge and does not release any other persons or entities.

29.     <u>Release of Dr. Trespalacios.</u>  Upon the later to occur of (i) the conclusion of the foreclosures of the Properties contemplated by this Settlement Agreement, and (ii) the delivery of the New Guaranty, Dr. Trespalacios shall receive a release from SummitBridge in the form attached hereto as Exhibit "K", if and only if, he has cooperated with SummitBridge in promptly concluding the foreclosure sales of the Properties. Notwithstanding the foregoing, any such release shall not release any obligations under the Exit Notes (which will be guaranteed by Dr. Trespalacios pursuant to the New Guaranty).

30.     <u>Release of the Debtors.</u>  Upon the Effective Date of this Settlement Agreement, SummitBridge  hereby unconditionally, absolutely and irrevocably releases and discharges each of the Debtors, jointly and severally, of all Claims, manners of action, causes of action, suits, debts, accounts, promises, warranties, damages and consequential damages, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate or matured, in law or in equity which SummitBridge now has or ever had against Debtors cumulatively and individually, upon or by reason of any manner, cause or thing whatsoever on or at any time prior to the date of

11

this Settlement Agreement, including, but not limited to Claims concerning, arising out of, or relating to the facts, circumstances, events, transactions or transfers alleged or which could have been alleged in the Avoidance Adversary Proceeding, the Second Motion to Dismiss or Convert, the Rent Motion, the Substantive Consolidation Adversary Proceeding, it being the intention of SummitBridge to reserve nothing whatsoever hereunder, and each of them, their peace and freedom from each and every of the released claims of whatever character and description; provided, however, (1) nothing in this paragraph shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of this Settlement Agreement; (2) nothing in this paragraph shall be deemed or construed to be a release, waiver or discharge of the SummitBridge Allowed Claims to the extent necessary (a) to foreclose on the Properties, (b) to receive distributions under any plan confirmed in the Bankruptcy Cases, (c) to obtain and enforce the Exit Notes, (d) to obtain distributions on account of the SummitBridge Allowed Unsecured Claim, and (e) to collect on account of any and all claims in the event of conversion or dismissal of the Bankruptcy Cases, and (3) this paragraph shall only release the Debtors and does not release any other persons or entities. For avoidance of doubt, nothing contained in this Release and this Settlement Agreement shall in any way release, waive, discharge, limit or impair the right and the ability of SummitBridge to enforce its rights on account of the Claims described in each of the proofs of claim, the Bankruptcy Cases or the State Court Action, to foreclose on the Properties or to complete foreclosures on the Properties.

31. <u>Further Assurances.</u> Each of the Parties shall execute and deliver to the other all such agreements, instruments and other documents as may reasonably be requested to cause liens to attach or become perfected, to foreclose on the Properties or otherwise transfer title to the Properties, or to accomplish whatever may be contemplated pursuant to this Settlement Agreement. Further, the Parties hereby agree to do and perform all acts, to make, execute and deliver all instruments and documents necessary to consummate the transactions contemplated by this Settlement Agreement.

32. <u>General Representations and Warranties.</u>

(a) <u>Authority.</u> Each of the undersigned covenants and warrants that he or she has the power and authority to execute this Settlement Agreement on behalf of the Party on whose behalf this Settlement Agreement is so executed.

(b) <u>Advice of Counsel.</u> Each of the Parties acknowledges and warrants that it has consulted with its attorneys regarding the terms of this Settlement Agreement, and that they have been completely read and are fully understood and voluntarily accepted for the purpose of making a full and final compromise, settlement and waiver of any and all claims as set forth herein.

33. <u>Due Diligence.</u> Each of the Parties has investigated the matters set forth in this Settlement Agreement, and all other matters pertaining to this Settlement Agreement. Each of the Parties represents and warrants that they have not relied upon any promises, agreements, representations, statements or warranties in entering into this Settlement Agreement that are not otherwise expressly provided for in this Settlement Agreement.

12

34.    No Admission of Liability.    Nothing contained in this Settlement Agreement shall be deemed as an admission of any liability or lack of merit in any claim, by any party of any matter, claim or defense previously in dispute. Each Party is aware that it may hereafter discover claims or facts in addition to or different from those it now knows or believes to be true. Nevertheless, it is the intention of the Parties to fully, finally and forever settle and resolve any and all controversies among themselves to the extent provided herein, and all claims relative thereto, that do now exist or heretofore have existed between them. In furtherance of such intention, the releases given herein shall be and remain in effect as a full and complete release of all such matters to the extent provided herein, notwithstanding the discovery or existence of any additional or different claims or facts relative thereto.

35.    Costs.    The Parties shall bear their respective attorneys' fees and costs in connection with this Settlement Agreement and the Bankruptcy Cases.

36.    Successors and Assigns.    This Settlement Agreement shall be binding upon, and inure to the benefit of all of the Parties and their respective predecessors, successors and assigns.

37.    Interpretation.    No provision of this Settlement Agreement will be interpreted in favor of, or against, any of the parties hereto by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

38.    Third Party Beneficiaries.    This Settlement Agreement is for the sole benefit of the parties hereto and their respective predecessors, successors and permitted assigns. Nothing herein shall give or be construed to give any person or entity, other than the parties hereto and their respective predecessors, successors and permitted assigns, any legal or equitable rights hereunder.

39.    Integration.    This Settlement Agreement represents the full and complete agreement between the Parties. Any representations, warranties, promises, or conditions, whether written or oral, not specifically incorporated into this Settlement Agreement, or in any other agreements, instruments, certificates or documents delivered as required or contemplated under this Settlement Agreement, shall not be binding upon the Parties. All other discussions, negotiations, term sheets and writings have been and are merged into this Settlement Agreement.

40.    Writing Required.    Neither this Settlement Agreement nor any term or provision hereof may be changed, waived, discharged, or terminated except by an instrument in writing duly signed by the Party against which enforcement of the change, waiver, discharge, or termination is sought.

41.    Governing Law and Consent to Jurisdiction.    This Settlement Agreement and all other documents required or contemplated hereby shall be governed by and construed in accordance with the laws of the State of Florida applicable to contracts made and to be performed wholly within the State of Florida but irrespective of its choice of law rules. As specific inducement for the Parties to enter into this Settlement Agreement, each of the Parties hereby consents to the exclusive jurisdiction of the Bankruptcy Court for resolution of all disputes arising

under this Settlement Agreement, and waives any objection it may have to the laying of venue in any such court and any claim that such suit has been brought in an inconvenient forum.

42. Notice to Parties. All notices given pursuant to this Settlement Agreement shall be delivered by first class mail, hand delivery, or email to the Parties at the following addresses (or, if applicable, the most current address available for such Party):

If to the Debtors:

Dr. Rafael Trespalacios
665 Apollo Boulevard
Melbourne, FL 32901

With a copy to:

Geoffrey S. Aaronson
Aaronson Schantz Beiley P.A.
One Biscayne Tower, Suite 3400
Miami, FL 33131
garronson@aspalaw.com

If to Dr. Trespalacios:

Dr. Rafael Trespalacios
4448 Reseda Way
Rockledge, FL 32955

With a copy to:

Roy S. Robert
Gray Robinson
301 East Pine Street
Suite 1400
Orlando, FL 32801
roy.kobert@gray-robinson.com

and:

Geoffrey S. Aaronson
Aaronson Schantz Beiley P.A.
One Biscayne Tower, Suite 3400
Miami, FL 33131
garronson@aspalaw.com

If to SummitBridge:

SummitBridge National Investments V LLC
c/o Summit Investment Management LLC
Attn: Senior Asset Manager
1700 Lincoln St., Suite 2150
Denver, CO 80203

With a copy to:

Richard A. Robinson, Esquire
Burr & Forman LLP
1201 N. Market Street
Suite 1407
Wilmington, DE 19801
rrobinson@burr.com

43.    <u>Headings.</u>   Paragraph headings contained in this Settlement Agreement are inserted for convenience of reference only, shall not be deemed to be a part of the Agreement, and shall not define or affect the meaning, construction, or scope of any of the provisions of this Settlement Agreement.

44.    <u>Counterparts.</u>  This Settlement Agreement may be signed in two or more original counterparts, each of which shall for all purposes be considered an original of this Settlement Agreement. Facsimile signatures shall be treated in all manner and respects as an original signature.

*[Signature Pages Follow]*

15

IN WITNESS WHEREOF, the Parties hereby have executed and delivered this Settlement Agreement as of the day and year first above written.

**Brevard Eye Center, Inc.**

By: _____
    Dr. Rafael Trespalacios
Its: President

**Brevard Surgery Center, Inc.**

By: _____
    Dr. Rafael Trespalacios
Its: President

**Medical City Eye Center, Inc.**

By: _____
    Dr. Rafael Trespalacios
Its: President

**THMIH, Inc.**

By: _____
    Dr. Rafael Trespalacios
Its: President

**Dr. Rafael Trespalacios**

By: _____
    Dr. Rafael Trespalacios, in his individual capacity

**SummitBridge National Investments V LLC**

By: _____
Its: _____

**AGREED UPON ON BEHALF OF AARONSON SCHANTZ BEILY P.A. WITH RESPECT TO** ~~PARAGRAPHS 21 AND 22.~~ *THE EXIT FINANCING.*
*SUPPLEMENT. ATTACHED HERETO AS EXHIBIT A*
*PARAGRAPH 9*

Aaronson Schantz Beiley P.A.

By: _____
    Geoffrey S. Aaronson
Its: *President*

IN WITNESS WHEREOF, the Parties hereby have executed and delivered this Settlement Agreement as of the day and year first above written.

**Brevard Eye Center, Inc.**

By: _____
Dr. Rafael Trespalacios
Its: President

**Brevard Surgery Center, Inc.**

By: _____
Dr. Rafael Trespalacios
Its: President

**Medical City Eye Center, Inc.**

By: _____
Dr. Rafael Trespalacios
Its: President

**THMIH, Inc.**

By: _____
Dr. Rafael Trespalacios
Its: President

**Dr. Rafael Trespalacios**

By: _____
Dr. Rafael Trespalacios, in his individual capacity

**SummitBridge National Investments V LLC**

By: _____   Scott Silvers
Its: _____   Authorized Signatory

**AGREED UPON ON BEHALF OF AARONSON SCHANTZ BEILY P.A. WITH RESPECT TO** ~~PARAGRAPHS 21 AND 22~~ *THE EXIT FINANCING SUPPLEMENT, ATTACHED HERETO AS EXHIBIT A PARAGRAPH 9*
Aaronson Schantz Beiley P.A.

By: _____
Geoffrey S. Aaronson
Its: _____

31767497 v1

# EXHIBIT "A"

## EXIT FINANCING SUPPLEMENT

1.     <u>Plan Effective Date.</u>  The Plan Effective Date shall be on or before January 1, 2019.

2.     <u>Valuation of SummitBridge's Claims in These Cases Under Any Plan.</u>   For purposes of consideration of any issues in connection with confirmation of the Plan (including issues under Sections 506 and 1129 of the Bankruptcy Code):

a.     SummitBridge's secured claim on the Properties (Orlando, Melbourne and Merritt Island) shall be $11,497,553.47 jointly and severally;

b.      SummitBridge's secured claim on all Other SummitBridge Collateral shall be $1,000,000;

c.     SummitBridge's unsecured claim shall be $6,000,000.00.

3.     <u>Treatment of SummitBridge's Secured Claim on the Properties.</u>

a.     Upon the Effective Date of the SummitBridge Settlement Agreement, the automatic stay of Section 362 of the Bankruptcy Code shall be lifted and modified to allow SummitBridge to exercise its rights and remedies with respect to the Properties including, without limitation, its rights to foreclose on the Properties.

4.     <u>Treatment of SummitBridge's Secured Claim on all Other SummitBridge Collateral.</u>  SummitBridge shall receive payment in connection with its lien on all non-real estate collateral pursuant to two notes, referred to herein as "Exit Note A" and "Exit Note B" attached hereto as Exhibits "1" and "2".  Exit Note A and Exit Note B shall be executed and delivered by the Debtors to SummitBridge as a condition precedent to the Plan Effective Date.

5.     <u>Treatment of SummitBridge's Unsecured Claim.</u> The treatment of SummitBridge's general unsecured claims under the Plan shall be the same as provided to all other general unsecured claims; provided, however, that any distribution to SummitBridge as a general unsecured creditor shall be applied to whichever of the then outstanding Exit Notes bears the highest interest rate and shall be applied in accordance with the terms of the applicable note.

6.     <u>Exit Financing.</u>  On the Plan Effective Date, SummitBridge will make a new loan to Debtors in the amount not to exceed $250,000 (the "Exit Financing") and SummitBridge will receive a note from the Debtors in the amount of $250,000 in the form attached hereto as Exhibit "3" (the "Exit Financing Note", together with Exit Note A and Exit Note B, the "Exit Notes"). The Parties agree that $125,000 of the proceeds of the Exit Financing may be used to pay administrative expense claims as may be awarded by the Court, and at least $125,000 of the proceeds of the Exit Financing shall be used to fund the Debtors' operations.

7.     <u>Security Agreement with Respect to the Exit Notes.</u>  To secure payments of the Exit Notes, Debtors shall execute and deliver to SummitBridge a security agreement (reflecting a

security interest on all property of Debtors) (the "New Security Agreement", and together with Exit Note A and Exit Note B) in the form attached hereto as Exhibit "4".

8.    Continuing Enforceability of SummitBridge's Pre-Petition Loan Documents. Notwithstanding anything to the contrary in the Settlement Agreement or this Exit Financing Supplement, SummitBridge's pre-petition notes and mortgages (attached to SummitBridge's proofs of claim filed in the Bankruptcy Cases) shall remain in place to allow for the foreclosure of the Properties by SummitBridge.  Accordingly, SummitBridge shall be entitled to assert in the foreclosure actions any or all of the SummitBridge Allowed Claim plus any interest, fees and other amounts that may be owed under applicable law under such pre-petition notes, mortgages and other agreements that are not included in the SummitBridge Allowed Claim. SummitBridge may utilize for purposes of credit bidding at the foreclosure sales of the Properties any or all of the SummitBridge Allowed Claim, provided, however, that the amount of the SummitBridge Allowed Claim will be reduced as set forth in this paragraph by the net amount that SummitBridge receives or credit bids, as applicable, in connection with such sales. There shall be no reduction in the SummitBridge Allowed Unsecured Claim or the Exit Notes on account of credit bids and net proceeds of the foreclosures on the Properties if they total less than $4,500,000.  After the first $4,500,000 of net proceeds or credit bids, as applicable, there will be a reduction to the extent of the excess amount of the credit bids or the net proceeds to the SummitBridge Allowed Unsecured Claim until it has been fully satisfied and, thereafter, to the extent of additional amounts, the balance under Exit Note B and, thereafter, to the extent of additional amounts, the balance under Exit Note A.

9.    Subordination of Administrative Expense Claims to Claims of SummitBridge.  To the extent that Debtors' counsel or any third party (other than current, ordinary course administrative expense claims) hold unpaid administrative expense claims on the Plan Effective Date, as a condition precedent to the occurrence of the Plan Effective Date, counsel for Debtors, Aaronson Schantz Beiley P.A., and any such other third party administrative creditors shall either, as applicable (i) file a certification that their administrative expense claims have been satisfied prior to the Plan Effective Date, or (ii) execute a subordination/inter-creditor agreement, in the form attached hereto as Exhibit "5".

10.    Prohibition on Liens For the Benefit of Administrative Creditors After the Plan Effective Date.  Pursuant to the Plan, no administrative expense claimants shall obtain, or hold, liens or security interests, of any sort to secure their claims and such creditors shall be general unsecured creditors of the Debtors on and after the Plan Effective Date (except to the extent of unpaid real estate taxes).

11.    Absolute and Unconditional Guaranty of Dr. Trespalacios and New Equity Holders. Except to the extent permitted below, Dr. Trespalacios shall retain one hundred percent of the equity in the Debtors from the Plan Effective Date until payment in full of the Exit Notes. Notwithstanding the foregoing, any new equity holder shall only be permitted to obtain equity in the Debtors upon the consent of SummitBridge, which consent shall not be unreasonably withheld. Under no circumstances shall holders of administrative expense claims be entitled to equity on account of, directly or indirectly, any administrative expense claim incurred prior to December 31, 2018.  SummitBridge understands that new equity may be necessary to obtain funds required to

2

be distributed under the Plan and otherwise.  On the Plan Effective Date, as a condition to the Plan Effective Date, Dr. Trespalacios shall absolutely and unconditionally guaranty the Exit Notes by executing and delivering to SummitBridge a Guaranty Agreement in the form attached hereto as Exhibit "6" (the "New Guaranty Agreement"). If any other equity holders of the Debtors are permitted (in accordance with the terms hereof) at any time prior to satisfaction of the Exit Notes, as a condition to their obtaining such equity,  SummitBridge shall also require them (or their individual owners if the new equity holder is an entity) to execute and deliver to SummitBridge a personal guarantee of the Exit Notes, in the same form as Exhibit "6".

12.    <u>Limitations on Compensation After the Plan Effective Date.</u>    The gross compensation of Dr. Trespalacios by the Debtors is capped at $20,000 per month with a bar to any other distributions or dividends until full payment of the Exit Notes, and the Debtors shall not employ or pay any family members of Dr. Trespalacios or incur management compensation (of any sort) above caps jointly agreed upon by SummitBridge and the Debtors.  Notwithstanding the foregoing, the Plan shall provide that after the Plan Effective Date, if the Debtors are not in default on any of the terms of the Plan, the Exit Notes or the Settlement Agreement, and they have adequate capital to continue operations and make the payments required by the Plan and the Exit Notes, the Debtors may pay Dr. Trespalacios up to an additional $30,000 per month (for total gross compensation of up to $50,000 per month), if, and only if, the Debtors simultaneously make a payment to SummitBridge of twenty-five percent (25%) of the gross amount of such additional compensation being paid to Dr. Trespalacios.  Any such payments to SummitBridge shall be applied to whichever of the then outstanding Exit Notes bears the highest interest rate and shall be applied in accordance with the terms of the applicable note.

13.    <u>Prohibition on Liens.</u>  Except with respect to liens limited to newly acquired equipment under equipment leasing or equipment financing agreements, and liens that are subordinate in all respects to the liens of SummitBridge, until SummitBridge has been paid in full the amount provided for in any plan confirmed in the Bankruptcy Cases, no liens or security interests, of any sort shall be granted with respect to any property of the Debtors or their bankruptcy estates.  As a condition to the granting of any such liens by the Debtors, the proposed lienholder shall execute a subordination/inter-creditor agreement in form and substance satisfactory to SummitBridge.

14.    <u>Prohibition on Payments Under the Plan When the Exit Notes or Settlement Agreement Are in Default.</u>  Except with regard to the rights and claims of SummitBridge, there is an absolute bar against the payment of any claims incurred prior to the Plan Effective Date of any sort (including administrative expense, priority or unsecured claims) at any time when Debtors are in breach or default under the Exit Notes or any of the obligations described in the Settlement Agreement or the Plan.

15.    <u>Injunction Against Subsequent Bankruptcy Filing.</u>  An injunction is hereby imposed to prohibit the filing of a new voluntary bankruptcy case by the Debtors for a period of two years after the Plan Effective Date, and prospective stay relief in the new bankruptcy cases is hereby provided for SummitBridge in the event that Debtors violate the two-year injunction.

3

16.　　Full Cooperation in Connection with Sales of the Properties.　The Debtors will fully cooperate in all respects in consummating the foreclosure and sale of the Properties, to the extent not already completed, in any lawful manner requested by SummitBridge.

17.　　Confirmation of the Plan.　Entry of the Settlement Approval Order is a condition precedent to Confirmation of the Plan.

18.　　SummitBridge's Entitlement to Sale Proceeds.　Upon receipt of sale proceeds at the foreclosure of each of the sales of the Properties, SummitBridge shall retain the proceeds and the SummitBridge Allowed Claim shall be reduced to reflect the net proceeds it receives or credit bids for the applicable property sold in accordance with paragraph 8 of this Exit Financing Supplement; provided, however, any subordinate lienholder shall retain its rights under state law, if any, to receive proceeds in connection with a foreclosure sale solely to the extent required by any subordination agreement and under applicable state law.

19.　　Cooperation.　In consideration of the mutual benefits of this Exit Financing Supplement, the parties agree to fully cooperate with each other.　Accordingly, SummitBridge agrees to (a) vote for the Plan in all respects and in all classes to which it may have a claim; (b) appear at confirmation hearing and support the Plan and endorse the Plan; (c) advocate for the overruling of any objections at the hearing that the Debtors also seek to have overruled; and (d) refrain from advising, or supporting any opposition to the Plan.

20.　　Definitions.　Except as expressly set forth herein, capitalized terms shall have the same meaning that has been given to such terms in the Settlement Agreement.　For purposes this Exit Financing Supplement only, the following capitalized terms shall have the following meanings:

　　　　a.　　"Plan" means a Chapter 11 Plan that is consistent with, and satisfies all of the conditions contained in paragraph 21 of the Settlement Agreement and this Exit Financing Supplement;

　　　　b.　　"Plan Effective Date" shall mean the effective date of the plan described in paragraph 22 of the Settlement Agreement and this Exit Financing Supplement, which shall not, absent the express written consent of SummitBridge, occur after January 1, 2019.

4

# EXHIBIT "1"

# **PROMISSORY NOTE**

$600,000.00                              Effective as of _____ ___, 201__ (the "Effective Date")

   **FOR VALUE RECEIVED**, BREVARD EYE CENTER, INC., a Florida corporation; BREVARD SURGERY CENTER, INC., a Florida corporation; MEDICAL CITY EYE CENTER, P.A., a Florida corporation; and THMIH, INC., a Florida corporation (collectively, the "Borrowers," and each individually, a "Borrower"), promise to pay to the order of SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company, and its successors and assigns (the "Lender"), the principal sum of SIX HUNDRED THOUSAND and No/100ths Dollars ($600,000.00), together with interest as hereinafter stated.

   1.    <u>Definitions</u>.  As used in this Note, the following terms shall have the respective meaning indicated:

   a.    "Exit Note B" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $400,000.00.

   b.    "Exit Financing Note" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $250,000.00.

   c.    "Interest Rate Floor" shall mean Five and One Half Percent (5.50%) per annum.

   d.    "Prime Rate" shall mean the U.S. "Prime Rate" published in the Wall Street Journal from time to time. If such prime rate shall cease to be published or is published infrequently or sporadically, then the Prime Rate shall be (i) the rate of interest per annum established from time to time by Lender and designated as its base or prime rate, which may not necessarily be the lowest interest rate charged by Lender and is set by Lender in its sole discretion, or (ii) if Lender does not publish or announce a base or prime rate, or does so infrequently or sporadically, then the Prime Rate shall be determined by reference to another base rate, prime rate or similar lending rate index, generally accepted on a national basis, as selected by Lender in its sole and absolute discretion. Each change in such fluctuating interest rate shall take effect simultaneously with the corresponding change in the Prime Rate.

   e.    "Property" shall mean the property encumbered by and subject to the lien of the Security Agreement.

   f.    "Security Agreement" shall mean that certain Amended and Restated Security Agreement executed by the Borrowers in favor of Lender on or about even date herewith, which encumbers certain property of the Borrowers described therein. The Security Agreement shall secure this Note.

g.      "Settlement Agreement" shall mean that certain Settlement Agreement executed by the Borrowers and Lender on _____ ___, 2018, pursuant to which the Borrowers and Lender agreed, *inter alia*, to enter into the Security Agreement and this Note.

2.      Payments.  Principal and interest shall be due and payable in lawful money of the United States of America at the principal office of Lender in _____, or at such other place or places as it or the holders hereof may from time to time hereafter designate in writing, as follows:

a.      Interest Rate.  Interest shall accrue on the outstanding principal balance of this Note at a floating rate equal to the Prime Rate plus One Percent (1.00%) per annum (the "Interest Rate").  Interest shall be calculated on the basis of a 360 day year, for the actual number of days elapsed; provided, however, that in no event shall the Interest Rate be lower than the Interest Rate Floor.

b.      Monthly Payments.  Commencing on January 1, 2019 and continuing on the 1st day of each month thereafter through the Maturity Date, the Borrowers shall pay monthly payments of principal based on the outstanding principal balance of this Note on January 1, 2019, amortized on a ten year amortization period, plus accrued interest hereunder at the Interest Rate.

c.      Maturity Date.  Notwithstanding anything to the contrary herein, the entire outstanding principal balance, together with any accrued interest, shall be due and payable on January 1, 2024 (the "Maturity Date").

d.      Allocation.  All payments made upon this Note shall be applied in any order Lender determines, in its sole discretion, to the following: (1) to accrued but unpaid interest, (2) to unpaid principal, (3) to reduce charges owed by the Borrowers that are neither principal nor interest, and (4) any partial prepayments of principal will be applied to installments due in the inverse order of their maturity and no such partial prepayment of principal will have the effect of postponing, satisfying, reducing or otherwise affecting any scheduled installment before the Note is paid in full.

3.      Late Charge.  All installments of interest or payments of principal provided for in this Note shall be paid promptly when due and, if not paid within seven (7) calendar days after the due date thereof, shall be subject to a late charge in an amount equal to five percent (5%) of the payment due and shall be paid to Lender in addition to and at the time of payment of the delinquent installment or payment.

4.      Prepayment.  The Borrowers shall have the right to prepay the principal balance of this Note, in whole or in part, without penalty at any time, upon payment of all interest accrued to date and other sums then due and payable pursuant to the provisions of this Note.

5.      Interest Limitation.  Notwithstanding any other provision of this Note or of any instrument securing this Note or any other instrument executed in connection with the loan evidenced hereby, it is expressly agreed that the amounts payable under this Note or under the other aforesaid instruments for the payment of interest or any other payment in the nature of or which

would be considered as interest or other charge for the use or loan of money shall not exceed the highest rate allowed by law, from time to time, to be charged by Lender.  In the event the provisions of this Note or of any instruments referred to in this paragraph regarding the payment of interest or other payments which would be considered as interest or other charge for the use or loan of money operate to produce a rate that exceeds such limitation, then the excess over such limitation will not be payable and the amount otherwise agreed to be paid shall be reduced by the excess, so that such limitation will not be exceeded, and in the event any such payment is paid by Borrowers or received by Lender, whereby such limitation is exceeded, the amount of the excess shall constitute and be treated as a payment on the principal hereof and shall operate to reduce such principal by the amount of such excess, unless Borrowers shall notify Lender in writing that Borrowers desire to have such excess sum refunded to it.

6.      Consent and Waiver.  Each Borrower does hereby:  (a) consent to any forbearance or extension of the time or manner of payment hereof and to the release of all or any part of any security held by the Lender to secure payment of this Note, all without notice to or consent of that party; (b) agree that no course of dealing or delay or omission or forbearance on the part of the Lender in exercising or enforcing any of its rights or remedies hereunder or under any instrument securing this Note shall impair or be prejudicial to any of the Lender's rights and remedies hereunder or to the enforcement hereof and that the Lender may extend, modify or postpone the time and manner of payment and performance of this Note, may grant forbearances and may release, wholly or partially, any security held by the Lender as security for this Note and release, partially and wholly, any person or party primarily or secondarily liable with respect to this Note, all without notice to or consent by any party primarily or secondarily liable hereunder and without thereby releasing, discharging or diminishing its rights and remedies against any other party primarily or secondarily liable hereunder; and (c) waive notice of acceptance of this Note, and presentment, demand, protest, notice of dishonor and notice of protest and notices of any and all action at any time taken or omitted by the Lender in connection with this Note or any instrument securing this Note and waive all requirements necessary to hold that party to the liability of that party.

7.      Cross Default.  A default under this Note shall be and constitute a default under Exit Note B, Exit Financing Note, the Security Agreement, and the Settlement Agreement.  A default under Exit Note B, Exit Financing Note, the Security Agreement, and the Settlement Agreement shall also constitute a default under this Note.

8.      Events of Default and Acceleration.  The happening of any of the following events shall constitute a default hereunder ("Event of Default"):  (a) failure of Borrowers to pay any principal, interest or any other sums when due under this Note; or (b) a default shall occur in any provision of this Note, in any instrument securing this Note, in Exit Note B, in Exit Financing Note, or in the Settlement Agreement, except that an Event of Default shall not occur with respect to a non-payment default unless the Borrowers fail to cure such non-payment default within seven (7) calendar days after notice of such non-payment default.  Notice under this paragraph shall be effective upon delivery by first class mail or hand delivery to the Borrowers and Borrowers' counsel at Brevard Eye Center, Inc., 665 S. Apollo Blvd., Melbourne, FL 32901, and via email transmission to Borrowers' counsel at gaaronson@aspalaw.com and scapuano@aspalaw.com.

If an Event of Default shall occur hereunder, then at the option of the Lender, the entire principal sum then remaining unpaid together with accrued interest shall immediately become due and payable without notice or demand.  While in default, the entire principal sum and accrued interest shall both bear interest from such default date at a rate equal to eighteen percent (18%); it being agreed that interest not paid when due shall, at the option of the Lender, draw interest at the rate provided for in this paragraph.

The Lender may, in addition, pursue each and every other right, remedy and power under this Note, Exit Note B, Exit Financing Note, the Security Agreement, or the Settlement Agreement, and pursue any other right or remedy available at law and in equity.

The remedies of Lender, as provided herein or in any document securing the Loan evidenced hereby, shall be cumulative and concurrent and may be pursued singularly, successively and together, at the sole discretion of Lender.  No act of omission or commission of the Lender, including, specifi-cally, any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same, such waiver or release to be effected only through a written document executed by Lender and then only to the extent specifically recited therein.  A waiver or release with reference to any one event shall not be construed as continuing, as a bar to or as a waiver or release of any subsequent right, remedy or recourse as to a subsequent event.

9.      Attorneys' Fees.  All parties liable for the payment of this Note agree to pay the Lender reasonable attorneys' fees and costs, whether or not an action is brought, for the services of counsel employed after maturity or default to collect this Note or any principal or interest due hereunder or to protect the security, if any, or enforce the performance of any other agreement contained in this Note or in any instrument of security executed in connection with this loan, including costs and attorneys' fees on any appeal or in any proceedings under the federal Bankruptcy Code or in any postjudgment proceedings.

10.      Set Off.  The Lender is hereby granted a lien upon and a security interest in all property of Borrowers now or at any time hereafter in the possession of the Lender as security for the payment of this Note, including, but not limited to, any balance or share of any credits, money, deposits, stocks, bonds, certificates of deposit, trust or agency account, and whenever any obligation under this Note matures or otherwise becomes due, whether by acceleration or otherwise, the Lender is hereby authorized to apply and set off against the balance hereunder owed, any such funds or prop-erty in possession of the Lender belonging to Borrowers in such order of application as the Lender may from time to time elect, without advance notice or consent of Borrowers.  The Lender also shall have the right, immediately and without further action by it, to set off against the Note all money owed by the Lender in any capacity to Borrowers, whether or not due.

11.      Florida Law; Venue; Time.  This Note constitutes a contract under the laws of the State of Florida and shall be enforceable in a court of competent jurisdiction in that state, regardless of in which state this Note is being executed.  Borrowers consent and agree that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, or related to this Note, Exit Note B, Exit Financing Note, the Security Agreement, or any other document executed by Borrowers and delivered to Lender shall be litigated, in Lender's sole discretion and at the Lender's

sole election, only in courts having a situs within or whose jurisdiction includes Brevard County, Florida. For the purpose of the foregoing, Borrowers hereby consent and submit to the jurisdiction of any local, state or federal court located within or whose jurisdiction includes Brevard County, Florida. Time is of the essence in this Note.

12.    <u>Headings</u>.    The headings of the paragraphs contained in this Note are for convenience of reference only and do not form a part hereof and no way modify, interpret or construe the meaning of the parties hereto.

13.    <u>Security</u>.    This Note is secured by <u>inter alia</u>, the Security Agreement. It is expressly agreed that all of the covenants, conditions and agreements of the Borrowers under the Security Agreement are made a part of this Note and shall be included in the interpretation of this Note.

14.    <u>Sale or transfer of Note and Security Agreement</u>.    Lender may at any time in its sole discretion sell, transfer or assign the Note, the Security Agreement and/or Exit Note B and/or Exit Financing Note, and any and all servicing rights with respect thereto, or grant participations therein.

15.    <u>Compliance Agreement</u>.    For and in consideration of the funding or renewal of this loan by Lender, the Borrowers hereby agree to cooperate or re-execute any and all loan documentation deemed necessary or desirable in Lender's discretion, in order to correct or to adjust for any clerical errors or omissions contained in any document executed in connection with this loan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD EYE CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of BREVARD EYE CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                    _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD SURGERY CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of BREVARD SURGERY CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                                    _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

MEDICAL CITY EYE CENTER, P.A.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of MEDICAL CITY EYE CENTER, P.A., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                    _____
                                 (Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

THMIH, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of THMIH, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                    _____
(Type, Stamp or Print Name)

My commission expires:

# EXHIBIT "2"

## PROMISSORY NOTE

$400,000.00                          Effective as of _____ ___, 201__ (the "Effective Date")

**FOR VALUE RECEIVED**, BREVARD EYE CENTER, INC., a Florida corporation; BREVARD SURGERY CENTER, INC., a Florida corporation; MEDICAL CITY EYE CENTER, P.A., a Florida corporation; and THMIH, INC., a Florida corporation (collectively, the "Borrowers," and each individually, a "Borrower"), promise to pay to the order of SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company, and its successors and assigns (the "Lender"), the principal sum of FOUR HUNDRED THOUSAND and No/100ths Dollars ($400,000.00), together with interest as hereinafter stated.

1.    <u>Definitions</u>.  As used in this Note, the following terms shall have the respective meaning indicated:

a.    "Exit Note A" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $600,000.00.

b.    "Exit Financing Note" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $250,000.00.

c.    "Property" shall mean the property encumbered by and subject to the lien of the Security Agreement.

d.    "Security Agreement" shall mean that certain Amended and Restated Security Agreement executed by the Borrowers in favor of Lender on or about even date herewith, which encumbers certain property of the Borrowers described therein. The Security Agreement shall secure this Note.

e.    "Settlement Agreement" shall mean that certain Settlement Agreement executed by the Borrowers and Lender on _____ ___, 2018, pursuant to which the Borrowers and Lender agreed to enter into the Security Agreement and this Note.

2.    <u>Payments</u>.  Principal and interest shall be due and payable in lawful money of the United States of America at the principal office of Lender in _____, or at such other place or places as it or the holders hereof may from time to time hereafter designate in writing, as follows:

a.    <u>Interest Rate</u>. Absent an Event of Default (as defined below), no interest shall accrue on any amounts due under this Note.

b.    <u>Monthly Payments</u>. Commencing on February 1, 2024 and continuing on the 1st day of each month thereafter through the Maturity Date, the Borrowers shall pay monthly payments of five thousand five hundred fifty six and no/100ths dollars ($5,556.00) but the

last payment shall be $5,540.00.

        c.      Maturity Date.  Notwithstanding anything to the contrary herein, upon receipt of the thirty-sixth (36th) payment described in Section 2(a) hereof, the entire outstanding principal balance shall be forgiven on February 1, 2027 (the "Maturity Date"). For the avoidance of doubt, absent an Event of Default, Borrower shall pay a total of $200,000.00 to Lender under this Note and the balance of the principal amount shall be forgiven.

        d.      Allocation.  All payments made upon this Note shall be applied in any order Lender determines, in its sole discretion, to the following: (1) to accrued but unpaid interest, (2) to unpaid principal, (3) to reduce charges owed by the Borrowers that are neither principal nor interest, and (4) any partial prepayments of principal will be applied to installments due in the inverse order of their maturity and no such partial prepayment of principal will have the effect of postponing, satisfying, reducing or otherwise affecting any scheduled installment before the Note is paid in full.

        3.      Late Charge.  All installments of interest or payments of principal provided for in this Note shall be paid promptly when due and, if not paid within seven (7) calendar days after the due date thereof, shall be subject to a late charge in an amount equal to five percent (5%) of the payment due and shall be paid to Lender in addition to and at the time of payment of the delinquent installment or payment.

        4.      Prepayment.  The Borrowers shall have the right to prepay the principal balance of this Note, in whole or in part, without penalty at any time, upon payment of all interest accrued to date and other sums then due and payable pursuant to the provisions of this Note.

        5.      Interest Limitation.  Notwithstanding any other provision of this Note or of any instrument securing this Note or any other instrument executed in connection with the loan evidenced hereby, it is expressly agreed that the amounts payable under this Note or under the other aforesaid instruments for the payment of interest or any other payment in the nature of or which would be considered as interest or other charge for the use or loan of money shall not exceed the highest rate allowed by law, from time to time, to be charged by Lender.  In the event the provisions of this Note or of any instruments referred to in this paragraph regarding the payment of interest or other payments which would be considered as interest or other charge for the use or loan of money operate to produce a rate that exceeds such limitation, then the excess over such limitation will not be payable and the amount otherwise agreed to be paid shall be reduced by the excess, so that such limitation will not be exceeded, and in the event any such payment is paid by Borrowers or received by Lender, whereby such limitation is exceeded, the amount of the excess shall constitute and be treated as a payment on the principal hereof and shall operate to reduce such principal by the amount of such excess, unless Borrowers shall notify Lender in writing that Borrower desires to have such excess sum refunded to it.

        6.      Consent and Waiver.  Each Borrower does hereby:  (a) consent to any forbearance or extension of the time or manner of payment hereof and to the release of all or any part of any security held by the Lender to secure payment of this Note, all without notice to or consent of that party; (b) agree that no course of dealing or delay or omission or forbearance on the part of the Lender in

exercising or enforcing any of its rights or remedies hereunder or under any instrument securing this Note shall impair or be prejudicial to any of the Lender's rights and remedies hereunder or to the enforcement hereof and that the Lender may extend, modify or postpone the time and manner of payment and performance of this Note, may grant forbearances and may release, wholly or partially, any security held by the Lender as security for this Note and release, partially and wholly, any person or party primarily or secondarily liable with respect to this Note, all without notice to or consent by any party primarily or secondarily liable hereunder and without thereby releasing, discharging or diminishing its rights and remedies against any other party primarily or secondarily liable hereunder; and (c) waive notice of acceptance of this Note, and presentment, demand, protest, notice of dishonor and notice of protest and notices of any and all action at any time taken or omitted by the Lender in connection with this Note or any instrument securing this Note and waive all requirements necessary to hold that party to the liability of that party.

7.    <u>Cross Default</u>.  A default under this Note shall be and constitute a default under Exit Note A, Exit Financing Note, the Security Agreement, and the Settlement Agreement.  A default under Exit Note A, Exit Financing Note, the Security Agreement, and the Settlement Agreement shall also constitute a default under this Note.

8.    <u>Events of Default and Acceleration</u>.  The happening of any of the following events shall constitute a default hereunder ("Event of Default"):  (a) failure of Borrowers to pay any principal or any other sums when due under this Note; or (b) a default shall occur in any provision of this Note, in any instrument securing this Note, in Exit Note A, in Exit Financing Note, or in the Settlement Agreement; or (c) a change in control in the medical practices of the Borrowers without the consent of Lender, which consent shall not be unreasonably withheld, except that an Event of Default shall not occur with respect to a non-payment default unless the Borrowers fail to cure such non-payment default within seven (7) calendar days after notice of such non-payment default.  Notice under this paragraph shall be effective upon delivery by first class mail or hand delivery to the Borrowers and Borrowers' counsel at Brevard Eye Center, Inc., 665 S. Apollo Blvd., Melbourne, FL 32901, and via email transmission to Borrowers' counsel at gaaronson@aspalaw.com and scapuano@aspalaw.com.

If an Event of Default shall occur hereunder, then at the option of the Lender, the entire principal sum then remaining unpaid together with accrued interest shall immediately become due and payable without notice or demand.  While in default, the entire principal sum and accrued interest shall both bear interest from such default date at a rate equal to eighteen percent (18%); it being agreed that interest not paid when due shall, at the option of the Lender, draw interest at the rate provided for in this paragraph.

The Lender may, in addition, pursue each and every other right, remedy and power under this Note, Exit Note A, Exit Financing Note, the Security Agreement, or the Settlement Agreement, and pursue any other right or remedy available at law and in equity.

The remedies of Lender, as provided herein or in any document securing the Loan evidenced hereby, shall be cumulative and concurrent and may be pursued singularly, successively and together, at the sole discretion of Lender.  No act of omission or commission of the Lender, including, specifi-

cally, any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same, such waiver or release to be effected only through a written document executed by Lender and then only to the extent specifically recited therein.  A waiver or release with reference to any one event shall not be construed as continuing, as a bar to or as a waiver or release of any subsequent right, remedy or recourse as to a subsequent event.

9.     <u>Attorneys' Fees</u>.  All parties liable for the payment of this Note agree to pay the Lender reasonable attorneys' fees and costs, whether or not an action is brought, for the services of counsel employed after maturity or default to collect this Note or any principal or interest due hereunder or to protect the security, if any, or enforce the performance of any other agreement contained in this Note or in any instrument of security executed in connection with this loan, including costs and attorneys' fees on any appeal or in any proceedings under the federal Bankruptcy Code or in any postjudgment proceedings.

10.     <u>Set Off</u>.  The Lender is hereby granted a lien upon and a security interest in all property of Borrowers now or at any time hereafter in the possession of the Lender as security for the payment of this Note, including, but not limited to, any balance or share of any credits, money, deposits, stocks, bonds, certificates of deposit, trust or agency account, and whenever any obligation under this Note matures or otherwise becomes due, whether by acceleration or otherwise, the Lender is hereby authorized to apply and set off against the balance hereunder owed, any such funds or property in possession of the Lender belonging to Borrowers in such order of application as the Lender may from time to time elect, without advance notice or consent of Borrowers.  The Lender also shall have the right, immediately and without further action by it, to set off against the Note all money owed by the Lender in any capacity to Borrowers, whether or not due.

11.     <u>Florida Law; Venue; Time</u>.  This Note constitutes a contract under the laws of the State of Florida and shall be enforceable in a court of competent jurisdiction in that state, regardless of in which state this Note is being executed.  Borrowers consent and agree that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, or related to this Note, Exit Note A, Exit Financing Note, the Security Agreement, or any other document executed by Borrowers and delivered to Lender shall be litigated, in Lender's sole discretion and at the Lender's sole election, only in courts having a situs within or whose jurisdiction includes Brevard County, Florida.  For the purpose of the foregoing, Borrowers hereby consent and submit to the jurisdiction of any local, state or federal court located within or whose jurisdiction includes Brevard County, Florida.  Time is of the essence in this Note.

12.     <u>Headings</u>.  The headings of the paragraphs contained in this Note are for convenience of reference only and do not form a part hereof and no way modify, interpret or construe the meaning of the parties hereto.

13.     <u>Security</u>.  This Note is secured by <u>inter alia</u>, the Security Agreement. It is expressly agreed that all of the covenants, conditions and agreements of the Borrowers under the Security Agreement are made a part of this Note and shall be included in the interpretation of this Note.

14.     <u>Sale or transfer of Note and Security Agreement</u>.  Lender may at any time in its sole discretion sell, transfer or assign the Note, the Security Agreement and/or Exit Note A and/or Exit Financing Note, and any and all servicing rights with respect thereto, or grant participations therein.

15.     <u>Compliance Agreement</u>.  For and in consideration of the funding or renewal of this loan by Lender, the Borrowers hereby agree to cooperate or re-execute any and all loan documentation deemed necessary or desirable in Lender's discretion, in order to correct or to adjust for any clerical errors or omissions contained in any document executed in connection with this loan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD EYE CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

    The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of BREVARD EYE CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)             _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD SURGERY CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of BREVARD SURGERY CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                          _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

MEDICAL CITY EYE CENTER, P.A.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of MEDICAL CITY EYE CENTER, P.A., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                          _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

THMIH, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of THMIH, INC., a Florida corporation, on behalf of the corporation. He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                    _____
(Type, Stamp or Print Name)

My commission expires:

# EXHIBIT "3"

## PROMISSORY NOTE

$250,000.00                  Effective as of _____ ___, 201__  (the "Effective Date")

**FOR VALUE RECEIVED**, BREVARD EYE CENTER, INC., a Florida corporation; BREVARD SURGERY CENTER, INC., a Florida corporation; MEDICAL CITY EYE CENTER, P.A., a Florida corporation; and THMIH, INC., a Florida corporation (collectively, the "Borrowers," and each individually, a "Borrower"), promise to pay to the order of SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company, and its successors and assigns (the "Lender"), the principal sum of TWO HUNDRED FIFTY THOUSAND and No/100ths Dollars ($250,000.00), together with interest as hereinafter stated.

1.    _Definitions_.  As used in this Note, the following terms shall have the respective meaning indicated:

a.    "Exit Note A" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $600,000.00.

b.    "Exit Note B" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $400,000.00.

c.    "Interest Rate Floor" shall mean Five and One Half Percent (5.50%) per annum.

d.    "Prime Rate" shall mean the U.S. "Prime Rate" published in the Wall Street Journal from time to time. If such prime rate shall cease to be published or is published infrequently or sporadically, then the Prime Rate shall be (i) the rate of interest per annum established from time to time by Lender and designated as its base or prime rate, which may not necessarily be the lowest interest rate charged by Lender and is set by Lender in its sole discretion, or (ii) if Lender does not publish or announce a base or prime rate, or does so infrequently or sporadically, then the Prime Rate shall be determined by reference to another base rate, prime rate or similar lending rate index, generally accepted on a national basis, as selected by Lender in its sole and absolute discretion. Each change in such fluctuating interest rate shall take effect simultaneously with the corresponding change in the Prime Rate.

e.    "Property" shall mean the property encumbered by and subject to the lien of the Security Agreement.

f.    "Security Agreement" shall mean that certain Amended and Restated Security Agreement executed by the Borrowers in favor of Lender on or about even date herewith, which encumbers certain property of the Borrowers described therein. The Security Agreement shall secure this Note.

g.    "Settlement Agreement" shall mean that certain Settlement Agreement executed by

the Borrowers and Lender on _____ ___, 2018, pursuant to which the Borrowers and Lender agreed to enter into the Security Agreement and this Note.

2.    <u>Payments</u>.  Principal and interest shall be due and payable in lawful money of the United States of America at the principal office of Lender in _____, or at such other place or places as it or the holders hereof may from time to time hereafter designate in writing, as follows:

a.    <u>Interest Rate</u>.  Interest shall accrue on the outstanding principal balance of this Note at a floating rate equal to the Prime Rate plus Three Percent (3.00%) per annum (the "Interest Rate"). Interest shall be calculated on the basis of a 360 day year, for the actual number of days elapsed; <u>provided</u>, <u>however</u>, that in no event shall the Interest Rate be lower than the Interest Rate Floor.

b.    <u>Monthly Payments</u>.  Commencing on January 1, 2019 and continuing on the 1st day of each month thereafter through the Maturity Date, the Borrowers shall pay monthly payments of principal based on the outstanding principal balance of this Note on January 1, 2019, amortized on a ten year amortization period, plus accrued interest hereunder at the Interest Rate.

c.    <u>Maturity Date</u>.  Notwithstanding anything to the contrary herein, the entire outstanding principal balance, together with any accrued interest, shall be due and payable on January 1, 2022 (the "Maturity Date").

d.    <u>Allocation</u>.  All payments made upon this Note shall be applied in any order Lender determines, in its sole discretion, to the following: (1) to accrued but unpaid interest, (2) to unpaid principal, (3) to reduce charges owed by the Borrowers that are neither principal nor interest, and (4) any partial prepayments of principal will be applied to installments due in the inverse order of their maturity and no such partial prepayment of principal will have the effect of postponing, satisfying, reducing or otherwise affecting any scheduled installment before the Note is paid in full.

3.    <u>Late Charge</u>.  All installments of interest or payments of principal provided for in this Note shall be paid promptly when due and, if not paid within seven (7) calendar days after the due date thereof, shall be subject to a late charge in an amount equal to five percent (5%) of the payment due and shall be paid to Lender in addition to and at the time of payment of the delinquent installment or payment.

4.    <u>Prepayment</u>.  The Borrowers shall have the right to prepay the principal balance of this Note, in whole or in part, without penalty at any time, upon payment of all interest accrued to date and other sums then due and payable pursuant to the provisions of this Note.

5.    <u>Interest Limitation</u>.  Notwithstanding any other provision of this Note or of any instrument securing this Note or any other instrument executed in connection with the loan evidenced hereby, it is expressly agreed that the amounts payable under this Note or under the other aforesaid instruments for the payment of interest or any other payment in the nature of or which would be considered as interest or other charge for the use or loan of money shall not exceed the highest rate allowed by law, from time to time, to be charged by Lender.  In the event the provisions

of this Note or of any instruments referred to in this paragraph regarding the payment of interest or other payments which would be considered as interest or other charge for the use or loan of money operate to produce a rate that exceeds such limitation, then the excess over such limitation will not be payable and the amount otherwise agreed to be paid shall be reduced by the excess, so that such limitation will not be exceeded, and in the event any such payment is paid by Borrowers or received by Lender, whereby such limitation is exceeded, the amount of the excess shall constitute and be treated as a payment on the principal hereof and shall operate to reduce such principal by the amount of such excess, unless Borrowers shall notify Lender in writing that Borrowers desire to have such excess sum refunded to it.

6.    <u>Consent and Waiver</u>.    Each Borrower does hereby:  (a) consent to any forbearance or extension of the time or manner of payment hereof and to the release of all or any part of any security held by the Lender to secure payment of this Note, all without notice to or consent of that party; (b) agree that no course of dealing or delay or omission or forbearance on the part of the Lender in exercising or enforcing any of its rights or remedies hereunder or under any instrument securing this Note shall impair or be prejudicial to any of the Lender's rights and remedies hereunder or to the enforcement hereof and that the Lender may extend, modify or postpone the time and manner of payment and performance of this Note, may grant forbearances and may release, wholly or partially, any security held by the Lender as security for this Note and release, partially and wholly, any person or party primarily or secondarily liable with respect to this Note, all without notice to or consent by any party primarily or secondarily liable hereunder and without thereby releasing, discharging or diminishing its rights and remedies against any other party primarily or secondarily liable hereunder; and (c) waive notice of acceptance of this Note, and presentment, demand, protest, notice of dishonor and notice of protest and notices of any and all action at any time taken or omitted by the Lender in connection with this Note or any instrument securing this Note and waive all requirements necessary to hold that party to the liability of that party.

7.    <u>Cross Default</u>.    A default under this Note shall be and constitute a default under Exit Note A, Exit Note B, the Security Agreement, and the Settlement Agreement.  A default under Exit Note A, Exit Note B, the Security Agreement, and the Settlement Agreement shall also constitute a default under this Note.

8.    <u>Events of Default and Acceleration</u>.    The happening of any of the following events shall constitute a default hereunder ("Event of Default"):  (a) failure of Borrowers to pay any principal, interest or any other sums when due under this Note; or (b) a default shall occur in any provision of this Note, in any instrument securing this Note, in Exit Note A, in Exit Note B or in the Settlement Agreement, except that an Event of Default shall not occur with respect to a non-payment default unless the Borrowers fail to cure such non-payment default within seven (7) calendar days after notice of such non-payment default.  Notice under this paragraph shall be effective upon delivery by first class mail or hand delivery to the Borrowers and Borrowers' counsel at Brevard Eye Center, Inc., 665 S. Apollo Blvd., Melbourne, FL 32901, and via email transmission to Borrowers' counsel at gaaronson@aspalaw.com and scapuano@aspalaw.com.

If an Event of Default shall occur hereunder, then at the option of the Lender, the entire principal sum then remaining unpaid together with accrued interest shall immediately become due

and payable without notice or demand.  While in default, the entire principal sum and accrued interest shall both bear interest from such default date at a rate equal to the Prime Rate at the time of such Event of Default plus ten percent (10%); it being agreed that interest not paid when due shall, at the option of the Lender, draw interest at the rate provided for in this paragraph.

The Lender may, in addition, pursue each and every other right, remedy and power under this Note, Exit Note A, Exit Note B, the Security Agreement, or the Settlement Agreement, and pursue any other right or remedy available at law and in equity.

The remedies of Lender, as provided herein or in any document securing the Loan evidenced hereby, shall be cumulative and concurrent and may be pursued singularly, successively and together, at the sole discretion of Lender.  No act of omission or commission of the Lender, including, specifically, any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same, such waiver or release to be effected only through a written document executed by Lender and then only to the extent specifically recited therein.  A waiver or release with reference to any one event shall not be construed as continuing, as a bar to or as a waiver or release of any subsequent right, remedy or recourse as to a subsequent event.

9.    <u>Attorneys' Fees</u>.  All parties liable for the payment of this Note agree to pay the Lender reasonable attorneys' fees and costs, whether or not an action is brought, for the services of counsel employed after maturity or default to collect this Note or any principal or interest due hereunder or to protect the security, if any, or enforce the performance of any other agreement contained in this Note or in any instrument of security executed in connection with this loan, including costs and attorneys' fees on any appeal or in any proceedings under the federal Bankruptcy Code or in any postjudgment proceedings.

10.    <u>Set Off</u>.  The Lender is hereby granted a lien upon and a security interest in all property of Borrowers now or at any time hereafter in the possession of the Lender as security for the payment of this Note, including, but not limited to, any balance or share of any credits, money, deposits, stocks, bonds, certificates of deposit, trust or agency account, and whenever any obligation under this Note matures or otherwise becomes due, whether by acceleration or otherwise, the Lender is hereby authorized to apply and set off against the balance hereunder owed, any such funds or property in possession of the Lender belonging to Borrowers in such order of application as the Lender may from time to time elect, without advance notice or consent of Borrowers.  The Lender also shall have the right, immediately and without further action by it, to set off against the Note all money owed by the Lender in any capacity to Borrowers, whether or not due.

11.    <u>Florida Law; Venue; Time</u>.  This Note constitutes a contract under the laws of the State of Florida and shall be enforceable in a court of competent jurisdiction in that state, regardless of in which state this Note is being executed.  Borrowers consent and agree that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, or related to this Note, Exit Note A, Exit Note B, the Security Agreement, or any other document executed by Borrowers and delivered to Lender shall be litigated, in Lender's sole discretion and at the Lender's sole election, only in courts having a situs within or whose jurisdiction includes Brevard County, Florida.  For the purpose of the foregoing, Borrowers hereby consent and submit to the jurisdiction

of any local, state or federal court located within or whose jurisdiction includes Brevard County, Florida.  Time is of the essence in this Note.

12.    <u>Headings</u>.  The headings of the paragraphs contained in this Note are for convenience of reference only and do not form a part hereof and no way modify, interpret or construe the meaning of the parties hereto.

13.    <u>Security</u>.  This Note is secured by <u>inter alia</u>, the Security Agreement. It is expressly agreed that all of the covenants, conditions and agreements of the Borrowers under the Security Agreement are made a part of this Note and shall be included in the interpretation of this Note.

14.    <u>Sale or transfer of Note and Security Agreement</u>.  Lender may at any time in its sole discretion sell, transfer or assign the Note, Exit Note A, Exit Note B, the Security Agreement, and any and all servicing rights with respect thereto, or grant participations therein.

15.    <u>Compliance Agreement</u>.  For and in consideration of the funding or renewal of this loan by Lender, the Borrowers hereby agree to cooperate or re-execute any and all loan documentation deemed necessary or desirable in Lender's discretion, in order to correct or to adjust for any clerical errors or omissions contained in any document executed in connection with this loan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD EYE CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of BREVARD EYE CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)               _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD SURGERY CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of BREVARD SURGERY CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

MEDICAL CITY EYE CENTER, P.A.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of MEDICAL CITY EYE CENTER, P.A., a Florida corporation, on behalf of the corporation. He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                      _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

THMIH, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of THMIH, INC., a Florida corporation, on behalf of the corporation. He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                 _____
(Type, Stamp or Print Name)

My commission expires:

# EXHIBIT "4"

## AMENDED AND RESTATED
## SECURITY AGREEMENT

THIS **AMENDED AND RESTATED SECURITY AGREEMENT** ("**Security Agreement**") made effective as of _____ ____, 2018, from **BREVARD EYE CENTER, INC.,** a Florida corporation, having a mailing address of 665 South Apollo Boulevard, Melbourne, Florida 32901; **BREVARD SURGERY CENTER, INC.**, a Florida corporation, having a mailing address of 665 South Apollo Boulevard, Melbourne, Florida 32901; **MEDICAL CITY SURGERY CENTER, INC.**, a Florida corporation, having a mailing address of 665 South Apollo Boulevard, Melbourne, Florida 32901; **THMIH, INC.**, a Florida corporation, having a mailing address of 665 South Apollo Boulevard, Melbourne, Florida 32901 (herein, whether one or more, called **"Debtor"**), to **SUMMITBRIDGE NATIONAL INVESTMENTS V LLC**, a Delaware limited liability company, and its successors and assigns, having an address of _____ (herein, together with its successors and assigns, called **"Secured Party"** or "**SummitBridge**," and together with Debtor, the "**Parties**").

## W I T N E S S E T H:

**WHEREAS**, Debtor had previously entered into a loan (the **"Loan"**) evidenced by that certain promissory note dated as of July 18, 2016, in the maximum original principal amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (the **"Original Note"**), which Original Note was secured by that certain Commercial Security Agreement in favor of the Secured Party dated as of July 18, 2016 (the **"Original Security Agreement"**), pursuant to which Debtor granted a security interest in all of Debtor's Collateral (as such term is defined in the Original Security Agreement); and

**WHEREAS**, Debtor and the Secured Party have entered into that certain settlement agreement executed on or about the date hereof (the **"Settlement Agreement"**), pursuant to which, *inter alia*, the Debtor and Secured Party have agreed to amend and restate the Original Security Agreement and restructure the Loan.

**NOW, THEREFORE**, in consideration of loans, advances or other financial accommodations made or to be made by Secured Party to Debtor, and for other value received by Debtor, the parties hereto, intending to be legally bound, agree as follows:

1.    **Security Interest**. Debtor grants to Secured Party a continuing security interest (the **"Security Interest"**) in all accounts receivable, equipment, inventory, personal property, business assets and fixtures now owned or hereafter acquired by Debtor, and in all increases, parts, fittings, accessories, attachments, additions, and accessions thereto, substitutions and replacements therefore and in all proceeds thereof in any form, together with all records relating thereto, as more particularly described in ***Exhibit "A"*** attached hereto (the **"Collateral"**).

2.    **Indebtedness Secured**. This Security Agreement secures (a) that certain Six Hundred Thousand and 00/100 Dollars ($600,000.00) Note of even date herewith (**"Exit Note A"**) (b) that certain Four Hundred Thousand and 00/100 Dollars ($400,000.00) Note of even date herewith (**"Exit Note B"**) and (c) that certain Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) Note of even date herewith (the **"Exit Financing Note"**, and together with Exit

Note A and Exit Note B, collectively, the **"Notes"** and each individually a **"Note"**).   The borrowing relationship between Debtor and Secured Party is to be a continuing one and may cover numerous types of extensions of credit, loans, overdraft payments, or advances made directly or indirectly to Debtor under the Notes. Accordingly, this Security Agreement and the Security Interest created hereby secures payment of all obligations of any kind owing by Debtor to Secured Party arising from the Notes, whether now existing or hereafter incurred, direct or indirect, primary or secondary, sole or joint and several, contingent or non-contingent, liquidated or non-liquidated, or otherwise, and whether the obligations are from time to time reduced and thereafter increased or entirely extinguished and new obligations thereafter incurred, including, without limitation, any sums advanced and any expenses or obligations incurred by Secured Party pursuant to this Security Agreement (including attorneys' fees and costs as provided herein) or any other agreement concerning, evidencing or securing obligations of Debtor to Secured Party, and any liabilities of Debtor to Secured Party arising from any source whatsoever and all extensions, renewals and modifications thereof (collectively, the **"Indebtedness"**).

3.     **Representations and Warranties of Debtor**.  Debtor represents and warrants and so long as this Security Agreement continues in force as provided in paragraph 7 hereof shall be deemed continuously to represent and warrant that:

(a)     Debtor is the sole and absolute owner of the Collateral free of all security interest and other encumbrances or claims, except for the security interests on the Collateral that existed prior to the Debtors' bankruptcy filing.

(b)     Debtor is authorized to enter into this Security Agreement and into the transactions evidenced by the Collateral.

(c)     The Collateral is used or bought for use primarily for business purposes.

(d)     By virtue of this Security Agreement and the perfection of the Security Interest as provided in paragraph 1 hereof, Secured Party has a valid, enforceable, and perfected security interest in the Collateral.

4.     **General Covenants of Debtor**.  So long as this Security Agreement continues in force as provided in paragraph 7 hereof, Debtor:  (a) will defend the Collateral against the claims and demands of all other persons at any time claiming the same; keep the Collateral free from all security interests or other encumbrances or claims whatsoever except the Security Interest and any security interests that existed prior to the execution of the Settlement Agreement, and will not sell, transfer, assign, deliver or otherwise dispose of any of the Collateral or any interest therein without the prior written consent of Secured Party, except for bona fide sales, assignments, transfers, or other dispositions in the ordinary course of business and dispositions of property which is obsolete and not used or useful in its business; (b) will not without the prior written consent of Secured Party create in favor of anyone other than Secured Party a security interest in any of the Collateral; (c) will notify Secured Party promptly in writing of any change in Debtor's address, name or identity from that specified above, and will permit Secured Party or its agents to inspect the Collateral at any time, wherever located, with reasonable prior notice to the Borrower exception in emergencies or default; (d) will keep the Collateral in good condition and repair, ordinary wear and tear and ordinary course dispositions excepted and will not use the

Collateral in violation of any provisions of this Security Agreement, of any applicable statute, regulation or ordinance or of any policy of insurance insuring the Collateral; (e) will notify Secured Party promptly in writing of any change in Debtor's address, name or identity specified above, of any change in the location or of any additional locations at which the Collateral is kept and of any change in the address at which records concerning the Collateral are kept; (f) in connection herewith will execute and deliver to Secured Party such financing statements and other documents, and take such other action as Secured Party may deem necessary or advisable to perfect the Security Interest created by this Security Agreement; (g) will pay or cause to be paid all taxes, assessments and other charges of every nature which may be levied or assessed against the Collateral or against any note or other instrument evidencing the Indebtedness provided that, unless any material item or property would be lost, forfeited or materially damages as a result thereof, no such charge or claim need to be paid if it is being diligently contested in good faith, if Lender is notified in advance of such contest and if Borrower establishes and adequate reserve or other appropriate provisions required by generally accepted accounting principles; (h) will keep the Collateral insured in amounts not less than the full insurable value thereof for the benefit of Secured Party (to whom loss shall be payable by New York Standard or Union Standard endorsements), in such companies and against such risks as may be satisfactory to or required by Secured Party (and each policy shall specifically provide that it may not be cancelled or modified adversely to the interests of Secured Party without 30 calendar days prior written notice to Secured Party), pay the cost of all such insurance, and deliver certificates evidencing such insurance to Secured Party, and Debtor assigns to Secured Party all right to receive proceeds of such insurance; (i) will prevent the Collateral or any part thereof from being or becoming an accession to other goods not covered by this Security Agreement; (j) unless the Collateral is specified in paragraph 3(e) as a fixture, will prevent the Collateral or any part of the Collateral from being or becoming a fixture; and (k) if any certificate of title may be issued with respect to any of the Collateral, Debtor will cause the Security Interest granted hereunder to Secured Party to be properly noted on the certificate and will deliver the original certificate to Secured Party.

5.    **Default**.

(a) Any of the following events or conditions shall constitute an event of default (**"Event of Default"**) hereunder: (i) non-payment when due whether by acceleration or otherwise of the principal of, or interest on any Indebtedness, time being of the essence, or failure of any Obligor (which term shall mean and include each Debtor and any endorser, surety, guarantor or other party liable for payment of, or pledging collateral as security for, any Indebtedness) to pay any sum due under any note or other instrument evidencing the Indebtedness or due by any Obligor to Secured Party under any other promissory note or under any security instrument or other written obligation of any kind now existing or hereafter created, subject to any applicable grace or cure period set forth in the applicable Loan Documents; (ii) failure by any Obligor to perform any obligations under this Security Agreement or any other agreement between any Obligor and Secured Party; (iii) death of any Obligor (unless a substitute obligor acceptable to Secured Party is provided to Secured Party within 30 calendar days of the date thereof); (iv) a commencement by the Borrower of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or the entry of a decree or order for relief in respect of the Borrower in a case under any such law or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrate (or other similar official) of the Borrower, or for any

substantial part of the property of Borrower, or ordering the wind-up or liquidation of the affairs of Borrower; or the filing and pendency for 30 calendar days without dismissal of a petition initiating an involuntary case under any such bankruptcy, insolvency or similar law, or the insolvency of any Obligor; (v) making a general assignment by any Obligor for the benefit of creditors, appointment of or taking possession by a receiver, trustee, custodian or similar official for any Obligor or for any assets of any such Obligor, (vi) the rendition of a final judgment against Borrower for the payment of damages or money in an amount in excess of $50,000.00, if the same is not discharge or if a writ of execution or similar process is issued with respect thereto and is not stayed within the time allowed by law for filing notice of appeal of the final judgment; (vii) material falsity in any certificate, statement, representation, warranty or audit at any time furnished to Secured Party by or on behalf of any Obligor, pursuant to or in connection with this Security Agreement or otherwise (including warranties in this Security Agreement) and including any omission to disclose any substantial contingent or liquidated liabilities or failure to disclose any material adverse change in any facts disclosed by any certificate, statement, representation, warranty, or audit furnished to Secured Party; (viii) issuing of any writ of attachment or writ of garnishment, or filing of any lien against the Collateral or the property of any Obligor; (ix) taking of possession of the Collateral or of any substantial part of the property of any Obligor at the instance of any governmental authority; (x) dissolution, merger, consolidation or reorganization of any Obligor; (xi) assignment or sale by Debtor of any equity in any of the Collateral, other than assignments, sales, dispositions and transfers occurring in the ordinary course, without the prior written consent of Secured Party; (xiii) cancellation of any guaranty with respect to any Indebtedness without the prior written consent of Secured Party; or (xiv) default by an Obligor under any other loan or indebtedness to Secured Party or to any other lender, which default continues past any applicable cure or grace period.

(b)     Secured Party may declare all or part of the Indebtedness to be immediately due and payable without notice or demand upon the happening of any Event of Default.  This paragraph is not intended to affect any rights of Secured Party with respect to any Indebtedness which may now or hereafter be payable on demand.

(c)     Upon the happening of any Event of Default, Secured Party's rights and remedies with respect to the Collateral shall be those of a secured party under the Uniform Commercial Code and any other applicable law from time to time in effect. Secured Party shall also have any additional rights granted herein and in any other agreement now or hereafter in effect between Debtor and Secured Party.  If requested by Secured Party, the Debtor, at its expense, will assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party.

(d)     Debtor agrees that any notice by Secured Party of the sale or disposition of the Collateral or any other intended action hereunder, whether required by the Uniform Commercial Code or otherwise, shall constitute reasonable notice to Debtor if the notice is sent via e-mail to _____, or mailed by regular or certified mail, postage prepaid, at least ten (10) calendar days before the action to Debtor's address as specified in this Security Agreement, to counsel for the Debtor via e-mail to gaaronson@aspalaw.com and scapuano@aspalaw.com, and to any other address which Debtor has specified in writing to Secured Party as the address to which notices shall be given to Debtor.

(e)     Debtor shall pay all costs and expenses incurred by the Secured Party in enforcing this Security Agreement, realizing upon any Collateral and collecting any Indebtedness, including reasonable attorneys' fees whether suit is brought or not and whether incurred in connection with collection, trial, appeal, bankruptcy or otherwise, all of which costs and expenses shall be secured hereby, and shall be liable for any deficiencies in the event the proceeds of disposition of the Collateral do not satisfy the Indebtedness in full.   All such proceeds shall be applied without marshaling of assets (i) first to the expenses of retaking and preparing the Collateral for sale, including expenses of sale, (ii) next to other costs and attorneys' fees incurred by Secured Party in exercising its rights and remedies under this Security Agreement, and (iii) finally to the payment of interest and/or principal due on the Indebtedness, in such order and to such Indebtedness as Secured Party may determine.

(f)     All rights and remedies of Secured Party under this Security Agreement and under the Uniform Commercial Code shall be deemed cumulative and not in substitution of any other rights at law or equity with respect to the Collateral or the collection of the Indebtedness. Debtor hereby waives notice of any and all actions, forbearances, and omissions of any rights contemplated by this Section and consents to be bound thereby as effectively as if Debtor had agreed to do so in advance.

7.     **Miscellaneous**.

(a)     Debtor authorizes Secured Party without notice to Debtor and without affecting Debtor's obligations hereunder from time to time (i) to renew, extend, increase, accelerate or otherwise change the time for payment of the principal of or the interest on the Indebtedness or any part thereof; (ii) to take from any party and hold collateral (other than the Collateral) for the payment of the Indebtedness or any part thereof, and to exchange, enforce or release such collateral or the Collateral or any part thereof; (iii) to accept and hold any endorsement or guaranty of payment of the Indebtedness or any part thereof and to release or substitute any such endorser or guarantor, or any party who has given any security interest in any collateral as security for the payment of the Indebtedness or any part thereof or any party in any way obligated to pay the Indebtedness or any part thereof; and (iv) to waive or fail to enforce any of Secured Party's rights against Debtor or any such collateral or the Collateral; and (v) upon the occurrence of any Event of Default to direct the order or manner of the disposition of the Collateral and any other collateral and the enforcement of any endorsements and guaranties relating to the Indebtedness or any part thereof as Secured Party in its sole discretion may determine.

(c)     Debtor authorizes Secured Party to file any financing statement or statements relating to the Collateral (without Debtor's signature thereon) which Secured Party deems appropriate, and Debtor authorizes Secured Party as Debtor's attorney-in-fact to execute any such financing statement or statements in Debtor's name and to perform all other acts which Secured Party deems appropriate to perfect and to continue perfection of the Security Interest. At the option of Secured Party, this Security Agreement, or a photocopy thereof, shall be deemed to be a financing statement authorized to be filed in such jurisdictions where such filing will be given effect.

(c)      Debtor hereby irrevocably consents to Secured Party or its agents entering upon its premises for the purpose of either (1) inspecting the Collateral with reasonable prior notice except for emergency or (2) taking possession of the Collateral after any Event of Default; and Debtor hereby waives its right to assert against Secured Party or its agents any claim based upon trespass or any similar cause of action for entering upon its premises where the Collateral may be located.

(d)      After an Event of Default Secured Party may notify any party obligated to pay proceeds of the existence of the Security Interest and may also direct them to make payments of all proceeds to Secured Party.

(e)      Secured Party may demand, collect and sue for all proceeds (either in Debtor's name or Secured Party's name at the latter's option) with the right to enforce, compromise, settle or discharge any proceeds. Debtor irrevocably appoints Secured Party as Debtor's attorney-in-fact to endorse Debtor's name on all checks, commercial paper and other instruments pertaining to the proceeds.

(f)      Debtor authorizes Secured Party to collect and apply against the Indebtedness any refund of insurance premiums or any insurance proceeds payable on account of the loss of or damage to any of the Collateral and irrevocably appoints Secured Party as Debtor's attorney-in-fact to adjust and settle any insurance claim relating to the Collateral and to endorse any check or draft representing insurance proceeds.

(g)      As further security for the Indebtedness, Debtor grants to Secured Party a security interest in all property of the Debtor now or at any time hereafter in the possession of Secured Party in any capacity whatsoever, including, but not limited to, any balance or share of any deposit, trust or agency account; and with respect to all of such property, Secured Party shall have the same rights as it has with respect to the Collateral. (ii) Without limiting any other right of Secured Party, whenever Secured Party has the right to declare any Indebtedness to be immediately due and payable (whether or not it has so declared), Secured Party may set off against the Indebtedness all monies then owed to Debtor by Secured Party in any capacity whether due or not and Secured Party shall be deemed to have exercised its right of set off immediately at the time its right to such election accrues.

(h)      Upon Debtor's failure to perform any of its duties hereunder Secured Party may, but it shall not be obligated to, perform any of such duties and Debtor shall forthwith upon demand reimburse Secured Party for any expense incurred by Secured Party in doing so, together with interest thereon at the highest rate permitted by applicable law.

(i)      No delay or omission by Secured Party in exercising any right hereunder or with respect to any Indebtedness shall operate as a waiver of that or any other right, and no single or partial exercise of any right shall preclude Secured Party from any other or future exercise of the right or the exercise of any other right or remedy.  Secured Party may cure any Event of Default by Debtor in any reasonable manner without waiving the Event of Default so cured and without waiving any other prior or subsequent Event of Default by Debtor.

(j)      Secured Party shall have no obligation to take and Debtor shall have the sole responsibility for taking any steps to preserve rights against all prior parties to any instrument or chattel paper in Secured Party's possession as proceeds of the Collateral. Debtor waives notice of dishonor and protest of any instrument constituting Collateral at any time held by Secured Party on which the Debtor is in any way liable and waives notice of any other action by Secured Party.

(k)      The rights and benefits of Secured Party under this Security Agreement shall, if Secured Party agrees, inure to any party acquiring an interest in the Indebtedness or any part thereof. Secured Party may from time to time honor drafts or otherwise advance funds to permit Debtor to purchase additional assets.  Any assets purchased with such funds shall become part of the Collateral.

(l)      The terms "Secured Party" and "Debtor" as used in this Security Agreement include the heirs, personal representatives, and successors or assigns of those parties. The terms "inventory", "accounts", "general intangibles" and "chattel paper" as used in this Security Agreement shall have the meanings given to such terms in the Florida Uniform Commercial Code.  Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

(m)      If more than one Debtor executes this Security Agreement, the term "Debtor" includes each of the Debtors as well as all of them, and their obligations under this Security Agreement shall be joint and several.

(n)      This Security Agreement is a continuing agreement which shall remain in force until it is marked "Cancelled" and returned to Debtor by Secured Party upon payment in full of all Indebtedness (and no further right on the part of the Debtor to obtain any advances or other disbursements from Secured Party) and, until such time, this Security Agreement shall continue to secure all of the Indebtedness and any extensions, renewals or modifications of the Indebtedness.

(o)      This Security Agreement shall be construed under and governed by the Florida Uniform Commercial Code and any other applicable Florida laws in effect from time to time.

(p)      This Security Agreement constitutes the complete agreement of the parties in regard to the matters set forth herein and this Security Agreement may not be modified or amended and no provision hereof shall be waived except by a writing signed by the party to be charged with such modification, amendment or waiver. This Security Agreement amends and restates all previous security agreements between and among the parties hereto.

(q)      Debtor agrees to provide Secured Party with Debtors' tax returns and quarterly financial statements in a form reasonably requested by Secured Party.  Financial statements for each quarter of the calendar year must be provided no later than the twentieth calendar day after the end of each quarter of the calendar year, and tax returns must be provided no later than the thirtieth calendar day after filing of said return.

8.      **Waiver**.  The Debtor hereby waives any rights Debtor may have to notice and a hearing before possession or sale of Collateral is effected by Secured Party by self-help, replevin, attachment, or otherwise.  Debtor further waives any right to a trial by jury in any civil action arising out of, or based upon, this Security Agreement or the Collateral.

9.      **Waiver of Venue and Jurisdiction**.  Debtor, whether or not a Florida resident, hereby waives any plea or claim of lack of personal jurisdiction or improper venue in any action, suit or proceeding brought upon to enforce this Security Agreement or the Debtor's obligations and liabilities hereunder.  The Debtor specifically authorizes any such action to be instituted and prosecuted in the Circuit Court in and for Brevard County, Florida, or any applicable United States District Court of Florida, at the election of Secured Party, where venue would lie and be proper against any Debtor.

**10.    Waiver of Jury Trial.  SECURED PARTY AND DEBTOR HEREBY KNOWINGLY VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS SECURITY AGREEMENT AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OF ACTIONS OR EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE SECURED PARTY ENTERING INTO THIS AGREEMENT.**

**IN WITNESS WHEREOF**, Debtor has duly executed this Security Agreement as of the date first above written.

Signed, sealed and delivered in the

Print Name: _____

_____

Print Name: _____

BREVARD EYE CENTER, INC.,
a Florida corporation

By: _____
Print Name: _____
As its: _____

Signed, sealed and delivered in the

Print Name: _____

_____

Print Name: _____

BREVARD SURGERY CENTER, INC.,
a Florida corporation

By: _____
Print Name: _____
As its: _____

Signed, sealed and delivered in the

Print Name: _____

_____

Print Name: _____

MEDICAL CITY EYE CENTER, INC.,
a Florida corporation

By: _____
Print Name: _____
As its: _____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, Debtor has duly executed this Security Agreement as of the date first above written.

Signed, sealed and delivered in the                    THMIH, INC.,
                                                       a Florida corporation

_____
Print Name: _____

                                                       By: _____
                                                       Print Name:_____
                                                       As its: _____

_____
Print Name: _____

## EXHIBIT "A"

The Debtor hereby assigns and grants to the Secured Party a security interest in all of the following assets of the Debtor (collectively, the "**Collateral**"):

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(a)    all accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later;

(b)    all products and produce of any of the property described in this Collateral section;

(c)    all accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section;

(d)    all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement, or other process;

(e)    all records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

# EXHIBIT "5"

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "Agreement") is made as of _____, 2018, by and among AARONSON SCHANTZ BEILEY P.A., a Florida professional association (the "Subordinated Creditor"); BREVARD EYE CENTER, INC., a Florida corporation, BREVARD SURGERY CENTER, INC., a Florida corporation, MEDICAL CITY EYE CENTER, INC., a Florida corporation, and THMIH, INC., a Florida corporation (the "Borrowers" or the "Debtors"), and SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company (the "Lender").

WHEREAS, in order to induce the Lender to enter into and consummate a settlement agreement and pursuant to the terms of the settlement agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE 1 -- DEFINITIONS

SECTION 1.1   Specific Definitions.  As used in this Agreement, the term:

"Insolvency Proceeding" means any receivership, conservatorship, general meeting of creditors, insolvency or bankruptcy proceeding, assignment for the benefit of creditors, or any proceeding by or against any Borrower for any relief under any bankruptcy or insolvency law or other laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions or extensions, including, without limitation, proceedings under federal bankruptcy laws, or under other federal, state or local statutes, laws, rules and regulations, all whether now or hereafter in effect.

"Lien" means any mortgage, deed of trust, deed to secure debt, grant, pledge, security interest, assignment, encumbrance, judgment, financing statement, lien or charge of any kind, whether perfected or unperfected, voidable or unavoidable, consensual or non-consensual including, without limitation, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"Loan Documents" means the collective reference to each and every note, instrument, security agreement, pledge agreement, guaranty agreement, mortgage, deed of trust, deed to secure debt, loan agreement, hypothecation agreement, indemnity agreement, letter of credit application, assignment, confirmed chapter 11 plan (if any), or any other document (whether similar or dissimilar to any of the foregoing) previously, simultaneously or hereafter executed or delivered by any Borrower or any other Person, singly or jointly with another Person or Persons, in connection with any of the Senior Indebtedness.

"Person" means an individual, a corporation, a limited liability company, a partnership, a joint venture, a trust, an unincorporated association, a government or political subdivision or agency thereof or any other entity.

"Security" means, with respect to the Borrowers, any security agreement, pledge, pledge agreement, guaranty agreement, mortgage, deed of trust, deed to secure debt, trust deed, land trust, indenture, indemnity deed of trust, indemnification agreement, proceeding in rem, reimbursement agreement, financing statement, purchase agreement, conditional sales contract, installment sales contract, collateral agreement, financing lease, letter of credit, bond, loan agreement, hypothecation agreement, deposit, financing statement or assignment, and also means any agreement, document, security device or arrangement, document, statutory lien, lien arising by operation of law, judgment or other lien, right of setoff, encumbrance, proceeding or other document or right, in whatever form or

31755356 v1

however arising, whether similar or dissimilar to the foregoing which directly or indirectly secures or enforces payment or performance of any Person against, or otherwise encumbers or gives notice of an encumbrance upon, the real property, personal property, rights or assets of any Person.

"Senior Indebtedness" means all indebtedness, liabilities and obligations of the Borrowers to the Lender of every kind and nature whatsoever, whether now existing or hereafter arising or created at any time.

"Subordinated Indebtedness" means any and all existing and future indebtedness, liabilities, claims (whether in an Insolvency Proceeding or otherwise) and obligations of any Borrower to the Subordinated Creditor of every kind and nature whatsoever arising out of, relating to this Subordination Agreement.

SECTION 1.2   Other Definitional Provisions.  Unless otherwise defined herein, all terms used herein which are defined by the Florida Uniform Commercial Code have the same meanings as assigned to them by the Florida Uniform Commercial Code unless and to the extent varied by this Agreement. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, schedule and exhibit references are references to sections or subsections of, or schedules or exhibits to, as the case may be, this Agreement unless otherwise specified.  As used herein, the singular number shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders, as the context may require. Reference to any one or more of the Loan Documents and any of the Loan Documents shall mean the same as the foregoing may from time to time be amended, restated, substituted, extended, renewed, supplemented or otherwise modified.

ARTICLE 2 -- SUBORDINATION

SECTION 2.1   Subordinated Indebtedness.

(a)      If the Borrowers are at any time in default with respect to the Senior Indebtedness or any of the Loan Documents evidencing the Senior Indebtedness, the Subordinated Creditor shall not, without the prior written consent of the Lender, enforce the Subordinated Indebtedness, demand or receive payment of the Subordinated Indebtedness, accelerate the Subordinated Indebtedness, declare a default under the Subordinated Indebtedness, sue for the Subordinated Indebtedness, or set-off the Subordinated Indebtedness.

SECTION 2.2   Security.  The Subordinated Creditor and the Borrowers agree, represent and warrant that the Subordinated Indebtedness is not, and shall not be secured in any way directly or indirectly by any Security.

SECTION 2.3   Further Representations and Warranties.(a)      The Subordinated Creditor represents and warrants to the Lender that the Subordinated Creditor is the exclusive legal and beneficial owner of all of the Subordinated Indebtedness, and such Subordinated Indebtedness is not subject to any lien, security interest, financing statement, subordination, assignment or other claim.

(b)      Each Borrower represents and warrants to the Lender that the execution, delivery and performance of this Agreement is within the corporate powers of the Borrowers, has been duly authorized by all necessary corporate action of the Borrowers, and does not contravene any  statute, regulation, rule, order or judgment, any charter, by-law or preference stock provision of the Borrowers, or any provision of any mortgage, indenture, contract or other agreement binding on the Borrowers or

2

affecting its properties, which would prohibit, or cause a default under or in any way prevent the execution, delivery, or carrying out of the terms of this Agreement.

SECTION 2.4   Further Documents.  The Subordinated Creditor and the Borrowers agree they shall promptly execute such further documents and acknowledgments (including, without limitation, amendments to and releases of financing statements and other documents of record) as the Lender may reasonably require to confirm or evidence their respective obligations and the Lender's rights under this Agreement.

## ARTICLE 3 -- DISTRIBUTIONS AND RECEIPTS

SECTION 3.1   Distributions, etc. If the Borrowers are at any time in default with respect to the Senior Indebtedness or any of the Loan Documents evidencing the Senior Indebtedness, the Subordinated Creditor shall not receive any payment or distribution of any sort whatsoever from the Borrowers or any Person of any sort whatsoever on account of the Subordinated Indebtedness, and during the time of any such default, any payment, distribution or benefit of any kind whatsoever or character, either in cash, securities or other property, otherwise payable or paid to the Subordinated Creditor on account of the Subordinated Debt, shall be paid or delivered directly to the Lender for application to the Senior Indebtedness (whether due or not due and in such order and manner as the Lender may elect; and including, without limitation any interest accruing subsequent to the commencement of any such event or Insolvency Proceedings).

SECTION 3.2   Receipts by Subordinated Creditor. Should any payment or distribution not permitted by the provisions of this Agreement or property or proceeds thereof be received by the Subordinated Creditor upon or with respect to all or any part of the Subordinated Indebtedness and/or the Security during any time when the Borrowers are in default with respect to the Senior Indebtedness or the Loan Documents evidencing the Senior Indebtedness, the Subordinated Creditor will deliver the same to the Lender in precisely the form received (except for the endorsement or assignment of the Subordinated Creditor when the Lender deems appropriate), for application to the Senior Indebtedness (whether due or not due and in such order and manner as the Lender may elect), and, until so delivered, the same shall be held in trust by the Subordinated Creditor as property of the Lender. In the event of the failure of the Subordinated Creditor to make any such endorsement or assignment, the Lender, or any of its officers or employees on behalf of the Lender, are hereby irrevocably authorized in their own name or in the name of the Subordinated Creditor to make the same.

## ARTICLE 4 -- ADDITIONAL AGREEMENTS

SECTION 4.1   Consents, Waivers, etc.  The Subordinated Creditor hereby waives demand, presentment for payment, protest, notice of dishonor and of protest with respect to the Senior Indebtedness, the Subordinated Indebtedness and/or the Security, notice of acceptance of this Agreement, notice of the making of any of the Senior Indebtedness and notice of default under any of the Loan Documents.

SECTION 4.2   Continuing Agreement.  This is a continuing Subordination Agreement until all of the Senior Indebtedness has been fully and indefeasibly paid in cash, until all of the Senior Indebtedness and all of the Subordinated Creditor's obligations to the Lender have been performed and satisfied, and until Lender has no obligation or agreement to allow further Senior Indebtedness.

SECTION 4.3   No Third Party Beneficiaries.  The provisions of this Agreement are solely for the benefit of the Lender, its successors and assigns, and to any Person which, with the Lender's concurrence, replaces financing provided by the Lender, and there are no other parties or Persons

3

whatsoever (including, without limitation, the Borrowers, its successors and assigns) who are intended to be benefited in any manner whatsoever by this Agreement.

SECTION 4.4  Transfer or Assignment of Senior Indebtedness.  If any of the Senior Indebtedness should be transferred or assigned by Lender this Agreement will inure to the benefit of such transferee or assignee, provided that such transferee or assigneee shall continue to have the unimpaired right to enforce this Agreement as to any of the Senior Indebtedness not so transferred or assigned.

SECTION 4.5  Actions Upon Breach.

(a)    If the Subordinated Creditor, contrary to this Agreement, commences or participates in any action or proceeding against any of the Borrowers or the Security, the Borrowers may interpose as a defense the making of this Agreement, and the Lender may intervene and interpose such defense or plea in the Lender's name or in the name of any of the Borrowers. Should the Subordinated Creditor, contrary to this Agreement, in any way attempt to enforce payment of the Subordinated Indebtedness or any part thereof or to realize upon the Security or any part thereof, either the Lender (in its own name or in the name of any of the Borrowers), any of the Borrowers itself, or both the Lender and any of the Borrowers, may restrain the Subordinated Creditor from so doing, it being understood and agreed by the Subordinated Creditor that (i) the Lender's and/or the Borrower's damages from its actions may at that time be difficult to ascertain and may be irreparable, and (ii) the Subordinated Creditor waives any defense that any of the Borrowers and/or that the Lender cannot demonstrate damage and/or can be made whole by the awarding of damages.

(b)    If the Subordinated Creditor, any of the Borrowers or both, contrary to this Agreement, make, attempt to or threaten to make or receive any payment, take any action with respect to the Security or take any action contrary to this Agreement, or fail to take any action required by this Agreement, the Lender may obtain relief by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Subordinated Creditor and each of the Borrowers that (i) the Lender's' damages may at that time be difficult to ascertain and may be irreparable and (ii) the Subordinated Creditor and the Borrowers waive any defense or claim that any of the Borrowers and/or the Lender cannot demonstrate damage and/or can be made whole by the awarding of damages.

(c)    Each of the Borrowers agrees to indemnify the Lender and to hold the Lender harmless for any and all costs and expenses (including, without limitation, reasonable attorney's fees) as they arise, relating to actions of any of the Borrowers taken contrary to this Agreement.

(d)    The Subordinated Creditor agrees to indemnify the Lender and to hold the Lender harmless for any and all costs and expenses (including, without limitation, reasonable attorney's fees) as they arise, relating to actions of the Subordinated Creditor taken contrary to this Agreement.

SECTION 4.7  Subrogation; Marshalling.  The Subordinated Creditor shall not be subrogated to, or be entitled to any assignment of any Senior Indebtedness or evidence of any evidence of Senior Indebtedness or any Security until all Senior Indebtedness is indefeasibly paid and satisfied in full.  The Subordinated Creditor hereby waives any and all rights to have any Security or any part thereof granted to the Lender marshaled in any Insolvency Proceedings or upon any foreclosure or other disposition of such Security by the Lender or otherwise.

ARTICLE 5 -- MISCELLANEOUS

SECTION 5.1  Additional Senior Indebtedness.

31755356 v1

    (a)  Nothing herein contained shall obligate Lender to grant credit to, or financing arrangements with, any of the Borrowers.

    (b)  If, for any reason, Lender grants new credit to any of the Borrowers, or extends new loans to any of the Borrowers, the Subordinated Creditor shall not be subordinated as set forth herein to such new credit or new loan.

SECTION 5.2   <u>Delay in Enforcement, etc</u>. No delay or failure on the part of the Lender to exercise any of its rights or remedies hereunder or now or hereafter existing at law or in equity or by statute or otherwise, or any partial or single exercise thereof, shall constitute a waiver thereof.  All such rights and remedies are cumulative and may be exercised singly or concurrently and the exercise of any one or more of them will not be a waiver of any other.  No waiver of any rights and remedies hereunder, and no modification or amendment of this Agreement shall be deemed to be made by the Lender unless the same shall be in writing, duly signed by the Lender, and each such waiver, if any, shall apply only with respect to the specific instance involved and shall in no way impair the rights and remedies of the Lender hereunder in any other respect at any other time.

SECTION 5.3   <u>Successors and Assigns.</u>  This Agreement shall be binding upon the Subordinated Creditor and the Borrowers and the Subordinated Creditor's and the Borrower's respective heirs, personal representatives, successors and assigns and shall inure to the benefit of the Lender and the Lender's successors and assigns, other holders or obligees under the Senior Indebtedness and any Person which, with the Lender's concurrence replaces financing provided by the Lender.

SECTION 5.4   <u>Headings</u>.  The titles and headings of Articles, sections or other parts of this Agreement are for convenience only, and shall not limit or otherwise affect any of the terms hereof.

SECTION 5.5   <u>Governing Law</u>.   This Agreement shall be governed and construed in accordance with the laws of the State of Florida, with the same force and effect as if this Agreement had been executed, delivered, accepted and performed solely in the State of Florida.

SECTION 5.6   <u>Notices</u>.   All notices, requests and demands to or upon the parties to this Agreement shall be deemed to have been given or made when delivered by hand, or five (5) business days after the date when deposited in the mail, postage prepaid by registered or certified mail, return receipt requested, or, when sent by overnight courier one-day delivery, on the first business day after the day when delivered by such overnight courier. All such notices shall be addressed to the Lender, the Borrowers and the Subordinated Creditor as set forth below the signature lines to this Agreement, or to such other address as may be hereafter designated by notice by the Lender, the Borrowers or the Subordinated Creditor to one another.

IN WITNESS THEREOF, the signatures and seals of the parties hereto as of the date first written above.

**BORROWERS**:

Brevard Eye Center, Inc.,
a Florida corporation

By: _____
Name: _____
Title: _____

Date: _____

Brevard Surgery Center, Inc.,
a Florida corporation

By: _____
Name: _____
Title: _____

Date: _____

Medical City Eye Center, P.A.,
a Florida corporation

By: _____
Name: _____
Title: _____

Date: _____

THMIH, Inc.,
a Florida corporation

By: _____
Name: _____
Title: _____

Date: _____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

6

IN WITNESS THEREOF, the signatures and seals of the parties hereto as of the date first written above.

**LENDER**:

SummitBridge National Investments V LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

Date: _____

**SUBORDINATED CREDITOR**:

Aaronson Schantz Beiley P.A.,
a Florida Professional Association

By: _____

Name: Geoffrey S Aaronson_____

Title: President_____

Date: _____

# EXHIBIT "6"

## CONTINUING UNCONDITIONAL AND ABSOLUTE GUARANTY AGREEMENT

This Continuing, Unconditional and Absolute Guaranty Agreement (hereinafter referred to as the "Guaranty"), is dated _____, and is made by DR. RAFAEL TRESPALACIOS, individually ("Guarantor") to SummitBridge National Investments V LLC, and its successors and assigns (hereinafter referred to as the "Lender").

WITNESSETH:

FOR VALUE RECEIVED In consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, and for the purpose of inducing Lender to accept (a) that certain Six Hundred Thousand and 00/100 Dollars ($600,000.00) Note of even date herewith ("Exit Note A"), (b) that certain Four Hundred Thousand and 00/100 Dollars ($400,000.00) Note of even date herewith ("Exit Note B"), and (c) that certain Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) Note of even date herewith (the "Exit Financing Note", and together with Exit Note A and Exit Note B, collectively, the "Notes" and each individually a "Note"), executed by Brevard Eye Center, Inc., Brevard Surgery Center, Inc., Medical City Eye Center, P.A., and/or THMIH, Inc. (collectively, the "Borrowers") in favor of Lender and in connection with confirmation of the Borrowers' chapter 11 plan (the "Plan") in the Borrowers' jointly administered bankruptcy cases pending in the United Stated Bankruptcy Court for the Middle District of Florida, Orlando Division, assigned lead case number 6:17-bk-01828-KSJ, which Notes Lender would not have accepted in connection with the Plan without this Guaranty, the Guarantor covenants and agrees with Lender as follows:

1.      The Guarantor has examined the Notes (collectively, the "Loan Documents") executed by Borrowers (and/or any of them) in connection with the Plan and does hereby unconditionally and absolutely guarantee, jointly and severally, to the Lender and its successors and assigns of either this Guaranty or of any of the obligations secured hereunder, due performance and full and prompt payment, in accordance with their terms, of the Loan Documents including any amendments, renewals, modifications or extensions thereof, and does further agree that if the Notes are not paid in accordance with its terms, or if any of the sums or obligations that may hereafter become due to Lender under the Loan Documents are not paid and performed in accordance with their terms, the Guarantor will immediately do so. Guarantor further unconditionally and absolutely guarantees the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of (a) all obligations, liabilities and indebtedness of the Borrowers to the Lender related to the Loan Documents, however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, or due or to become due; (b) any and all extensions, renewals, modifications, or substitutions of the foregoing, and all expenses, including without limitation reasonable attorney's fees incurred for consultation, trial and appellate representation, if the Lender endeavors to collect from the Borrowers or any guarantor by law or through an attorney at law; (c) any indebtedness resulting from advances made on the Borrowers' behalf by Lender to protect or preserve the priority of its lien, if any, on any collateral pledged to secure the Liabilities; (d) all other charges and expenses, including without limitation late charges, and the payment of all costs, expenses, charges

1

and other expenditures required to be made by Borrowers, or which Borrowers agree to make, under the terms and provisions of the Loan documents. All such items (a), (b), (c) and (d) are herein collectively referred to as the "Liabilities."

2.      This is a continuing Guaranty and may not be assigned, revoked, modified, or amended by the Guarantor without Lender's written consent, and Guarantor acknowledges and agrees that full and adequate consideration for this Guaranty has been given by Lender and received by Guarantor.

3.      The obligations of this Guaranty include all of Borrowers' warranties, representations, obligations, duties and responsibilities under the Loan Documents either now or hereafter existing, and any renewals or extensions, in whole or in part, together with all damages, losses, costs, interest, charges, expenses including attorneys' fees, and liabilities of every kind, nature and description suffered or incurred by Lender arising in any manner of, or in any way connected with or growing out of the Loan Documents.

4.      The Guarantor hereby consents and agrees that Lender may at any time, either with or without consideration, surrender any property or other security of any kind or nature whatsoever held by it securing any indebtedness or liability covered by this Guaranty, or substitute for any collateral so held by it, or modify the terms of the Loan Documents securing payment of the principal indebtedness without notice to or further consent from the Guarantor, and such surrender, substitution or modification shall not in any way affect the obligation of the Guarantor hereunder.  The Guarantor further consents and agrees that Lender may at any time, either with or without consideration, grant extensions of time for performance under the Loan Documents without notice to the Guarantor and such extension shall not in any way affect the obligation of the Guarantor hereunder.

5.      The Guarantor hereby consents and agrees that Lender may, at any time, either with or without consideration, release the Borrowers or any endorser or any other guarantor of the Notes and Liabilities without notice to or further consent from the Guarantor, and such release shall not in any way affect the obligation of the Guarantor hereunder not so released.

6.      Lender shall have the right to proceed against the Guarantor without first proceeding against the Borrowers, or any property securing payment of the Notes or Liabilities, or any other Guarantor or endorser of the Notes or Liabilities, and may pursue all or any of its remedies at one or at different times.

7.      No delay, act or omission on the part of the Lender with respect to any right, power or privilege under the Loan Documents securing the same shall operate as a waiver of such privilege, power or right or as a waiver of any rights under the terms of this Guaranty or in any way affect or impair this Guaranty.

8.      This Guaranty shall be construed as an absolute and unconditional guarantee of payment and performance, without regard to the validity, regularity or enforceability of any

2

obligation or purported obligation of Borrowers.  Lender shall have its remedy under this Guaranty without being required to first resort to any security or to any other remedy or remedies to enforce payment or collection of the obligations hereby guaranteed, and may pursue all or any of its remedies at one or at different times.  The liability of Guarantor shall be separate and independent of the obligations of Borrowers, and separate or joint actions may be instituted by Lender against any one or all of the Guarantor or Borrowers, as Lender may choose.  Any action taken by Lender pursuant to the provisions herein contained or contained in the Loan Documents shall not release the party or parties to this Guaranty until all of the obligations of Borrowers to Lender are paid and performed in full.

9.    The Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Lender to proceed against Borrowers or any other person or entity or to proceed against or exhaust any security held by it at any time or to pursue any other remedy in its power before proceeding against the Guarantor; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of, or revocation hereof by other persons; (c) presentment, demand, protest and notice of any kind including, without limitation, notice of acceptance of this Guaranty, dishonor, the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person or entity whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon any election of remedies by Lender which destroys or otherwise impairs the subrogation rights of the undersigned or the right of the undersigned to proceed against Borrower for reimbursement, or both; (e) any duty on the part of Lender to disclose to the undersigned any facts it may now or hereafter know about Borrowers; (f) any defense arising by reason of any disability or other defense of Borrowers or by reason of the cessation from any cause whatsoever of the liability of Borrowers; or (g) any right or claim of right to cause a marshaling of Borrowers' assets or to require Lender to proceed against the Guarantor in any particular order.

10.    Guarantor hereby waives any claim, right or remedy which Guarantor may now have or hereafter acquire against Borrowers, which arises hereunder and/or from the performance by Guarantor hereunder, including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, indemnification, or participation in any claim, right or remedy of Lender against the Borrower or any security which Lender now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise, and waives any right to enforce any remedy which Lender now has or may hereafter have against Borrowers, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender, until payment in full of the Notes and Liabilities and satisfaction of all of Borrowers' obligations under the Loan Documents.

11.    Any indebtedness of Borrowers now or hereafter held by the Guarantor is hereby subordinated to the indebtedness of Borrowers to Lender.  Upon a default under the Loan Documents, any such indebtedness shall be collected, enforced and received by the Guarantor as trustee for Lender and be paid over to the Lender on account of the indebtedness of Borrowers to

3

Lender, but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guaranty.

12.     The Guarantor hereby agrees that until all of the terms, covenants and conditions of this Guaranty are fully performed, the Guarantors' obligations hereunder shall not be released, in whole or in part, by any act or thing which might, but for this provision, be deemed a legal or equitable discharge of a surety or guarantor, or by reason of any waiver, extension, modification, forbearance or delay or other act or omission of Lender or its failure to proceed promptly or otherwise, or by reason of any action taken or omitted or circumstances which may or might vary the risk of or affect the rights or remedies of the Guarantor, or by reason of any further dealings between Borrowers or Lender; and the Guarantor hereby expressly waives and surrenders any defense to liability hereunder based upon any of the foregoing acts, omissions, things, agreements or waiver of any of them, it being the purpose and intent of the parties hereto that the obligations of the Guarantor hereunder are absolute and unconditional under all circumstances.

13.     The Guarantor agrees to pay reasonable attorneys' fees, including but not limited to the fees and costs of paralegals, whether or not suit is filed and including such fees at state, federal, bankruptcy, trial and appellate courts, and all other costs and expenses which may be incurred by Lender in the enforcement of Borrowers' obligation and/or of this Guaranty.

14.     All notices which are required or permitted hereunder must be in writing and shall be deemed to have been given, delivered or made, as the case may be, (notwithstanding lack of actual receipt by the addressee): (i) when delivered by personal delivery; or (ii) three (3) business days after having been deposited in the United States mail, certified or registered, return receipt requested, sufficient postage affixed and prepaid; or (iii) one (1) business day after having been deposited with an expedited, overnight courier service (such as by way of example but not limitation, U.S. Express Mail, Federal Express or Purolator), addressed to the party to whom notice is intended to be given at the address set forth below:

        If to Dr. Trespalacios:

                Dr. Rafael Trespalacios
                4448 Reseda Way
                Rockledge, FL 32955

                **and**

                **Roy S. Kobert, Esq.**
                **301 East Pine Street, Suite 1400**
                **Orlando, Florida 32801**

        If to SummitBridge:

4

SummitBridge National Investments V LLC
c/o Summit Investment Management LLC
Attn: Senior Asset Manager
1700 Lincoln St., Suite 2150
Denver, CO 80203

Any party may change the address to which its notices are sent by giving the other party written notice of any such change in the manner provided in this Section, but notice of change of address is effective only upon receipt.

15.     This Guaranty shall inure to the benefit of the Lender, its successors and assigns, and shall bind the Guarantor, and the respective heirs, executors, administrators, legal representatives, successors and assigns of the Guarantor.

16.     Whenever the text of this instrument so requires, the use of any gender shall be deemed to include all genders, and the use of the singular shall include the plural.

17.     The Guarantor acknowledges that the making of the Loan by the Lender to the Borrower confers a real and substantial benefit to the Guarantor and is fully supportive of and valuable consideration for the execution of this Guaranty by the Guarantor.  The Guarantor further acknowledges that he is thoroughly familiar with the business and operations of the Borrowers.  The Lender shall have no duty to the Guarantor to observe the actions or financial conditions of the Borrowers or to monitor the performance of the Borrowers.  It is the intention of the parties that the Lender may rely completely on this Guaranty for its repayment of the Borrowers' indebtedness and obligations whether or not the Borrowers are creditworthy and whether or not it would be prudent to make loans and advances to the Borrowers or to permit the same to remain outstanding.  The Lender and its representatives shall have no duty to exercise diligence or care in and about the enforcement of the remedies or in respect to any other security for the Borrowers' obligations.

18.     This Guaranty shall be governed and controlled by Florida law.  The Guarantor, in order to induce the  Lender to accept this Guaranty, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agrees that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from this Guaranty shall be litigated, at Lender's election, only in courts having a situs within or whose jurisdiction includes Brevard County, Florida.  For the purpose of the foregoing, the Guarantor hereby consents and submits to the jurisdiction of any local, state or federal court located within or whose jurisdiction includes Brevard County, Florida.  The Guarantor, for themselves and any parties claiming under them, hereby waives any right that the Guarantor may have to transfer or change the venue of any litigation brought against the Guarantor in accordance with this paragraph.  The Guarantor acknowledges that the provisions of this paragraph have been fully discussed by the Guarantor and the Lender, that they bargained at arm's length and in good faith and without duress of any kind for the terms and conditions of this paragraph and that the provisions hereof shall be subject to no exceptions.  No party has in any way agreed with or represented to any other party that the provisions

5

of this paragraph will not be fully enforced in all instances. Wherever possible each provision of this guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this guaranty.

19.  <u>WAIVER OF JURY TRIAL</u>.  THE UNDERSIGNED HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT THAT THE UNDERSIGNED MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE UNDERSIGNED OR LENDER IN CONNECTION WITH THIS GUARANTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER MAKING LOANS OR OTHER FINANCIAL ACCOMMODATIONS TO BORROWERS.

IN WITNESS WHEREOF, the Guarantor has caused these presents to be signed, sealed and delivered the day and year first above written.

**GUARANTOR:**

_____
Dr. Rafael Trespalacios, individually

STATE OF FLORIDA
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by Dr. Rafael Trespalacios, individually.  He is personally known to me ☐ OR produced a Florida Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                         _____
(Type, Stamp or Print Name)

My commission expires:

6

31718912 v1
31755314 v1

# EXHIBIT "B"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

BREVARD EYE CENTER, INC.                    Case No. 6:17-bk-01828-RAC
                                            Chapter 11

                                            Jointly Administered With

BREVARD SURGERY CENTER, INC.,               Case No.: 6:17-bk-01829-RAC

MEDICAL CITY EYE CENTER, P.A.,              Case No.: 6:17-bk-01830-RAC

THMIH, INC.,                                Case No.: 6:17-bk-01831-RAC

        Debtors.

_____/

## ORDER (I) APPROVING SETTLEMENT PURSUANT TO BANKRUPTCY RULE 9019, (II) MODIFYING THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF

Upon the motion, dated June 13, 2018, of the jointly administered Debtors, BREVARD

EYE CENTER, INC. ("BEC"), BREVARD SURGERY CENTER, INC. ("BSC"), MEDICAL

CITY EYE CENTER, P.A. ("MCEC"), AND THMIH, INC. ("THMIH") (collectively, the

"Debtors"), for entry of an order pursuant to sections 105(a), 363(b) and 362(d) of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 4001(a) and 9019(a) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules") (A) approving the Settlement[1] set forth in the

Settlement Agreement, substantially in the form attached to the Motion, by and among (i) Brevard

Eye Center, Inc., Brevard Surgery Center, Inc., Medical City Eye Center, P.A., and THMIH, Inc.

(the "Debtors"), and (ii) SummitBridge National Investments V LLC ("SummitBridge"), creditor

and party in interest (collectively, the "Parties"); and (B) modifying the automatic stay as to the

Properties (the ("Settlement Motion"); and

Upon consideration of the Settlement Motion, any objections thereto, briefs and arguments

of counsel, and due and proper notice of the Motion having been provided to all parties in interest,

and it appearing that the notice of the Motion is sufficient, adequate, and timely under the

circumstances of this case and that no other or further notices need be provided; and a reasonable

opportunity to object or be heard regarding the motion having been given to all such parties; and

a full and fair opportunity having been afforded to litigate all issues raised in all objections, or

which might have been raised, and all objections having been fully and fairly litigated;

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted in all respects.

2.      The Settlement described in the Motion and Settlement Agreement is authorized

and approved pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3.      The Debtors are authorized to enter into the Settlement Agreement, and take all

actions reasonably necessary to consummate the Settlement Agreement and perform all obligations

contemplated therein.

---

[1] Capitalized terms in this Order shall have the meaning given to such terms in the Settlement Agreement.

4.     To the extent it applies, the automatic stay imposed by section 362(a) of the Bankruptcy Code is modified to permit the enforcement and consummation of the Settlement Agreement in all respects.

5.     The automatic stay imposed by Section 362(a) is hereby immediately lifted, modified, and terminated to allow SummitBridge to exercise any or all of its rights and remedies under applicable law concerning the Properties, including, but not limited to, completion of foreclosure sales and issuances of certificates of title.

6.     All leases and purchases of property that are being entered into in connection with the Settlement Agreement are being entered into and consummated by the parties thereto in good faith within the meaning of Section 363(m) of the Bankruptcy Code and, accordingly, the Settlement Agreement and the parties thereto shall be afforded the protections of Section 363(m) of the Bankruptcy Code.

9.      In the event that the Bankruptcy Cases are dismissed, the Debtors are barred from filing new voluntary bankruptcy cases for a period of two years after the date of dismissal.

7.     The Court shall retain jurisdiction to (i) enforce and implement the terms and provisions of the Agreement and resolve disputes thereunder, and (ii) implement and enforce the provisions of this Order.

8.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

9.     This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a). To the extent applicable, the stays under Bankruptcy Rules 4001(a)(3) and 6004(h) are hereby waived.  The Settlement Motion

provides reasonable notice of the provisions of the Settlement Agreement and opportunity for a

hearing, and therefore, the procedural requirements of Bankruptcy Rule 4001(d), to the extent not

satisfied, are hereby waived.

###

Submitted by:

Richard A. Robinson, Esq.
Florida Bar No. 41238
Jonathan M. Sykes, Esq.
Florida Bar No. 73176
Burr & Forman LLP
200 South Orange Avenue
Suite 800
Orlando, Florida  32801
Telephone: 497-540-6600
Telefax: 407-540-6601
rrobinson@burr.com
jsykes@burr.com
*Attorneys for Creditor, SummitBridge National Investments V LLC*


Attorney Sykes is directed to serve a copy of this Order on all interested
parties and to file a proof of service within three days of entry of the Order.

# EXHIBIT "C"

# LEASE

THIS LEASE AGREEMENT ("**Lease**") is made this ____ day of August, 2018, by and between the "**Landlord**" and the "**Tenant**" hereafter set forth.  The "Effective Date" for purposes of this Lease shall mean the date upon which the last of Landlord and Tenant have executed this Lease.

## WITNESSETH:

1. **DEFINITIONS.**

   (a)  **Landlord**:       **THMIH, INC.**, a Florida corporation
        Address:       665 South Apollo Boulevard
                       Melbourne, Florida 32901

   (b)  **Tenant**:        **BREVARD EYE CENTER, INC.**, a Florida corporation;
                       **BREVARD SURGERY CENTER, INC.**, a Florida corporation; and
                       **MEDICAL CITY EYE CENTER, P.A.**, a Florida corporation, jointly and
                       severally
        Address:       665 South Apollo Boulevard
                       Melbourne, Florida 32901

   (c)   "**Premises**":  9,028 square feet of rentable area, as outlined in red on the attached Exhibit "A" expressly made a part hereof.  The Premises are located within the structure, hereinafter called the "**Building**," located at 665 South Apollo Boulevard, Melbourne, Brevard County, Florida 32901.  Landlord reserves the sole and exclusive right, at any time and from time to time, to name and re-name the Building, but shall not affect any business signage that may be reflected on the Building (except to the extent that it violates any applicable law).  For the purposes of Items 1(j), 4, 5 and 9 of this Lease, the term "**Building**" includes its appurtenances and surrounding common areas outside the Building, including without limitation, grounds, parking facilities, site lighting and costs and charges associated therewith.

   (d)   "**Use of Premises**":  medical office use for licensed physicians to engage in the private practice of medicine for the care and treatment of human beings and ancillary, related activities incidental thereto including ophthalmologic surgery, general optometry including the examination, prescription and dispensation of eyewear, and administrative offices.  Notwithstanding the generality of the foregoing sentence, Tenant's use and occupancy of the Premises shall at all times comply with the use restrictions set forth in Exhibit "D", attached hereto and made a part hereof.

   (e)   "**Commencement Date**":  August 1, 2018.  At Landlord's option, Tenant shall execute a Lease Commencement Date certification confirming the Commencement Date of the Lease and Tenant's Proportionate Share.

   (f)   "**Term**":  Sixty (60) months commencing on the Commencement Date, this Lease to end on the last day of the sixtieth (60th) calendar month after the Commencement Date.

(g)    "**Rent**":    During the Term of this Lease, Tenant, starting with the Rent Commencement Date, shall pay to Landlord base Rent of $11,285.00 per month for the initial twelve (12) month period and subject to upward adjustment annually as follows:

At the end of the first Lease Year and every twelve (12) months thereafter (each twelve (12) month period being considered a 'Lease Year') during the term of this Lease plus any option years, the amount of base Rent shall be adjusted and such adjusted amount shall then be the base Rent for the following Lease Year.  The base Rent for each Lease Year after the initial Lease Year shall be equal to the base Rent for the Lease Year just ended multiplied by the percentage increase in CPI in effect for the month preceding the twelfth (12th) month of such Lease Year. As used in this Lease, "CPI" shall mean the Consumer Price Index for All Urban Consumers (CPI-U), U.S. City Average, all items, as published by the United States Department of Labor, Bureau of Labor Statistics. If the CPI is discontinued or revised, the CPI used for purposes of this Lease shall be adjusted or replaced by Landlord with an index or measure reasonably calculated by Landlord to measure the change in the cost of living in a manner consistent with the CPI. In no event shall the base Rent, as so escalated, for any Lease Year be less than one hundred percent (100%) of the base Rent in effect for the immediately preceding Lease Year.

During the period of time between the Commencement Date and the Rent Commencement Date, Tenant shall not be required to pay Rent, but the Tenant shall be responsible for all taxes, insurance costs, and other charges and amounts due and payable by Tenant under this Lease and all other obligations of the Tenant under this Lease.

Said base Rent shall be paid by Tenant to Landlord in equal monthly installments for each of the above-described periods, each monthly payment, plus applicable state sales tax, to be made in advance and on or before the first day of the applicable month.  Any partial calendar months shall be pro-rated.

Rent and all other sums payable by Tenant to Landlord under this Lease, plus any applicable tax, shall be paid to Landlord, without demand, recoupment, abatement, deduction or offset, at _____ or at such other place(s) as Landlord may hereafter specify in writing.

(h)    "**Security Deposit**":  The sum of Eleven Thousand Two Hundred Eighty Five Dollars ($11,285.00).    (i)    "**Real Property**":  The underlying real property upon which the Building is located that is owned by THMIH, Inc., a Florida corporation.

(j)    "**Real Estate Taxes**":  Real Estate Taxes shall have the meaning set forth in Item 4 herein.

(k)    "**Proportionate Share**":  The term "Proportionate Share" shall mean  100% of the Premises.

(l)    "**Rent Commencement Date**": January 1, 2019.

**2.    PREMISES AND TERM.**  Landlord, in consideration of the Rent and Additional Rent hereinafter reserved to be paid and of the covenants, conditions and agreements to be kept and performed by Tenant, hereby leases, lets and demises to Tenant, and Tenant hereby leases and hires from Landlord, that certain space called the Premises as described above in Item 1, Section (c).

Landlord shall deliver possession of the Premises to Tenant on the Commencement Date in an AS-IS condition. **Tenant agrees that all expenses of the Premise, including, but not limited to, insurance, maintenance, and repairs, are the sole responsibility of Tenant during the Term of the Lease and that the Premises shall be maintained in a professional and safe manner. Tenant also acknowledges it has occupied the Premise for several years and is fully aware of the conditions of the Premises and accepts the Premises in its AS-IS condition**.

3.    <u>RENT</u>.  Tenant covenants and agrees to pay Rent and Additional Rent, without demand, recoupment, abatement, deduction or offset, to Landlord commencing on the Rent Commencement Date for the Premises and on or before the first (1st) day of each and every successive calendar month thereafter during the full Term of this Lease, subject to the adjustments as provided in Item 1(g), along with any applicable tax, at the then current rate.

Whenever under the terms of this Lease any sum of money is required to be paid by Tenant in addition to the Rent herein reserved, whether or not such sum is herein described as "**Additional Rent**" or a provision is made for the collection of said sum as "**Additional Rent**," said sum shall nevertheless, at Landlord's option, if not paid when due, be deemed Additional Rent, and shall be collectible as such with the first installment of Rent thereafter falling due hereunder.  In the event any installment or increment of Rent or Additional Rent payable under this Lease shall not be paid within ten (10) calendar days of when due, a "late charge" of $500.00 may be charged (as Additional Rent) by Landlord for the purpose of defraying the expense and inconvenience incident to handling such overdue payment and for the purpose of compensating Landlord for its attendant inconvenience and loss of cash flow.

4.    <u>REAL ESTATE TAXES ADJUSTMENTS</u>.    During the Term of this Lease, and any extension(s) thereof, Tenant, beginning with the Commencement Date, shall directly pay to the applicable taxing authority(ies), in the form of Additional Rent (plus any applicable tax), all real estate taxes and personal property and/or assessments due and owing prior to the taxes and/or assessments becoming delinquent. Additionally, the parties hereby agree that Tenant shall be responsible for Real Estate Taxes accruing between January 1, 2018 and the Commencement Date.

In lieu of the above, at Landlord's election, Tenant shall pay Landlord on or before the first day of each calendar month one-twelfth (1/12) of the amount of Tenant's estimated annualized liability for such Real Estate Taxes for the then current calendar year.  At any time and from time to time during the then applicable current calendar year, Landlord may (but not unreasonably) re-estimate Tenant's monthly monetary responsibilities under this Item 4 and Tenant shall pay Landlord such re-estimated amounts.  There shall be an annual reconciliation between what Tenant paid and what Tenant should have paid.  Any amount paid by Tenant which exceeds the correct amount due shall be credited to the next succeeding payment due under this Item 4.  If Tenant has paid less than the correct amount due, Tenant shall pay the balance within fifteen (15) calendar days of receipt of notice from Landlord.  If the Term of this Lease begins or ends other than on the first day or last day of a calendar year, the subject Real Estate Taxes shall be billed and adjusted on the basis of such fraction of a calendar year.  Tenant's obligation to pay the adjustments described in this Item 4 shall survive the expiration or earlier termination of this Lease.  Tenant shall have thirty (30) calendar days immediately following the submission to it by Landlord of each applicable adjustment calculation to object to such particular calculation.  If Tenant fails duly and timely to object to such particular calculation, which objection, to be effective, must be in writing and must state the specifics of such particular objection, then, the parties understand and agree, Landlord's calculation shall be conclusively deemed to be correct.

The term "**Real Estate Taxes**" shall include, but not be limited to, each, every, any and all taxes, assessments, levies and/or other charges (of any nature or description whatsoever) imposed (or sought to be imposed):  (a) against the Real Property of which the Building or the Premises are a part and/or (b) against the appurtenances and/or facilities of, within or serving the Building or the Premises, by any authority having (or claiming to have) the power so to tax, assess, levy or charge, whether the same are general or special, ordinary

or extraordinary, foreseen or unforeseen, including, but not limited to, any city, county, state or federal government, or any school, agricultural, transportation or environmental control agency, lighting, drainage, or other improvement district thereof, and said term also shall include the expenses of contesting the amount or validity of any such taxes, assessments, levies and/or other charges.

5.    **OPERATING EXPENSE AND UTILITY ADJUSTMENTS.**  During the Term of this Lease, and any extension(s) thereof, Tenant, beginning with the Commencement Date, shall directly pay all  Operating Expenses and Utility Costs.


The term "**Operating Expenses**" shall include, but not be limited to, the annual expenses for the operation, management, repair and maintenance of the Premises and the Building which are reasonable or customary for the operation, management, repair and maintenance of this type of Premises and Building, and shall include, but not be limited to , maintenance and janitorial expense, costs of maintenance and janitorial expense, repairs and replacements, compliance with applicable current and future laws, rules, codes, regulations, etc., management and operation of the Building, taxes and fees, employee benefits, administrative salaries, costs and fees, insurance, security, landscaping and costs, including without limitation, as applicable, common area parking lot maintenance, landscaping, liability insurance, lawn maintenance and similar costs and expenses.

The term "**Utility Costs**" shall include the  annual expenses for the operation and maintenance of the Building with respect to charges, costs and taxes for furnishing heat, air-conditioning, electricity, water, sewerage, gas, garbage removal, etc. for common areas. The defined terms the subject of this particular paragraph are for definitional purposes only and shall not impose any obligation whatsoever upon Landlord to incur any expense or provide any service within such defined terms.


6.    **USE OF PREMISES.**  The Premises shall be used by Tenant as described above in Item 1, Section (d), and for no other business or purpose whatsoever without the prior written discretionary consent of Landlord.  Tenant shall not do or permit to be done in or about the Premises, nor bring or keep or permit to be brought or kept therein, anything which is prohibited by, or will in any way conflict with, any law, statute, ordinance or governmental rule or regulation now in force or which may hereafter be enacted or promulgated, or which is presently or hereafter prohibited by any standard form of fire insurance policy or will presently or hereafter in any way increase the existing rate of or affect any fire or other insurance upon the Building or any of its contents, or presently or hereafter cause a cancellation of any insurance policy covering the Building or any part thereof or any of its contents.  Tenant shall not do or permit anything to be done in or about the Premises which will presently or hereafter in any way obstruct or interfere with the rights of other tenants of the Building, or injure or annoy them or use or allow to be used the Premises for any improper, immoral, unlawful or objectionable purpose (as determined by Landlord); nor shall Tenant cause, maintain, or permit any nuisance (as determined by Landlord or by law) in or about the Premises or commit or suffer to be committed any waste in, on, or about the Premises.  Tenant shall be responsible for all losses and damages to Landlord as a result of Tenant's failure to use, occupy and surrender the Premises in strict accordance with the contents of this Lease, and such responsibility shall survive the expiration or earlier termination of this Lease. Tenant, at Tenant's expense, shall comply with all laws, rules, orders, statutes, ordinances, directions, regulations and requirements of all federal, state, county and municipal authorities pertaining to Tenant's use and occupancy of the Premises and with the recorded covenants, conditions and restrictions pertaining thereto, regardless of when they become effective or applicable, including, without limitation, all applicable federal, state and local laws, regulations or ordinances pertaining to air and water quality, Hazardous Materials, waste disposal, air emissions and other environmental matters, all zoning and other land use matters, and with any direction of any public officer or officials which shall impose any duty upon Landlord or Tenant with respect

to the use or occupation of the Premises. For the purposes of this Item 6, the term "**Tenant**" includes Tenant's agents, employees, principals, officers, successors, assigns, subtenants, invitees, contractors and consultants.

7.     <u>ASSIGNMENT AND SUBLETTING.</u>   Tenant shall not assign the right of occupancy under this Lease, or any other interest therein, or sublet the Premises, or any portion thereof, without the prior written consent of Landlord, which consent will not be unreasonably withheld. For avoidance of doubt, any assignment or sublease proposed by a party for a use in any manner concerning marijuana, or for use other than the current use (namely, ophthalmology and eye care), will not be permitted. If Landlord elects to grant its written consent to any proposed assignment or sublease (whether by Tenant or by others claiming by or through Tenant), Tenant or such others agree to pay Landlord an administrative processing fee in the amount of $1,250.00, plus reasonable attorney's fees to review and approve such assignment or sublease, and Landlord may prescribe the substance and form of such assignment or sublease.

Notwithstanding any assignment of this Lease, or the subletting of the Premises, or any portion thereof, Tenant shall continue to be fully liable for the performance of the terms, conditions and covenants of this Lease, including, but not limited to, the payment of Rent and Additional Rent. Landlord shall have the additional option, which shall be exercised by providing Tenant with written notice, of terminating Tenant's rights and obligations under this Lease rather than permitting any assignment or subletting by Tenant, any statement or implication in this Lease or at law to the contrary notwithstanding. The acceptance of Rent and/or Additional Rent and/or other monies from any person or entity other than Tenant shall not be deemed to be a waiver of any of the provisions or contents of this Lease or to be a consent to the assignment of this Lease or the subletting of all or any part of the Premises or the occupancy thereof by any person or entity other than Tenant.

If Landlord permits any assignment or subletting by Tenant and if the monies (no matter how characterized) received as a result of such assignment or subletting, when compared to the monies still payable by Tenant to Landlord, be greater than would have been received hereunder had not Landlord permitted such assignment or subletting, then fifty percent (50%) of the excess shall be payable by Tenant to Landlord, it being the parties' intention that Landlord, and not Tenant, in consideration for Landlord's permitting such assignment or subletting, shall share in any profit from any such assignment or subletting.   In the event of the transfer and assignment by Landlord of its interest in this Lease and/or sale of the Building containing the Premises, either of which it may do at its sole option, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of Landlord for performance of such obligations. The provisions of Item 36 hereafter dealing with "Notices" shall be amended to provide the correct names and addresses of the assignee or sublessee. If Tenant is a corporation whose stock is not regularly traded on a bona fide public exchange, and if any transfer, sale, pledge or other disposition of the common stock shall occur which changes the power to vote the majority of the outstanding capital stock of the company, such action shall be considered an assignment under the terms of this Lease. Any breach of this Item 7 by Tenant will constitute an automatic default under the terms of this Lease, per Item 20 hereof.

8.     <u>ACCESS TO PREMISES.</u>   Landlord or its authorized agent(s) shall have the right to enter upon the Premises at all reasonable times for the purposes of inspecting the same, preventing waste, making such repairs as Landlord may consider necessary (but without any obligation to do so except as expressly provided for herein).   During the last one hundred eighty (180) calendar days of the Term, Landlord or its authorized agent(s) may, upon two business days prior notice, have the right to enter and show the Premises to prospective tenants, mortgagees and/or purchasers at reasonable times.

9.     <u>TENANT UTILITIES.</u>   Tenant acknowledges it is solely responsible for providing and paying for all utility service to the Building.   It is expressly understood and agreed by the parties that Landlord specifically shall not be liable for any losses or damages of any nature whatsoever incurred by Tenant due to any failure of

the equipment to function properly, or while it is being repaired, or for interruption of services furnished herein, due to any governmental laws, regulations or restrictions.

Tenant agrees that Landlord is not responsible for any Building maintenance and services. Tenant is and shall be solely responsible for any and all expenses and costs of any nature whatsoever associated with operation, maintenance, upkeep and repair of the interior of the Premises, including without limitation, (i) electric service separately metered to the Premises, (ii) water service separately metered to the Premises, (iii) plumbing and bathroom facilities located within and serving the Premises, and (iv) maintaining tenant improvements in the Premises and replacing lighting fixtures and bulbs in the Premises.

**10.    ELECTRICAL OVERLOAD; STRUCTURAL OVERLOAD.**

A.    Tenant's electrical load in the Premises shall not exceed the level customarily and typically utilized for medical office use.

B.    Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot area which such floor was designed to carry and which may be allowed by law.  Landlord reserves the right to prescribe the weight and position of all heavy equipment and similar items, and to prescribe the reinforcing necessary, if any, which in the opinion of Landlord may be required under the circumstances, such positioning and reinforcing to be at Tenant's pre-paid expense.

**11.    PARKING AREAS AND COMMON AREAS.**  Tenant shall keep and maintain or cause to be kept in good condition any parking areas that may be provided.  Landlord reserves the right, at the expense of Tenant, to control the method, manner and time of parking in parking spaces so long as parking is permitted so as to allow ordinary course business operations.  Landlord shall not be responsible at all, any statement or implication elsewhere in this Lease to the contrary notwithstanding, for the security of the parking areas provided pursuant to this Lease.

Landlord reserves the right to impose reasonable rules and regulations regarding the common parking areas so long as parking is permitted so as to allow ordinary course business operations.

Any statement or implication elsewhere in this Lease to the contrary notwithstanding, Landlord shall have the unrestricted right, which shall not be subject to Tenant's prior notice or consent, to change the size, use, capacity, configuration, shape or nature of the Building, its common areas and its appurtenances so long as the Building will continue to be available to provide ordinary course business operations in order to function as set forth in paragraph 1(d).

**12.    LEASEHOLD IMPROVEMENTS.**  The Premises are rented "as is," without any additional services or improvements to be rendered by Landlord.

**13.    REPAIRS AND MAINTENANCE.**  Tenant will, at its own cost (as part of the Operating Expenses), make necessary repairs of damage to the Building corridors, lobby, structural members of the Building, and equipment used to provide services to the Building.  Tenant will allow no maintenance or repairs to be done in, on, to or about the Premises other than by a contractor (such term to include all degrees and levels of subcontractors) approved by Landlord in writing prior to any such maintenance or repairs being undertaken.  Landlord shall be entitled to require such contractor to be bonded and insured in such amounts and with such companies as Landlord may in its discretion prescribe.  Tenant will not injure the Premises or the Building but will maintain the Premises in a clean, attractive condition and in good repair, except as to damage to be repaired by Landlord as provided above.  Upon termination of this Lease, Tenant will surrender and deliver the Premises to Landlord in the same condition in which they existed at the commencement of this Lease, excepting only ordinary wear and tear and damage arising from any cause not required to be repaired by Tenant.

**14.**   **ALTERATIONS AND IMPROVEMENTS.**  Tenant absolutely shall not make any alterations, additions or improvements to or in the Building outside the Premises. Furthermore, Tenant shall make no alterations, additions or improvements to or in the Premises without the prior written approval of Landlord, and unless in each instance and for each such alteration, addition or improvement Landlord or a contractor approved by Landlord is hired to do such alterations, additions or improvements. Such approval shall not be unreasonably withheld in the case of alterations, additions or improvements to the interior of the Premises if such alterations, additions, or improvements are normal for the use described in Item 1 (d) of this Lease, do not violate any applicable laws, codes, ordinances, etc., do not adversely affect utility of the Premises for future tenants, do not alter the exterior of the Building, do not affect portions of the Building outside of the Premises, and are accompanied by insurance satisfactory to Landlord and by prepayment or bond provisions or waivers by the contractor in form satisfactory to Landlord sufficient to protect the Building from claims of lien of any sort; otherwise, such approval may be withheld for any reason whatsoever. Furthermore, such alterations, additions or improvements absolutely shall not affect the mechanical, plumbing, electrical and HVAC systems in the Premises or the Building and shall not be of a structural nature. Tenant shall conduct its work in such a manner as to maintain harmonious labor relations and as not to interfere with the operation of the Building and shall, prior to the commencement of the work, submit to Landlord copies of all necessary permits. Landlord reserves the right to have final approval of the contractors hired by Tenant. All such contractors hired by Tenant shall be, at levels and coverages prescribed by Landlord, bonded and insured, and Landlord may require evidence of same, which Tenant agrees to secure and provide Landlord prior to the commencement of any work by such contractors. All alterations, additions or improvements, whether temporary or permanent in character, made in or upon the Premises, either by Landlord or Tenant, shall be Landlord's property and at the end of the term hereof shall remain in or upon the Premises without compensation to Tenant. All of Tenant's furniture, movable trade fixtures and equipment not attached to the Building may be removed by Tenant at the expiration of this Lease, if Tenant so elects, and shall be so removed, if required by Landlord, and, if not so removed, shall, at the option of Landlord, become the property of Landlord. To the extent Tenant makes any alterations, additions or improvements and/or to the extent Landlord on behalf of Tenant under an "**Extra Work Agreement**" makes such alterations, additions or improvements, and as a result thereof it can be clearly determined that thereupon was caused an increase in real estate taxes or insurance premiums, then Tenant shall be responsible for reimbursing Landlord for such increases as Landlord may pay.

    Landlord expressly reserves the right (but shall not have the obligation) to further develop, add to, improve, repair and alter the Building and all its common areas, appurtenances, roadways, parking areas, etc., as Landlord may see fit, free from any and all liability of any nature whatsoever to Tenant for loss of business or damages of any nature whatsoever to Tenant occasioned during the making of such improvements, developments, additions, repairs and alterations.

**15.**   **INDEMNITY.**  Landlord shall not be liable for, and Tenant will indemnify and save Landlord (and Landlord's officers, principals, agents, employees and insurers) harmless of and from, each, every, any and all fines, suits, damages, claims, demands, losses and actions (including attorney's fees) for any injury to person or damage to or loss of property on or about the Premises and Building caused by the negligence or misconduct or breach of (or non-compliance with) this Lease by Tenant, its employees, agents, principals, contractors, consultants, assigns, subtenants, invitees or by any other person entering the Premises or the Building under express or implied invitation of Tenant, or arising out of Tenant's use of the Premises. Landlord absolutely shall not be liable or responsible for any loss or damage to any property or the death or injury to any person occasioned by theft, crime (of any nature whatsoever), fire, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, requisition of governmental body or authority, by other tenants of the Building or by any other matter beyond the absolute control of Landlord, or for any injury or damage or inconvenience which may arise through repair or alteration of any part of the Building, or failure to make repairs, or from any cause whatsoever except Landlord's negligence or intentional act. It is specifically understood and agreed that there shall be no personal liability on Landlord (nor on Landlord's officers, principals, agents and employees) with respect to any of the covenants, conditions or provisions of this Lease.

**16.**   **DAMAGE BY FIRE OR THE ELEMENTS.** In the event that the Building is totally destroyed by fire, tornado or other casualty, or in the event the Premises or Building is so damaged that rebuilding or repairs cannot be completed within one hundred eighty (180) calendar days after the date of such damage, either Landlord or Tenant may, at its option, by written notice to the other given not more than sixty (60) calendar days after the date of such fire or other casualty, terminate this Lease. In such event, the Rent and Additional Rent shall be abated during the unexpired portion of this Lease effective with the date of such fire or other casualty.

      In the event the Building or the Premises are damaged by fire, tornado, hurricane, or other casualty covered by Landlord's insurance but only to such extent that rebuilding or repairs can be completed within one hundred eighty (180) calendar days after the date of such damage, or if the damage should be more serious but neither Landlord nor Tenant elects to terminate this Lease, then Landlord may, within thirty (30) calendar days after the date of such damage or such election, commence to rebuild or repair the Building and/or the Premises and may proceed with reasonable diligence to restore the Building and/or the Premises to substantially the same condition in which it/they was/were immediately prior to the happening of the casualty, except that Landlord shall not be required to rebuild, repair or replace any part of the furniture, equipment, fixtures and other improvements which may have been placed by Tenant or other tenants or occupants within the Building or Premises. Landlord shall, unless such damage is deemed by Landlord to be the result of the negligence or willful misconduct of Tenant or Tenant's employees, agents, principals, contractors, consultants, assigns, subtenants or invitees, allow Tenant a fair diminution of Rent and Additional Rent during the time of such rebuilding or repairs. In the event any mortgagee, or the holder of any deed of trust, security agreement or mortgage on the Building, requires that the insurance proceeds be used to retire the mortgage debt, Landlord shall have no obligation to rebuild and this Lease shall terminate upon notice to Tenant. Any insurance which may be carried by Landlord or by Tenant against loss or damage to the Premises or its contents shall be for the sole benefit of the party carrying such insurance and under its sole control.

**17.**   **BUILDING RULES AND REGULATIONS.** Tenant shall faithfully observe and comply with the Rules and Regulations printed on or annexed to this Lease as Exhibit "B" (and expressly made a part of) and all reasonable modifications of and additions thereto from time to time put into effect by Landlord. Landlord shall not be responsible to Tenant for the nonperformance of any of said Rules and Regulations by any other tenant, occupant, invitee or visitor of the Building. Tenant shall and does hereby have an affirmative obligation (to include indemnification of Landlord, per Item 15 hereof) to notify its agents, employees, principals, assigns, subtenants and invitees of the contents of such Rules and Regulations and of this Lease and to assure their compliance therewith.

**18.**   **EMINENT DOMAIN.** If the whole or a portion of the Building is taken for any public or quasi-public use under any statute or by right of Eminent Domain or private purchase in lieu thereof, then at Landlord's option, but not otherwise, this Lease, the Term hereby demised and each, every, any and all rights of Tenant hereunder shall immediately cease and terminate and the Rent and Additional Rent shall be adjusted as of the date of such termination. Tenant shall be entitled to no part of the award made for such condemnation (or other taking) or the purchase price thereof; provided, however, that to the extent the same does not decrease or lessen the award due to Landlord, Tenant shall be entitled to claim and receive any award from the governmental entity responsible for such taking solely pertaining to Tenant's leasehold estate and other permissible claims under applicable law. Nevertheless, anything to the contrary notwithstanding, likewise at Landlord's option, but not otherwise, if the Premises are unaffected by such condemnation (or other taking), then this Lease and each and every one of its provisions shall continue in full force and effect.

**19.**   **SIGNS AND ADVERTISING.** Without the prior written approval of Landlord, which may be withheld at Landlord's discretion, Tenant shall not permit the painting or display of any signs, placard, lettering, or advertising material of any kind on or near the exterior of the Premises or the Building. Notwithstanding the foregoing, Tenant may, with Landlord's prior approval, display Tenant's name on or near

the entrance to the Premises, in a Building-standard manner prescribed by Landlord. The parties stipulate that the present signage on the Building is acceptable (provided that it complies in all respects with applicable law).

**20.    TENANT'S DEFAULT.**    Landlord, at its election, may exercise any one or more of the options referred to below upon the happening, or at any time after the happening, of any one or more of the following events, to wit:

        (a)    Tenant's failure to pay the Rent, Additional Rent, or any other sums (no matter how characterized) payable hereunder for a period of seven (7) calendar days after written notice by Landlord (provided, however that Tenant shall only be entitled to two (2) such cure opportunities in any calendar year);

        (b)    Tenant's failure to observe, keep or perform any of the other terms, covenants, agreements or conditions of this Lease or in the Building Rules and Regulations for a period of ten (10) calendar days after written notice by Landlord;

        (c)    Tenant's making an assignment for the benefit of creditors;

        (d)    Tenant's bankruptcy or voluntarily petitioning for relief under, or otherwise seeking the benefit of, any bankruptcy, reorganization, arrangement or insolvency law;

        (e)    Tenant's deserting, vacating or abandoning any portion of the Premises or attempting to mortgage, pledge or otherwise encumber in any way its interest hereunder without the prior written consent of Landlord;

In the event of any of the foregoing happenings, Landlord, at its election, may exercise any one or more of the following options, the exercise of any of which shall not be deemed to preclude the exercise of any others herein listed or otherwise provided or permitted by statute or general law at the same time or in subsequent times or actions:

        (1)    Terminate Tenant's right to possession under this Lease and re-enter and retake possession of the Premises and relet or attempt to relet the Premises on behalf of Tenant at such rent and under such terms and conditions as Landlord may deem best under the circumstances for the purpose of reducing Tenant's liability.  Landlord shall not be deemed to have thereby accepted a surrender of the Premises, and Tenant shall remain fully liable for any and all Rent, Additional Rent, or other sums (no matter how characterized) due under this Lease and for all damages suffered by Landlord because of Tenant's breach of any of the covenants of this Lease.

        (2)    Declare this Lease to be terminated and ended and re-enter upon and take possession of the Premises whereupon all right, title and interest of Tenant in the Premises shall end.

        (3)    Accelerate and declare the entire remaining unpaid Rent and Additional Rent for the balance of this Lease to be immediately due and payable forthwith, and may, at once, take legal action to recover and collect the same.

No re-entry or retaking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless a specific written notice of such intention is given to Tenant, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any Rent, Additional Rent or other monies due to Landlord hereunder or of any damages accruing to Landlord by reason of the violations of any of the terms, provisions and covenants herein contained.  Landlord's acceptance of Rent or Additional Rent or other monies following any event of default hereunder shall not be construed as Landlord's waiver of such

event.  No forbearance by Landlord of action upon any violation or breach of any of the terms, provisions, and covenants herein contained shall be deemed or construed to constitute a waiver of the terms, provisions, and covenants herein contained.  Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default.  Legal actions to recover for loss or damage that Landlord may suffer by reason of termination of this Lease or the deficiency from any reletting as provided for above shall include the expense of repossession or reletting and any repairs or remodeling undertaken by Landlord following repossession.

If Tenant does not perform any covenant, agreement, term, provision or condition within this Lease (as may be hereafter amended or modified in writing) contained on Tenant's part to be performed, Landlord, in addition to any other rights and remedies or has under this Lease (as may be hereafter amended or modified in writing) or otherwise and without thereby waiving any such non-performance (or resulting default), may (but shall not be obligated to do so) perform the same on behalf of, for the account of and at the expense of Tenant without notice in a case of emergency (as not unreasonably determined by Landlord) and in any other case if such non-performance continues after seven (7) calendar days from the date that Landlord gives written notice to Tenant of Landlord's intention to do so.  Invoices for all amounts paid by Landlord and all losses, costs and expenses incurred or paid by Landlord in connection with any such performance by Landlord pursuant to this particular paragraph, including, without limitation, all amounts paid and costs and expenses incurred by Landlord for any goods, property, material, labor or services provided, supplied, furnished or rendered, or caused to be provided, supplied, furnished or rendered, by Landlord to Tenant (together with interest at the then current Florida statutory rate from the date Landlord pays the amount(s) or incurs the loss, cost or expense until the date of full repayment by Tenant) may be sent by landlord to Tenant monthly or immediately, at Landlord's option, and shall be due and payable by Tenant to Landlord as Additional Rent, plus any applicable tax(es), within seven (7) calendar days after the same are sent to Tenant by Landlord.

THE PARTIES HERETO SHALL, AND THEY HEREBY DO, WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER, AND WITH RESPECT TO ANY ISSUE OR DEFENSE RAISED THEREIN, ON ACCOUNT OF ANY MATTERS WHATSOEVER ARISING OUT OF, OR IN ANY WAY CONNECTED WITH, THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES AND/OR BUILDING, AND/OR CLAIM OF LOSS, INJURY OR DAMAGE. IN THE EVENT TENANT MUST, BECAUSE OF APPLICABLE COURT RULES, INTERPOSE ANY COUNTERCLAIM OR OTHER CLAIM AGAINST LANDLORD IN SUCH PROCEEDINGS, LANDLORD AND TENANT COVENANT AND AGREE THAT, IN ADDITION TO ANY OTHER LAWFUL REMEDY OF LANDLORD, UPON MOTION OF LANDLORD, SUCH COUNTERCLAIM OR OTHER CLAIM ASSERTED BY TENANT SHALL BE SEVERED OUT OF THE PROCEEDINGS INSTITUTED BY LANDLORD (AND, IF NECESSARY, TRANSFERRED TO A COURT OF DIFFERENT JURISDICTION), AND THE PROCEEDINGS INSTITUTED BY LANDLORD MAY PROCEED TO FINAL JUDGMENT SEPARATELY AND APART FROM AND WITHOUT CONSOLIDATION WITH OR REFERENCE TO THE STATUS OF EACH COUNTERCLAIM OR ANY OTHER CLAIM ASSERTED BY TENANT.

The parties hereto agree that any and all suits for any and every breach of this Lease shall be instituted and maintained only in those courts of competent jurisdiction in the county in which the Building is located. In the event of litigation by and between the parties, or their respective successor(s), to enforce the terms and provisions of this Lease, the prevailing party shall be entitled to recover from the non-prevailing party the prevailing party's reasonable attorney's fees and court costs, all through final appeal.  However, the contents of the immediately preceding sentence shall expressly not be applicable to any lawsuits seeking declaratory relief or a declaratory judgment.

Time is of the essence of this Lease.

**21.**   **CONTRACTUAL LANDLORD'S LIEN.**  Landlord shall have, at all times, a valid security interest to secure payment of all Rent, Additional Rent and other sums of money becoming due hereunder from Tenant, and to secure payment of any damages or loss which Landlord may suffer by reason of the breach by Tenant of any covenant, agreement or condition contained herein, upon all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant presently or which may hereinafter be situated in the Premises, and all proceeds therefrom, and such property shall not be removed therefrom without the consent of Landlord until all arrearages in Rent and Additional Rent as well as any and all other sums of money then due to Landlord hereunder shall first have been paid and discharged and all of the covenants, agreements, and conditions hereof have been fully complied with and performed by Tenant.  In consideration of this Lease, upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Premises and take possession of any and all goods, wares, equipment, fixtures, furniture, improvements, and other personal property of Tenant situated on or in the Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made, at which sale Landlord or its assigns may purchase unless otherwise prohibited by law.  Unless otherwise provided by law, and without intending to exclude any other manner of giving Tenant reasonable notice, the requirement of reasonable notice shall be met if such notice is given in the manner prescribed in Item 36 dealing with "Notices" in this Lease at least ten (10) calendar days before the time of sale.   The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interest granted in this Item 21.  Any surplus shall be paid to Tenant or as otherwise required by law, and Tenant shall pay any deficiencies forthwith.  Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Uniform Commercial Code then in force in the State of Florida.

**22.**   **SUBORDINATION; ATTORNMENT; ESTOPPEL CERTIFICATE.**

(a)      Except as provided in the SNDA (defined below), Tenant agrees that at Landlord's option this Lease shall be subordinate to any mortgage or ground lease that now or may hereafter be placed upon the Building and Premises and to any and all advances to be made thereunder and to the interest thereon and all renewals, replacements, assignments and extensions thereof. This provision shall be self-executing, provided however, that Tenant agrees within ten (10) calendar days of request of Landlord, to execute any subordination that Landlord may deem necessary to accomplish that end and, in default of Tenant's so doing, Landlord is hereby empowered to execute such paper or papers in the name of Tenant and as the act and deed of Tenant, and this subordination is declared to be coupled with an interest and not revocable.

(b)      Tenant shall, in the event any proceedings are brought for the foreclosure of the Premises, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Premises, attorn to the Purchaser upon any such foreclosure or sale and recognize such Purchaser as Landlord under this Lease.

(c)      Tenant agrees that at any time within ten (10) calendar days of Landlord's written request, to execute, acknowledge and deliver to Landlord a written statement certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the Lease is in full force and effect as modified and stating the modifications), and the dates to which the Rent and other charges have been paid in advance, if any, it being intended that any such statement delivered pursuant to this paragraph may be relied upon by any prospective purchaser or mortgagee of the Building and lands upon which it is located.  In the event Tenant fails or refuses to execute the written statement at the request of Landlord, Tenant hereby appoints Landlord as its attorney-in-fact with full power and authority to execute and deliver any such statements or certificates on behalf of Tenant.

(d)      Except as provided in the SNDA (defined below), if Landlord's Mortgagee shall succeed to the interest of Landlord under this Lease, Landlord's Mortgagee shall not be: (i) liable for any act or omission of any prior lessor (including Landlord); (ii) bound by any rent or additional rent or advance rent which Tenant

might have paid for more than the current month to any prior lessor (including Landlord), and all such rent shall remain due and owing, notwithstanding such advance payment; (iii) bound by any security or advance rental deposit made by Tenant which is not delivered or paid over to Landlord's Mortgagee and with respect to which Tenant shall look solely to Landlord for refund or reimbursement; (iv) bound by any termination, amendment or modification of this Lease made without Landlord's Mortgagee's consent and written approval, except for those terminations, amendments and modifications permitted to be made by Landlord without Landlord's Mortgagee's consent pursuant to the terms of the loan documents between Landlord and Landlord's Mortgagee; (v) subject to the defenses which Tenant might have against any prior lessor (including Landlord); or (vi) subject to the offsets which Tenant might have against any prior lessor (including Landlord) except for those offset rights which (A) are expressly provided in this Lease; (B) relate to periods of time following the acquisition of the Building by Landlord's Mortgagee; and (C) Tenant has provided written notice to Landlord's Mortgagee and provided Landlord's Mortgagee a reasonable opportunity to cure the event giving rise to such offset event. Landlord's Mortgagee shall have no liability or responsibility under or pursuant to the terms of this Lease or otherwise after it ceases to own an interest in the Building. Nothing in this Lease shall be construed to require Landlord's Mortgagee to see to the application of the proceeds of any loan, and Tenant's agreements set forth herein shall not be impaired on account of any modification of the documents evidencing and securing any loan

(e)    The provisions of this Paragraph 22 of the Lease shall be subject in their entirety to the Subordination, Non-Disturbance and Attornment Agreement by and between Tenant, Landlord, and SummitBridge National Investment V LLC of even date herewith (the "**SNDA**").

**23.    QUIET ENJOYMENT.**  Provided Tenant has fully, duly and timely performed all of the terms, covenants, agreements and conditions of this Lease on its part to be performed, including the payment of Rent, Additional Rent and all other sums due hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises, subject to Paragraph 22 above and the rights of any current or future lienholder that is not a party to the SNDA defined in subparagraph 22(e) above (**except with respect to liens created by the actions of Lender (as defined in the SNDA) or its successors and assigns**) against Landlord and all persons claiming by, through or under Landlord, for the Term (as may be extended) herein described, subject to the provisions and conditions of this Lease.

**24.    SECURITY DEPOSIT.**  Tenant, on the Rent Commencement Date, shall deposit with Landlord a Security Deposit as described in Item 1, Section (h), which sum shall be retained by Landlord as a Security Deposit. The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that such deposit shall not be considered an advance payment of Rent or Additional Rent or a measure of Landlord's damages in case of default by Tenant. Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other available remedy, use such deposit to the extent necessary to make good any arrearages of Rent, Additional Rent and any other damage, injury, loss, expense or liability caused to Landlord by such event of default. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not then in default hereunder, any remaining balance of such deposit shall be returned by Landlord to Tenant upon expiration of this Lease. If Landlord transfers its ownership interest in the Building during the Lease Term (or any extension thereof), Landlord may assign the Security Deposit to the transferee and thereafter Landlord absolutely shall have no further liability for the return of such Security Deposit.

**25.    MECHANIC'S LIENS.**  Tenant is prohibited from making, and agrees not to make, alterations in the Premises, except as permitted by Item 14, and Tenant shall not permit any mechanic's lien or liens to be placed upon the Premises or the Building or improvements thereon during the Term (as may be extended) hereof caused by or resulting from any work performed, materials furnished or obligation incurred by or at the request of Tenant, and in the case of the filing of any such lien, Tenant will promptly pay or statutorily bond same. If default in payment or statutory bonding thereof shall continue for twenty (20) calendar days after written notice thereof from Landlord to Tenant, Landlord shall have the right and privilege, at Landlord's option, of paying

the same or any portion thereof without inquiry as to the validity thereof, and any amounts so paid, including expenses, interest, and attorney's fees, shall be so much additional indebtedness hereunder due from Tenant to Landlord and shall be repaid to Landlord immediately on rendition of a bill therefor, together with interest per annum at the maximum rate permitted by law until repaid, and if not so paid within twenty (20) calendar days of the rendition of such bill shall constitute default under Item 20 hereof.

The interest of Landlord shall not be subject to liens for improvements made by Tenant in or to the Premises or otherwise. Tenant shall notify any contractor performing any construction work in the Premises on behalf of Tenant that this Lease specifically provides that the interest of Landlord in the Premises shall not be subject to liens for improvements made by Tenant. In addition, Landlord shall have the right to post and keep posted at all reasonable times on the Premises any notices which Landlord shall be required so to post for the protection of Landlord and the Premises from any such lien. Tenant agrees to promptly execute such instruments in recordable form in accordance with the terms and provisions of Florida Statute 713.10.

**26.    FORCE MAJEURE.**  Whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant, Landlord or Tenant shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, theft, crime, fire, public enemy, injunction, insurrection, court order, requisition of governmental body or authority, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the absolute control of Landlord.

**27.    SEVERABILITY.**  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the Term (as may be extended) of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby.

**28.    HOLDING OVER.**  The failure of Tenant to surrender the Premises on the date provided herein for the expiration of the Term (as may have been theretofore extended) of this Lease (or at the time this Lease may be terminated otherwise by Landlord), and the subsequent holding over by Tenant, with or without the consent of Landlord, shall result in the creation of a tenancy at will at 150% of the Rent payable at the time of the date provided herein for the expiration of this Lease or at the time this Lease may be terminated otherwise by Landlord. This provision does not give Tenant any right to hold over at the expiration of the Term (as may have been heretofore extended) of this Lease, and shall not be deemed, the parties agree, to be a renewal of the Lease Term (as may have been heretofore extended), either by operation of law or otherwise.

**29.    RELOCATION.**  [Reserved].

**30.    RENT A SEPARATE COVENANT.**  Tenant shall not for any reason withhold or reduce Tenant's required payments of Rent, Additional Rent and other charges provided in this Lease, it being expressly understood and agreed contractually by the parties that the payment of Rent and Additional Rent is a contractual covenant by Tenant that is independent of the other covenants of the parties under this Lease.

**31.    JOINT AND SEVERAL LIABILITY.**  If two or more individuals, corporations, partnerships, or other business associations (or any combination of two or more thereof) shall sign this Lease as Tenant, the liability of each such individual, corporation, partnership or other business association to pay Rent and Additional Rent and perform all other obligations hereunder shall be deemed to be joint and several.

**32.    ABSENCE OF OPTION.**  The submission of this Lease for examination does not constitute a reservation of or option for the Premises, and this Lease becomes effective only upon execution and delivery thereof by Landlord.

**33.    CORPORATE TENANCY.**  If Tenant is a corporation, the undersigned officer of Tenant hereby warrants and certifies to Landlord that Tenant is a corporation in good standing and is authorized to do business

in the State of Florida. The undersigned officer of Tenant hereby further warrants and certifies to Landlord that he or she, as such officer, is authorized and empowered to bind the corporation to the terms of this Lease by his or her signature thereto. Landlord, before it accepts and delivers this Lease, may require Tenant to supply it with a certified copy of the corporate resolution authorizing the execution of this Lease by Tenant. If Tenant is a corporation (other than one whose shares are regularly and publicly traded on a recognized stock exchange), Tenant represents that the ownership and power to vote its entire outstanding capital stock belongs to and is vested in the officer or officers executing this Lease or members of his, her or their immediate family. If there shall occur any change in the ownership of and/or power to vote the majority of the outstanding capital stock of Tenant, whether such change of ownership is by sale, assignment, bequest, inheritance, operation of law or otherwise, without the prior written discretionary consent of Landlord, then Landlord shall have the option to terminate this Lease upon thirty (30) calendar days' written notice to Tenant so stating; furthermore, Tenant shall have an affirmative obligation to notify immediately Landlord of any such change.

**34.     BROKERAGE COMMISSION.** Tenant warrants that there are no claims for broker's commissions or finder's fees in connection with its execution of this Lease and agrees to indemnify and save Landlord completely harmless from any liability or lien that may arise from such claim, including reasonable attorney's fees.

**35.     LANDLORD'S DEFAULT.** Landlord shall in no event be charged with default in the performance of any of its obligations under this Lease unless and until Landlord shall have failed to perform such obligations within thirty (30) calendar days (or within such additional time as is reasonably required to remedy any such default) after written notice to Landlord by Tenant properly specifying and detailing the particulars of wherein and whereby Tenant claims Landlord has failed to perform any such obligations. If the holder of record of the first mortgage covering the Premises shall have given prior written notice to Tenant that it is the holder of such first mortgage and such notice includes the address at which notices to such mortgagee are to be sent, then Tenant shall give such mortgagee notice simultaneously with any notice given to Landlord to correct any default of Landlord as hereinabove provided. Such mortgagee shall have the right within thirty (30) calendar days (or within such additional time as is reasonably required to correct any such default) after receipt of such notice to correct or remedy such default before Tenant may take any action under this Lease by reason of such default. Any notice of default given Landlord by Tenant shall be null and void unless simultaneous notice has been given by Tenant to said first mortgagee.

In no event shall Landlord be liable for prospective profits or special, indirect, or consequential damages.

**36.     NOTICES.** All Notices or demands which are required or permitted hereunder must be in writing and shall be deemed to have been given, delivered or made, as the case may be (not withstanding lack of actual receipt of the actual addressee), (i) one business day after delivered by personal delivery, (ii) five (5) business days after having been deposited in the United States mail certified or registered, return receipt requested, with sufficient postage affixed and prepaid, or (iii) one (1) business day after having been received from  an expedited, overnight courier service such as, by way of example but not limitation, UPS or Federal Express, addressed to the party to whom notice is intended to be given at the address set forth below:

**LANDLORD:**       **THMIH, Inc.**
                    665 South Apollo Boulevard
                    Melbourne, Florida 32901
                    Attn. Kevin Garrity, CEO

**TENANT:**         **Brevard Surgery Center, Inc.**
                    665 South Apollo Boulevard
                    Melbourne, Florida 32901
                    Attn. Kevin Garrity, CEO

Such addresses may be changed from time to time by either party by serving notices as above provided.

Within ten (10) calendar days after receipt, Tenant shall notify Landlord in writing and provide Landlord with complete and legible copies of (if applicable):

(a)      any notices alleging violation of any applicable laws, codes, rules, regulations, etc., and/or

(b)      any notices of actions, inquiries, inspections or claims made or threatened regarding any alleged violation of any applicable laws, codes, rules, regulations, etc.

as same relate to all or any portion of the Premises and/or the Building and/or Tenant's use, occupancy or possession thereof.

37.    **INSURANCE.**    Tenant shall not conduct or permit to be conducted any activity, or place any equipment, materials or other items in, on or about the Premises or the Building, which will in any way increase the rate of fire or liability or casualty or property insurance on the Building. Should Tenant fail to comply with the foregoing covenant on its part to be performed, Tenant shall reimburse Landlord for such increased amount upon written demand therefor from Landlord, the same to be considered Additional Rent payable by Tenant to Landlord under this Lease. For the purposes of this Item 37, Landlord's affiliates, subsidiaries, successors, assigns, directors, officers, shareholders, partners, members, designates, employees, contractors, managers, agents and lenders shall, collectively, individually and in any combination, be known and defined as "**Landlord Parties**." As regards each liability insurance policy actually (or to be) carried by Tenant under this Lease, Landlord and Landlord Parties shall be named as an "additional insured" in an endorsement to each such liability insurance policy. For the purposes of the immediately preceding sentence, "additional insured" status to Landlord and Landlord Parties shall be provided in favor of Landlord and Landlord Parties on each such liability insurance policy via ISO Form 2026 or its equivalent, without modification, but from the requirements of said immediately preceding sentence shall be excluded worker's compensation insurance and employer's liability insurance. As regards each property insurance policy actually (or to be) carried by Tenant under this Lease, Landlord and Landlord Parties shall be named as a "loss payee" in an endorsement to each such property insurance policy. In the event Tenant fails, refuses or neglects to procure, maintain and/or pay for the insurance required by this Lease, at the times, under the circumstances and for the duration described in this Lease, Landlord shall have the right, but not the obligation, at any time and from time to time, and without notice, to procure and maintain such insurance and/or to pay the premiums for such insurance, in which event Tenant shall repay (all as "**Additional Rent**") Landlord, immediately upon Landlord's written demand therefor, all sums so paid by Landlord, together with interest thereon (at the highest rate permitted by law) and any costs or expenses incurred by Landlord in connection therewith, without prejudice to any other rights or remedies of Landlord under this Lease or otherwise. All Tenant's insurance coverage shall be endorsed to be primary to all insurance available to Landlord and/or Landlord Parties, with Landlord's and Landlord Parties' insurance being excess, secondary and non-contributing. All insurance coverage actually (or to be) carried by Tenant under this Lease shall contain no non-standard, special and/or unusual exclusions or restrictive endorsements without the prior written consent of Landlord. No insurance coverage obtained by Tenant

pursuant to this Lease shall contain a deductible or self-insured retention in excess of Five Thousand Dollars ($5,000.00) without the prior written consent of Landlord and all deductibles and/or retentions shall be paid by, assumed by, for the account of, and at Tenant's sole risk. All the insurance coverage(s) the subject of this Lease to be obtained by Tenant shall be provided at Tenant's sole risk, expense and responsibility.

Tenant shall, at Tenant's sole expense, obtain and keep in force at all times during the Term (as may be extended) of this Lease commercial general liability insurance, to include fire, special form and extended coverage including property damage, on an occurrence basis and on a "per location" basis, with limits of not less than Two Million Dollars ($2,000,000.00) combined single limit, insuring Landlord, Landlord Parties and Tenant against any liability arising out of the ownership, lease, possession, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Said commercial general liability insurance shall be on Insurance Services Office, Inc. (ISO), form CG 00 01 07 98 or, if Landlord elects, on an equivalent occurrence basis commercial general liability insurance policy form that is acceptable to Landlord (at Landlord's sole and unrestricted discretion). The limit of said insurance shall not, however, limit the liability of Tenant under this Lease or otherwise.

Tenant shall, at Tenant's sole expense, obtain, maintain and keep in force at all times during the Term (as may be extended) of this Lease insurance with a contractual liability endorsement and upon all property in the Premises owned by Tenant or for which Tenant is legally liable, such insurance to be in an amount not less than such property's actual cash value or actual replacement value, whichever is greater. Tenant shall maintain insurance against such other perils and in such amounts as Landlord may in writing from time to time not unreasonably require. The insurance required to be obtained and maintained under this Lease shall be with a company or companies licensed to issue the relevant insurance and licensed to do business in the State of Florida. Such insurance company or companies shall each have a policyholder's rating of no less than "A" and be assigned a financial size category of at least Class X as rated in the most recent edition of "Best's Key Rating Guide" for insurance companies. No policy shall be cancelable or subject to reduction of coverage except after thirty (30) calendar days' prior written notice to Landlord. All policies of insurance maintained by Tenant shall be in a form, and shall have a substance, acceptable to Landlord with satisfactory evidence that all premiums have been paid. Tenant agrees not to violate or permit to be violated any of the conditions or provisions of the insurance policies required to be furnished hereunder, and agrees to promptly notify Landlord of any fire, loss or other casualty. If Tenant fails to procure and maintain insurance as required hereunder, Landlord may do so, and Tenant shall, on written demand, as Additional Rent, reimburse Landlord for all monies expended by Landlord to procure and maintain such insurance.

Tenant hereby waives and releases any and all rights of recovery against Landlord (and Landlord Parties) for injury, loss or damage to Tenant (and/or any person, party or entity claiming by, through or under Tenant) or its (and/or their) property arising from any cause insured against or required to be insured against by Tenant under this Lease. Tenant shall obtain and furnish evidence to Landlord of the waiver by Tenant's insurer(s) of its (their) rights of subrogation against Landlord and Landlord Parties        Upon    Landlord's written request for same, Tenant shall provide Landlord with written evidence of Tenant's compliance with its obligations under this Item 37. In order to fulfill the mandate of the immediately preceding sentence, a duplicate original insurance policy, an insurance binder (countersigned by the applicable insurer), or Evidence of Insurance (in form ACORD 27) for each of the insurance policies Tenant is required to carry in compliance with its obligations under this Lease shall be delivered to Landlord at least ten (10) calendar days prior to the time such insurance is first required to be carried by Tenant and upon renewals or extensions not less than thirty (30) calendar days prior to the expiration of any such policy. All insurance policies actually (or to be) carried by Tenant under this Lease shall contain a provision that the applicable insurer will not cancel, will not refuse to renew or extend the applicable policy and will not change in any way whatsoever the extent and/or scope of the coverage provided by the applicable policy without first giving Landlord at least thirty (30) calendar days' prior written notice by certified mail, return receipt requested, at the notice address for Landlord described in Item 36 of this Lease or to such other address(es) as may be designated by Landlord to such insurer via certified mail, return receipt requested.

**38.**    **RECORDING.**  Notice of this Lease may be recorded in the public records by the Tenant.

**39.**    **STATUTORILY MANDATED NOTIFICATION.**  As required by F.S. 404.056(8), Landlord hereby notifies Tenant as follows: "RADON GAS:  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."

**40.**    [Intentionally omitted.]**41.**    **HAZARDOUS MATERIALS.**  Except as provided in the last paragraph of this Section 41, Tenant shall not cause or permit any Hazardous Material (as hereinafter defined) to be brought upon, kept or used in or about the Premises or the Building by Tenant, its agents, principals, employees, assigns, sublessees, contractors, consultants or invitees without the prior written consent of Landlord, which consent may be withheld for any reason whatsoever or for no reason at all.  If Tenant breaches the obligations stated in the immediately preceding sentence, or if the presence of Hazardous Material on the Premises or around the Building caused or permitted by Tenant (or the aforesaid others) results in contamination of the Premises or the Building or the surrounding area(s), or if contamination of the Premises or the Building or the surrounding area(s) by Hazardous Material otherwise occurs for which Tenant is legally, actually or factually liable or responsible to Landlord (or any party claiming by, through or under Landlord) for damages, losses, costs or expenses resulting therefrom, then Tenant shall fully and completely indemnify, defend and hold harmless Landlord (or any party claiming by, through or under Landlord) from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses, including, without limitation: (i) diminution in the value of the Premises and/or the Building and/or the land on which the Building is located and/or any adjoining area(s) which Landlord owns or in which it holds a property interest; (ii) damages for the loss or restriction on use of rentable or usable space of any amenity of the Premises, the Building or the land on which the Building is located; (iii) damages arising from any adverse impact on marketing of space; and (iv) any sums paid in settlement of claims, attorneys' fees, consultants' fees and expert fees which arise during or after the Term of this Lease, as may be extended, as a consequence of such contamination.  This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any clean-up, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Material present in the soil or ground water on or under the Premises or the Building.  Without limiting the foregoing, if the presence of any Hazardous Material on, under or about the Premises, the Building or the surrounding area(s) caused or permitted by Tenant (or the aforesaid others) results in any contamination of the Premises, the Building or the surrounding area(s), Tenant shall immediately take all actions at its sole expense as are necessary or appropriate to return the Premises, the Building and the surrounding area(s) to the condition existing prior to the introduction of any such Hazardous Material thereto; provided that Landlord's prior written discretionary approval of such actions by Tenant shall be first obtained.  The foregoing obligations and responsibilities of Tenant shall survive the expiration or earlier termination of this Lease.

As used herein, the term "**Hazardous Material**" means any hazardous or toxic substance, material or waste, including, but not limited to, those substances, materials, and wastes listed in the United States Department of Transportation Hazardous Materials Table (49 CFR 172.101) or by the Environmental Protection Agency as hazardous substances (40 CFR Part 302) and amendments thereto, or such substances, materials and wastes that are or become regulated under any applicable local, state or federal law.  Hazardous Material includes any and all material or substances which are defined as "**hazardous waste**", "**extremely hazardous waste**" or a "**hazardous substance**" pursuant to state, federal or local governmental law. "**Hazardous Substance**" includes but is not restricted to asbestos, polychlorobiphenyls ("**PCB's**") and petroleum.

Landlord and its agents shall have the right, but not the duty, to inspect the Premises at any time and from time to time to determine whether Tenant is complying with the terms of this Item 41.  If Tenant is not

in compliance with this Item 41, Landlord shall have the right to immediately enter upon the Premises to remedy any contamination caused by Tenant's failure so to comply, notwithstanding any other provision of this Lease, but shall not be liable for any interference caused thereby.

Notwithstanding anything to the contrary in this Section 41, but subject to the absolute indemnity provided hereinabove, Tenant, at Tenant's sole cost and expense, may temporarily store on Premises and be responsible for medical, special and infectious waste removal for the Premises and the maintenance and storage thereof pending removal, all in accordance with all applicable laws, regulations and orders. Tenant shall comply with all federal, state and local laws, regulations and ordinances which govern the use, storage, handling and disposal of Hazardous Substances, wastes or materials and medical, special or infectious wastes. The terms of this Section 41 shall survive the expiration or earlier termination of this Lease.

## 42.  **PATRIOT ACT REPRESENTATIONS.**

(a)  Landlord advises Tenant hereby that the purpose of this Item 42 is to provide to the Landlord information and assurances to enable Landlord to comply with the law relating to OFAC.

(b)  Tenant hereby represents, warrants and covenants to Landlord, either that (i) Tenant is regulated by the SEC, FINRA or the Federal Reserve (a **"Regulated Entity"**) or (ii) neither Tenant nor any person or entity that directly or indirectly (a) controls Tenant or (b) has an ownership interest in Tenant of twenty-five percent (25%) or more, appears on the list of Specially Designated Nationals and Blocked Persons ("OFAC List") published by the Office of Foreign Assets Control ("**OFAC**") of the U.S. Department of the Treasury.

(c)  If, in connection with this Lease, there is one or more guarantors of Tenant's obligations under this Lease, then Tenant further represents, warrants and covenants either that (i) any such guarantor is a Regulated Entity or (ii) neither guarantor nor any person or entity that directly or indirectly (a) controls such guarantor or (b) has an ownership interest in such guarantor of twenty-five percent (25%) or more, appears on the OFAC List.

(d)  Tenant covenants that during the Term of this Lease to provide to Landlord information reasonably requested by Landlord including without limitation, organizational structural charts and organizational documents which Landlord may deem to be necessary ("**Tenant OFAC Information**") in order for Landlord to confirm Tenant's continuing compliance with the provisions of this Item 42.  Tenant represents and warrants that the Tenant OFAC Information it has provided or to be provided to Landlord or Landlord's broker in connection with the execution of this Lease is true and complete.

## 43.  **AMENDMENTS.**  This Lease contains the entire agreement between the parties hereto and may not be altered, changed or amended, except by written instrument signed by both parties hereto.  No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord and addressed to Tenant, nor shall any custom or practice which may grow up between the parties in the administration of the provisions hereof be construed to waive or lessen the right of Landlord to insist upon the performance by Tenant in strict accordance with the terms hereof.  The terms, provisions, covenants, and conditions contained in this Lease shall apply to, inure to the benefit of, and be binding upon the parties hereto, and upon their respective successors in interest and legal representative, except as otherwise herein expressly provided.

The parties each acknowledge that they have thoroughly read and understand this Lease (to include its Exhibits and attachments) in its entirety, that they are completely familiar with each, every, any and all of the terms, covenants, provisions and conditions set forth therein and that there are no other representations, promises, covenants, assurances, conditions, statements, understandings, warranties or agreements (collectively, "**Representations**") concerning this Lease which do not appear in writing therein.  This Lease supersedes and revokes all previous negotiations, arrangements, letters of intent, offers to lease, lease

proposals, brochures, Representations, and information or data conveyed, whether oral or in writing, between the parties and/or their respective representatives or any other person(s) purporting to represent either Landlord or Tenant. Each party acknowledges that it has not been induced to enter into this Lease by any Representations not expressly set forth herein. The parties further acknowledge that the terms and provisions contained within this Lease have been fully, freely and fairly negotiated by and between them.

## 44.    **MISCELLANEOUS HEALTH CARE PROVISIONS.**

(I)    <u>Records</u>.    Upon the written request of the Secretary of the U.S. Department of Health and Human Services, the U.S. Comptroller General of the Government Accounting Office, or their authorized representatives, Landlord shall make available this Lease and all books, documents, and records necessary to certify the nature and extent of Landlord's costs with respect to this Lease and the Premises for a period of four (4) years after performing its duties hereunder.  If the Landlord carries out any of its duties under this Lease through a subcontract worth $10,000 or more over a 12-month period, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General, and their authorized representatives to such subcontractor's books and records.

(II)    <u>Regulatory Matters</u>.

(a)    Landlord and Tenant enter into this Lease with the intent of conducting their relationship and implementing the agreements contained herein in full compliance with applicable federal, state and local law, including without limitation, the Medicare/Medicaid Anti-Kickback statute (the "**Anti-Kickback Law**") and Section 1877 of the Social Security Act (the "**Stark Law**"), as amended.  Notwithstanding any unanticipated effect of any of the provisions of this Lease, neither party will intentionally conduct itself under the terms of this Lease in a manner that would constitute a violation of the Anti-Kickback Law or the Stark Law.  Without limiting the generality of the foregoing, Landlord and Tenant expressly agree that nothing contained in this Lease shall require either party to refer any patients to the other, or to any affiliate or subsidiary of the other.

(b)    If any legislation, regulation or government policy is passed or adopted, the effect of which would cause either party to be in violation of such laws due to the existence of any provision of this Lease, then Landlord and Tenant agree to negotiate in good faith for a period of ninety (90) calendar days to modify the terms of this Lease to comply with applicable law.  Should the parties hereto fail to agree upon modified terms to this Lease within this time, then either Landlord or Tenant may immediately terminate this Lease by giving written notice to the other party.

(c)    Landlord represents and warrants to Tenant that Landlord (i) is not currently excluded, debarred or otherwise ineligible to participate in Medicare or any federal health care program under section 1128 and 1128A of the Social Security Act or as defined in 42 U.S.C. § 1320a-7b(f) (the "**Federal Health Care Programs**"); (ii) has not been convicted of a criminal offense related to the provision of healthcare items or services; and (iii) is not under investigation or otherwise aware of any circumstances which may result in Landlord being excluded from participation in any Federal Health Care Program. The foregoing representation shall be an ongoing representation and warranty during the term of this Lease and Landlord shall immediately notify Tenant of any change in the status of the representation and warranty set forth in this Section, at which time Tenant will have the right to immediately terminate this Lease.

(d)    For purposes of this Section of this Lease, "protected health information", or PHI, shall have the meaning defined by the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Part 160 and Subparts A and E of Part 164 (the "**Privacy Standards**"), as promulgated by the Department of Health and Human Services ("HHS") pursuant to the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"). The parties agree that neither the Landlord nor its contractors, subcontractors or agents shall need access to, nor shall they use or disclose, any PHI of Tenant.  However, in the event PHI is disclosed by Tenant or its agents to Landlord, its, contractors, subcontractors or agents, regardless as to whether the disclosure is inadvertent or otherwise, Landlord agrees

to take reasonable steps to maintain, and to require its contractors, subcontractors and agents to maintain, the privacy and confidentiality of such PHI.  The parties agree that the foregoing does not create, and is not intended to create, a "business associate" relationship between the parties as that term is defined by the Privacy Standards.

**45.**     **LEASE GUARANTY.**  The personal guaranty agreement attached hereto as Exhibit "C" is made a part of this Lease **[TO BE EXECUTED IF ANY GUARANTORS ARE REQUIRED BY SUMMITBRIDGE UNDER THE SETTLEMENT AGREEMENT**

**46.**     **RENEWAL OPTION.**  So long as this Lease is in full force and effect and Tenant is not in Default in the performance of any of the covenants or terms and conditions of this Lease, Tenant shall have the option (the "**Extension Option**") to extend the Term for the entire Premises for one (1) additional period(s) of sixty (60) months (the "**Extension Period" or "Extension Periods", if more than one**") subject to the following terms and conditions:

(a)     Tenant shall have given Landlord written notice of its exercise of the Extension Option on or before six (6) months prior to the expiration of the Term of its desire to extend the Term of this Lease.  The Extension Option shall be only applicable to the entire Premises, as it may have expanded or contracted from time to time pursuant to the terms of this Lease.

(b)     The base Rent during the Extension Period shall be subject to the adjustments described in Section 1(g) of this Lease.

(c)     The rights granted to Tenant under this Section are personal to Tenant, and in the event of any assignment of this Lease or sublease by Tenant that does not comply with the provisions of this Lease, the Extension Option shall thenceforth be void and of no further force or effect.

**47.**     **TENANT FINANCIAL INFORMATION.**  Tenant shall provide Landlord, from time to time (but not more frequently than once during any twelve month period) during the term of this lease within thirty (30) calendar days after written request, with a copy of Tenant's current financial statement prepared by an independent CPA and certified by Tenant as being true and correct, together with a copy of Tenant's most recent federal tax return.  Landlord is permitted to provide a copy thereof the Landlord's lender for the Building.  In the event there is a guaranty agreement(s) for this Lease, the guarantor shall furnish the same information upon request from Landlord that is required for Tenant as set forth above.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties, either for themselves or by and through their undersigned, duly-authorized representatives, have executed this Lease for the purposes therein expressed.

Two Witnesses Required:

**TENANT**:

_____
Print Name: _____

Brevard Eye Center, Inc.,
a Florida corporation

_____
Print Name _____

By: _____
Name: _____
Title: _____

Date: _____

_____
Print Name: _____

Brevard Surgery Center, Inc.,
a Florida corporation

_____
Print Name _____

By: _____
Name: _____
Title: _____

Date: _____

_____
Print Name: _____

Medical City Eye Center, Inc.,
a Florida corporation

_____
Print Name _____

By: _____
Name: _____
Title: _____

Date: _____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties, either for themselves or by and through their undersigned, duly-authorized representatives, have executed this Lease for the purposes therein expressed.

Two Witnesses Required:                                    **LANDLORD**:

_____                          THMIH, Inc.,
Print Name: _____                           a Florida corporation

_____                          By: _____
Print Name _____                            Name: _____
                                                           Title: _____

                                                           Date: _____

**EXHIBIT "A"**

**SKETCH OF PREMISES**

**EXHIBIT "B"**

**BUILDING RULES AND REGULATIONS**

The following Building Rules and Regulations have been adopted by Landlord for the care, protection and benefit of the Premises and the Building and for the general comfort and welfare of all tenants.

1.      The sidewalks, entrances, passages, halls, elevators and stairways shall not be obstructed by Tenant or used by Tenant for any purpose other than for ingress and egress to and from the Building and Tenant's Premises.

2.      Restroom facilities, water fountains, and other water apparatus shall not be used for any purposes other than those for which they were constructed.

3.      Tenant shall not put additional locks or latches upon any door without the written discretionary consent of Landlord.  Any and all locks so added on any door shall remain for the benefit of Landlord, and the keys to such locks shall be delivered to Landlord by and from Tenant.

4.      Landlord shall not be liable for injuries, damage, theft, or other loss to persons or property that may occur upon or near any parking areas that may be provided by Landlord.  Tenant, its agents, employees, and invitees are to use same at their own risk, Landlord to provide no security with respect thereto.  The driveways, entrances, and exits upon, into and from such parking areas shall not be obstructed by Tenant, Tenant's employees, agents, guests, or invitees; provided, however, Landlord shall not be responsible or liable for failure of any person to observe this rule.  Tenant, its employees, agents, guests and/or invitees shall not park in space(s) that may be reserved or designated for others.

5.      Tenant shall not install in the Premises any heavy weight equipment or fixtures or permit any concentration of excessive weight in any portion thereof without first having obtained Landlord's written consent.

6.      Landlord reserves the right at all times to exclude newsboys, loiterers, vendors, solicitors, and peddlers from the Building and to require registration or satisfactory identification or credentials from all persons seeking access to any part of the Building outside ordinary business hours.  Landlord will exercise its best judgment in the execution of such control but will not be liable for the granting or refusal of such access.

7.      No wires of any kind or type (including but not limited to TV and radio antennas) shall be attached to the outside of the Building and no wires shall be run or installed in any part of the Building without Landlord's prior discretionary written consent.  All existing wires of any type are acceptable (provided that they comply with applicable law).

8.      Landlord shall furnish a reasonable number of door keys to Tenant's Premises and/or the Building which shall be surrendered on termination or expiration of the Lease.  Landlord reserves the right to require a deposit for such keys to insure their return at the termination or expiration of the Lease.  Tenant shall get keys only from Landlord and shall not obtain duplicate keys from any outside source.  Further, Tenant shall not alter

the locks or effect any substitution of such locks as are presently being used in Tenant's Premises or the Building.

9.      Tenant shall keep all doors to Premises closed at all times except for ingress and egress to the Premises.

10.     All installations in any Common Telephone/Electrical Equipment Rooms shall be limited to terminal boards and connections.  All other electrical equipment must be installed within Tenant's Premises.

11.     It is expressly understood and agreed that any items of any nature whatsoever placed in Common Areas (i.e., hallways, restrooms, elevators, parking garage, storage areas and equipment rooms) are placed at Tenant's sole risk and Landlord assumes no responsibility whatsoever for any loss or damage as regards same.

12.     Tenant will allow no maintenance or repairs to be done in, on, to or about the Premises other than by a contractor (such term to include all degrees of subcontractors) approved by Landlord in writing prior to any such maintenance or repairs being undertaken.  Landlord shall be entitled to require such contractor to be bonded and insured in such amounts and with such companies as Landlord may in its discretion prescribe.

13.     Smoking within the Building (to include the Premises and the Building's common areas and appurtenances) is **strictly and absolutely** prohibited.  Landlord may, however, if (but not otherwise) it so chooses, designate certain areas outside the Building where smoking will be permitted.  Landlord reserves the right to revoke any such designation(s) the subject of the immediately preceding sentence.

14.     To the extent Landlord designates employee only parking area(s) within the common area parking, Tenant agrees that it shall be responsible for enforcement of the same for its employees, and that Landlord reserves the right to enforce the parking restriction in any manner it deems reasonably necessary, including if required, towing in accordance with applicable laws and ordinances.

15.     Landlord reserves the right to designate the location and manner in which any specimen or similar boxes or repositories are placed within the Building.  To the extent Landlord designates a location within the common areas of the Building, Tenant shall be responsible for keeping the specimen or similar box or repository in a clean, neat and orderly condition.

**EXHIBIT "C"**

**GUARANTY AGREEMENT**

This is an absolute and unconditional guarantee of that certain Lease Agreement dated _____, by and between POINCIANA MEDICAL CENTER DEVELOPMENT, LLC, a Florida limited liability company (hereinafter called "Landlord") and _____, a _____ (hereinafter called "Tenant"), concerning that certain premises known as Suite ___, located at 339 Cypress Parkway, Kissimmee, Florida 34759.

FOR VALUE RECEIVED, and in consideration for, and as an inducement to Landlord to enter into that certain Lease Agreement dated _____ (the "Lease"), the undersigned, jointly and severally, hereby guarantees to Landlord, its successors and assigns, the payment of all rentals specified in the Lease and hereunder and all other payments to be made by Tenant under said Lease, and the full performance and observance by Tenant of all the terms, covenants, conditions and agreements therein provided to be performed and observed by Tenant for which the undersigned shall be jointly and severally liable with Tenant, without requiring any notice of nonpayment, nonperformance or nonobservance, or proof of notice or demand, whereby to charge the undersigned, all of which the undersigned does hereby expressly waive, and the undersigned expressly agrees that the Landlord, its successors and assigns, may proceed against the undersigned separately or jointly, before, after or simultaneously with the proceedings against the Tenant for default, and that this Guarantee shall not be terminated, affected or impaired in any way or manner whatsoever by reason of the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of said Lease, or by reason of summary or other proceedings against Tenant, or by the omission of Landlord to enforce any of its rights against Tenant or by reason of any extensions of time or indulgence granted by Landlord to Tenant. The undersigned further covenants and agrees (i) that the undersigned will be bound by all of the provisions, terms, conditions, restrictions, and limitations contained in said Lease, the same as though the undersigned was named therein as Tenant; and (ii) that this Guarantee shall be absolute and unconditional and shall remain and continue in full force and effect as to any renewal, extension, amendment, addition, assignment, sublease, transfer or other modification of said Lease, whether or not the undersigned shall have any knowledge or have been notified of or agreed or consented to any such renewal, extension, amendment, addition, assignment, sublease, transfer or other modification of said Lease, and the undersigned agrees to be bound by any and all modifications to the Lease. If Landlord at any time is compelled to take any action or proceeding in court or otherwise to enforce or compel compliance with the terms of this Guarantee, the undersigned shall, in addition to any other rights and remedies to which the Landlord may be entitled hereunder or as a matter of law or in equity, be obligated to pay all costs, including attorneys' fees, incurred or expended by Landlord in connection therewith. Further, the undersigned hereby covenants and agrees to assume said Lease and to perform all of the terms and conditions thereunder for the balance of the original term should said Lease be disaffirmed by any Trustee in Bankruptcy for Tenant, or at the option of Landlord, the undersigned shall, in the event of Tenant's bankruptcy, make and enter into a new lease which shall be in form and substance identical to said Lease.  All obligations and liabilities of the undersigned pursuant to this Guarantee shall be binding upon the heirs, legal representatives, successors and assigns of the undersigned, and the undersigned, its heirs, legal representatives, successors and assigns shall remain fully liable under the Lease and this Guarantee regardless of any merger, corporate reorganization or restructuring involving Tenant regardless of the resulting organization, structure or ownership of Tenant.  This Guarantee shall be governed by and construed in accordance with the laws of the State of Florida.

**THE UNDERSIGNED HEREBY UNCONDITIONALLY CONSENTS AND AGREES THAT ANY LEGAL ACTION BROUGHT UNDER THIS GUARANTEE MAY BE BROUGHT IN ANY**

**STATE COURT OF THE STATE OF FLORIDA OR IN A FEDERAL UNITED STATES COURT IN FLORIDA AND THE UNDERSIGNED HEREBY UNCONDITIONALLY CONSENTS TO THE JURISDICTION OF SUCH COURTS IN CONNECTION WITH ANY CAUSE OF ACTION BROUGHT BY OR AGAINST TENANT AND/OR THE UNDERSIGNED IN ANY WAY DIRECTLY OR INDIRECTLY RELATED TO THE AFOREMENTIONED LEASE OR THIS GUARANTEE. THE UNDERSIGNED HEREBY WAIVES ANY RIGHT THE UNDERSIGNED MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST THE UNDERSIGNED IN ACCORDANCE WITH THIS GUARANTEE, AND THE UNDERSIGNED ALSO AGREES NOT TO SEEK A JURY TRIAL IN ANY LAWSUIT, PROCEEDING, COUNTERCLAIM OR ANY OTHER LITIGATION PROCEEDING BASED UPON OR ARISING OUT OF THIS GUARANTEE.**

Until all obligations of Tenant under the Lease have been performed, satisfied and paid in full, the undersigned shall have no right of subrogation, reimbursement or indemnity whatsoever and no right of recourse to or with respect to any assets or property of Tenant.  If Landlord is required to or agrees to repay any amount received by Landlord on account of any payments, obligations and liabilities of Tenant to Landlord as a result of a judgment, order or decree of a court of competent jurisdiction or as a result of a settlement or compromise concerning a claim for repayment by any party to such payments, obligations and liability, the undersigned shall remain fully liable to Landlord for the amount repaid notwithstanding the revocation or termination of this Guarantee or the cancellation or termination of the Lease.

At any time that Tenant is required to furnish a certificate pursuant to the Lease, the undersigned, by guarantying the terms and conditions of the Lease, agree that he will, upon twenty (20) calendar days prior written request to Tenant, certify (by written instrument, duly executed, acknowledged and delivered to Landlord and to any third person designated by Landlord in such request) that the undersigned concurs with the statements set forth in said certificate by Tenant and that this guarantee remains in full force and effect as to all obligations of Tenant under this Lease. Failure to deliver such certificate to Landlord (and any such designated third party) within such twenty (20) day period shall constitute automatic approval of the requested certificate as though such certificate had been fully executed and delivered by the undersigned to Landlord and such designated third party.

IN WITNESS WHEREOF, the undersigned has executed this Guarantee this _____ day of _____, 201_.

_____

Name:_____

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 201_, by _____, as _____ of _____, a _____ corporation, on behalf of the corporation.  He/She is [__] personally known to me or [__] has produced _____ as identification.

_____

My Commission Expires:               Notary Public

**EXHIBIT "D"**

**USE RESTRICTIONS FOR PREMISES**

1.      All licensed physicians (herein, a "Physician" or "Physicians") who conduct a medical practice and related activities (a "**Practice**") at the Premises must be and remain appropriately licensed and in good standing with the state licensing board and any applicable federal, state or local certification or licensing agency or office, without restriction, and not subject to any material sanction, exclusion order, or other disciplinary order with respect to his or her participation in any federal or state healthcare program.

2.      The Premises shall not be used in whole or in part for the following activities:

(i)      any purpose that is in violation of any law, code, ordinance, zoning ordinance or condition or governmental rule or regulation,

(iI)      any operation which creates a nuisance.

3.      No drugs or medicines may be dispensed on or in the Premises to persons other than the patients of Physicians occupying the Premises as a tenant.

4.      The installation and use of any diagnostic, laboratory or radiology equipment on or in the Premises shall be subject to the prior written approval of Landlord, which approval may be granted or denied in their sole and absolute discretion.  No such equipment installed and used on the Premises with prior written consent as stated in the foregoing sentence may be used in a manner or for purposes that violate the provisions of this Exhibit "D".

# EXHIBIT "D"

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Agreement is made effective as of the ____ day of August, 2018 by and among BREVARD EYE CENTER, INC., a Florida corporation, BREVARD SURGERY CENTER, INC., a Florida corporation, and MEDICAL CITY EYE CENTER, P.A., a Florida corporation, each with a mailing address of 250 North Courtenay Parkway, Suite 201, Merritt Island, Florida 32953 (collectively, the "**Tenant**"), THMIH, INC., a Florida corporation ("**Landlord**") SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company, with a mailing address of _____ ("**Lender**," and together with Tenant and Landlord, the "**Parties**").

### W I T N E S S E T H:

**WHEREAS**, BANK OF AMERICA, N.A. (the "Original Lender"), previously extended loans (the "Loans") to Tenant and Landlord, which loan was secured by, among other things, (a) that certain Mortgage executed by Landlord in favor of Lender dated on or about September 27, 2013, recorded in the Public Records of Brevard County, Florida at O.R. Book 6982, Page 2563 (the "Melbourne Mortgage") covering certain real property generally located at 665 South Apollo Boulevard, Melbourne, Florida 32901 with all improvements thereon (the "Melbourne Property") and (b) that certain Mortgage executed by Landlord in favor of Lender dated on or about May 9, 2014, recorded in the Public Records of Brevard County, Florida at O.R. Book 7125, Page 2560 (the "Merritt Island Mortgage", and together with the Melbourne Mortgage, collectively, the "Mortgages") covering certain real property generally located at 250 North Courtenay Parkway, Merritt Island, Florida 32953 with all improvements thereon (the "Merritt Island Property", and together with the Melbourne Property, collectively, the "Properties"); and

**WHEREAS**, Landlord and Tenant entered into those certain Lease Agreements with an effective date of _____, 2018 (collectively, the "Leases"), pursuant to the terms of which Landlord has agreed to lease the Properties to Tenant and Tenant has agreed to lease the Properties from Landlord; and

**WHEREAS**, Tenant and Lender desire to enter into this Agreement in order to (a) acknowledge that the Leases are subordinate to the lien of the Mortgages, (b) for Tenant to attorn to and recognize Lender upon, among other things, foreclosure of the Mortgages, (c) for Lender to consent to all the terms and provisions of the Leases, and (d) for Lender to agree not to disturb Tenant's rights under the Lease, all subject to the terms hereof.

### Agreement:

**NOW, THEREFORE**, the Parties hereto, in consideration of the mutual covenants herein contained, and intending to be legally bound hereby, agree as follows:

1.      **Tenant** agrees that each Lease is subordinate to the lien of the relevant Mortgage and to any and all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum of the Loans, all accrued and unpaid interest thereon and all other costs and expenses provided for under the Loans.

1

2.      Lender has reviewed the Leases and hereby approves of and consents to all of the terms and provisions thereof.

3.      So long as Tenant complies with all of the terms and provisions of the Lease applicable to it, Tenant's rights under the Lease shall not be disturbed or interfered with by Lender, and all other terms and provisions of the Lease shall remain in full force and effect. So long as Tenant is not in default under each Lease beyond applicable notice and cure periods, Lender agrees that: (i) it shall not join Tenant in any foreclosure of the lien of the applicable Mortgage or other proceeding in respect thereof and (ii) to the full extent permitted under applicable law, no foreclosure of the lien of the applicable Mortgage or other proceeding in respect thereof shall divest, impair, modify, abrogate or otherwise adversely affect any interests or rights whatsoever of the Tenant under the applicable Lease. In the event of any such adverse effect, so long as Tenant is not in default under the applicable Lease beyond applicable notice and cure periods, Lender or other purchaser or transferee of the applicable Property and Tenant shall enter into a new lease with the same terms as the applicable Lease. Notwithstanding anything contained in this Agreement to the contrary, however, it is agreed that Lender shall not be (A) liable for any act or omission of any prior landlord, provided that Lender shall be obligated to correct any conditions that exist as of the date of succession that violate Lender's obligations as Landlord under the applicable Lease, (B) subject to any offsets or defenses which the Tenant may have against any prior landlord unless such offset or defense relates to events that occurred on or after the date of succession, (C) bound by any rent or additional rent which the Tenant might have paid for more than the current month to any prior landlord unless actually received by Lender, (D) bound by any amendment or modification to the Lease which effectively decreases the term of the applicable Lease without the prior written consent of Lender nor (E) bound by any amendment or modification to the Lease which is executed after the Commencement Date (as defined in the Leases) that creates any additional right to terminate the Leases in favor of Tenant without the prior written consent of Lender

4.      Tenant agrees that it shall attorn to and recognize Lender, as mortgagee in possession or otherwise, the purchaser of either Property at foreclosure sale under the applicable Mortgage, any transferee who acquires the property by deed in lieu of foreclosure or otherwise, and the successors and assigns of each of them (provided such party expressly assumes the obligations of Landlord under the applicable Lease), as Tenant's landlord for the balance of the term of the applicable Lease in accordance with the terms and provisions of such Lease, but subject to the provisions of Section 3 above.

5.      So long as a Mortgage remains outstanding and unsatisfied, prior to terminating the applicable Lease due to a default by Landlord thereunder, Tenant will mail or deliver to the Lender, at the address set forth above, a copy of the termination notice to be given to the Landlord by the Tenant under and pursuant to the terms and provisions of the Lease. Within the time permitted the Landlord for curing any default under the applicable Lease as therein provided, the Lender may, but shall have no obligation to, pay any taxes and assessments, make any repairs and improvements, make any deposits or do any other act or thing required of the Landlord by the terms of the Lease; and all payments so made and all

2

things so done and performed by the Lender shall be as effective to prevent the lease being terminated or rights of the Landlord from being forfeited or adversely affected because of any default under the Lease as the same would have been if done and performed by the Landlord.

6. In the event of any transfer of the Properties, whether through foreclosure or otherwise,  all monies owed by or collected from Tenant under the Leases, including but not limited to Rent and the Security Deposit (as such terms are defined in the Leases), shall be turned over, delivered, and paid to Lender, to the extent not previously turned over, delivered, or paid to Lender.

7. Except as otherwise specifically provided herein, this Agreement shall inure to the benefit of and be binding upon each of the Parties and their successors and assigns, and shall be governed and construed in accordance with the laws of the jurisdiction in which the Properties are located.

8. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original instrument, but all such counterparts together shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

3

31754975 v1

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed the day and year first-above written.

Two Witnesses Required:                **TENANT**:

_____    Brevard Eye Center, Inc.,
Print Name: _____    a Florida corporation

_____    By:    _____
Print Name _____    Name:  _____
                                   Title:  _____

                                   Date:    _____

_____    Brevard Surgery Center, Inc.,
Print Name: _____    a Florida corporation

_____    By:    _____
Print Name _____    Name:  _____
                                   Title:  _____

                                   Date:    _____

_____    Medical City Eye Center, P.A.,
Print Name: _____    a Florida corporation

_____    By:    _____
Print Name _____    Name:  _____
                                   Title:  _____

                                   Date:    _____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

4

31754975 v1

## SIGNATURE PAGE TO SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

Two Witnesses Required:                          **LANDLORD**:

_____          THMIH, Inc.,
Print Name: _____          a Florida corporation


_____          By: _____
Print Name _____           Name: _____
                                         Title: _____

                                         Date: _____

### [SIGNATURES CONTINUE ON FOLLOWING PAGE]

5

## SIGNATURE PAGE TO SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

Two Witnesses Required:

**LENDER**:

SummitBridge National Investments V LLC,

Print Name: _____

a Delaware limited liability company

By: _____

Print Name _____

Name: _____

Title: _____

Date: _____

6

31754975 v1

# EXHIBIT "E"

IN THE CIRCUIT COURT OF THE NINTH
JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

**SummitBridge National Investments V
LLC, a Delaware limited liability company**

CASE NO.  2017 CA 2483

       **Plaintiff,**

**v.**

**Rafael Trespalacios a/k/a Rafael
Trespalacios, M.D., an individual, THMIH,
Inc., a Florida corporation, Brevard Eye
Center, Inc., a Florida corporation, Brevard
Surgery Center, Inc., a Florida corporation,
Medical City Eye Center, P.A., a Florida
corporation, Steve Black, an individual, and
unknown tenants in possession,**

       **Defendants.**

_____/

## STIPULATION AND CONSENT TO ENTRY OF FINAL JUDGMENT OF FORECLOSURE

Plaintiff, SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited

liability company ("Plaintiff"), and Defendants, THMIH, Inc., a Florida corporation, Brevard Eye

Center, Inc., a Florida corporation, Brevard Surgery Center, Inc., a Florida corporation, and

Medical City Eye Center, P.A., a Florida corporation (collectively, the "Defendants"), by and

through their undersigned counsel, hereby stipulate and agree to the following (this "Stipulation"):

      1.     Plaintiff is the owner and the holder of the Loan Documents,[1] and owner and holder

of the original Notes.

      2.     Defendants defaulted in their obligations under the Loan Documents by, among

other things, failing to pay Plaintiff amounts due under the Loan Documents when due.

_____

3.      As of March 1, 2017, the aggregate amount of principal and interest due under the Loan Documents with respect to each of the Loans was $11,720,646.02, consisting of unpaid principal of $11,597,316.76 and accrued and unpaid interest of $123,329.26, which amounts accrue interest at the rate of $2,085.68 per day, in addition to fees, penalties and costs owed under the Loan Documents that continue to accrue as incurred (the "Indebtedness").

4.      Due to the Defendants' failure to pay amounts owing under the Loan Documents as and when due, it was necessary for Plaintiff to employ its counsel of record to enforce Plaintiff's rights and remedies under the Loan Documents, including without limitation the filing of this action, for which Plaintiff has incurred costs and expenses, including attorneys' fees, which the Defendants are obligated to pay under the terms and conditions of the Loan Documents.

5.       Due to Defendants' defaults under the Loan Documents, Plaintiff is entitled to foreclose its mortgages on the Real Property.

6.      This Court has jurisdiction over the parties and subject matter of this action.

7.      All allegations of the Plaintiff in the Verified Complaint are true and correct and are hereby admitted by Defendants.

8.      Plaintiff, and its successors or assigns, may file and record a notice of lis pendens against the Real Property, and may amend the Verified Complaint to add any and all counts, claims, or parties that Plaintiff deems necessary or appropriate to foreclose Plaintiff's mortgage liens on the Real Property.

9.      Defendants stipulate and agree to entry of a final judgment of foreclosure against Defendants in a form substantially similar to the Final Judgment attached hereto as **Exhibit 1** (the "Final Judgment").  The Final Judgment does not contain the names of additional parties that may need to be added in order to foreclose the Real Property, and Defendants stipulate and agree to the

addition or inclusion of any additional parties to the Final Judgment for purposes of, and as necessary to, proceed with foreclosing the Real Property. Any other provision of the Final Judgment may be modified, amended, stricken, or added, for purposes of foreclosing the Real Property, such as the modification or amendment of the amount of Indebtedness, Plaintiff's right to credit bid, the existence and priority of liens against the Property, or whether the Real Property shall be sold separately or together.

10.     Defendants further stipulate and agree that the Mortgages that are the subject of this action include real property lying in Orange County and Brevard County, Florida, and that, in accordance with Section 702.04, *Florida Statutes*, all of the Real Property located in Brevard County, Florida that is the subject of this action may be foreclosed in Orange County, Florida, and that all foreclosure proceedings over the Real Property may be had in this Court.

11.     Defendants further stipulate and agree, to the extent deemed necessary or appropriate by Plaintiff or the Court, that this action may be transferred to any other Circuit Court that may have jurisdiction over the subject matter of this action, including but not limited to the Circuit Court in and for Brevard County, Florida.

12.     Defendants further stipulate and consent to, and hereby waive, with prejudice, any defenses, objections or challenges to, any action, motion or pleading made or requested by Plaintiff to complete foreclosure and sale of the Real Property, including, but not limited to, the filing and recordation of a notice of lis pendens against the Properties, an amended complaint adding additional parties or lienholders, the amendment or modification of the proposed Final Judgment attached hereto as Exhibit "1," the credit bidding of any or all of the Indebtedness, the transfer of the State Court Action or the commencement of a new foreclosure action in the Circuit Court in and for Brevard County, Florida, any actions required by a title insurance company to fully insure

the transfer of title by foreclosure, and any actions required by a court of law to foreclose and sell the Properties.

13.     This Stipulation is being filed in connection with a Settlement Agreement entered into by and between Plaintiff and Defendants and approved by the United States Bankruptcy Court in and for the Middle District of Florida, Orlando Division, in the bankruptcy case of *In re Brevard Eye Center, Inc.*, case no. 6:17-BK-01828-KSJ.   Defendants do not stipulate to entry of a deficiency judgment against them; provided, however Plaintiff shall retain all of its rights to enforce the indebtedness in connection with its *in rem* rights against the Real Property, including foreclosing on additional property, and Plaintiff shall retain all of its claims in the Defendants' bankruptcy cases.

WHEREFORE, Plaintiff and Defendants hereby request the Court to enter the Final Judgment attached hereto in accordance with this Stipulation, enter such other and further orders the Court deems just and appropriate to carry out this Stipulation, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted this ___ day of ___, 2018,

Respectfully submitted,

_____
Richard A. Robinson, Esq.
Florida Bar Number: 41238
Primary Email: rrobinson@burr.com
Secondary Email: lcarnevale@burr.com
Jonathan M. Sykes, Esq.
Florida Bar Number: 73176
Primary Email:     jsykes@burr.com
Secondary Email:  lloving@burr.com
**BURR & FORMAN LLP**
200 S. Orange Avenue, Suite 800
Orlando, FL 32801
Telephone:  (407) 540-6600

Facsimile:   (407) 540-6601
**ATTORNEYS FOR PLAINTIFF**

_____

[Geoffrey Aaronson's signature block]

STIPULATED AND AGREED TO BY:


_____

Dr. Rafael Trespalacios, as owner and president of THMIH, Inc.


_____

Dr. Rafael Trespalacios, as owner and president of Brevard Eye Center, Inc.


_____

Dr. Rafael Trespalacios, as owner and president of Brevard Surgery Center, Inc.


_____

Dr. Rafael Trespalacios, as owner and president of Medical City Eye Center, P.A.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on _____, 20___, a true and correct copy of the foregoing was filed with the Clerk of Court by using the Florida Courts E-Filing Portal which will send notice of electronic filing and complete service of the foregoing as required by Fla. R. Jud. Admin. 2.516 to: **Roy S. Kobert, Esq.,** (Roy.Kobert@gray-robinson.com)**,** Gray Robinson, P.A., 301 E. Pine Street, Suite 1400, Orlando, FL 32802 and **Michael A. Nardella, Esq.,** (mnardella@nardellalaw.com), Nardella & Nardella, PLLC, 250 E. Colonial Drive, Suite 102, Orlando, FL 32801-1231

_____
Jonathan M. Sykes, Esq.

7

# **EXHIBIT 1**

Agreed Final Judgment

**[Follows this Page]**

IN THE CIRCUIT COURT OF THE NINTH
JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

**SummitBridge National Investments V
LLC, a Delaware limited liability company**

CASE NO.  2017 CA 2483

       **Plaintiff,**

**v.**

**Rafael Trespalacios a/k/a Rafael
Trespalacios, M.D., an individual, THMIH,
Inc., a Florida corporation, Brevard Eye
Center, Inc., a Florida corporation, Brevard
Surgery Center, Inc., a Florida corporation,
Medical City Eye Center, P.A., a Florida
corporation, Steve Black, an individual, and
unknown tenants in possession,**

       **Defendants.**

_____/

## <u>STIPULATED CONSENT FINAL JUDGMENT OF FORECLOSURE</u>

THIS CAUSE comes before the Court on the Stipulation and Consent to Final Judgment

filed by Plaintiff, SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited

liability company ("Plaintiff"), and Defendants, THMIH, Inc., a Florida corporation, Brevard Eye

Center, Inc., a Florida corporation, Brevard Surgery Center, Inc., a Florida corporation, and

Medical City Eye Center, P.A., a Florida corporation (collectively, the "Defendants"), the Court

having reviewed the Stipulation and Consent to Final Judgment and the pleadings on file, having

reviewed the signatures of the parties on the Stipulation and Consent to Final Judgment, and having

been otherwise duly advised in the premises, and it is hereby:

ORDERED AND ADJUDGED:

1.    The Court has jurisdiction of the subject matter and the parties. The allegations

contained in Verified Complaint, including any and all amendments thereto, have been admitted

by the Defendants and constitute competent evidence to support the Plaintiff's claims against the Defendants. Further, the equities are with the Plaintiff and judgment is due to be entered in Plaintiff's favor.

2.      The Stipulation and Consent to Final Judgment is hereby APPROVED.

3.      The address of the Plaintiff is 1700 Lincoln Street, Suite 2150, Denver, Colorado 80203.

4.      Defendant, Trespalacios, is an individual whose address is 4448 Reseda Way, Rockledge, Florida 32955.

5.      Defendant, THMIH, is a Florida corporation whose principal place of business is located at 665 S. Apollo Boulevard, Melbourne, Florida 32901.

6.      Defendant, Brevard Eye, is a Florida corporation whose principal place of business is located at 665 S. Apollo Boulevard, Melbourne, Florida 32901.

7.      Defendant, Brevard Surgery, is a Florida corporation whose principal place of business is located at 665 S. Apollo Boulevard, Melbourne, Florida 32901.

8.      Defendant, Medical City, is a Florida corporation whose principal place of business is located at 665 S. Apollo Boulevard, Melbourne, Florida 32901.

9.      Defendant, THMIH, is a Florida corporation whose principal place of business is located at 665 S. Apollo Boulevard, Melbourne, Florida 32901.

10.     Defendants, Unknown Tenants, if any, reside in or have their principal place of business in Brevard County, Florida.

11.     [Insert the last known address of any additional defendants named by Plaintiff in accordance with the Stipulation and Consent to Final Judgment]

12.     Pursuant to the Stipulation and Consent to Final Judgment, the Court finds the amount due and owing to Plaintiff, and its successors and assigns, by and from Defendants, jointly and severally, as of the date of this Judgment, is ＿＿＿＿＿＿＿＿＿＿ [which shall be an amount that includes costs, interest, fees, and attorneys' fees that accrue through the date of Judgment], which amount shall bear interest at the statutory rate of 5.35% commencing on the date of this Consent Final Judgment, which interest shall be adjusted annually on January 1 of each year in accordance with the interest rate in effect on that date as set by the Chief Financial Officer until the judgment is paid, pursuant to §55.03(3) Fla. Stat., and shall be increased in the amount of such further fees and costs as may be incurred in this action by Plaintiff, and its successors and assigns (the "Indebtedness").

13.     Judgment is hereby entered in favor of Plaintiff, and its successors and assigns, foreclosing on the real and related personal property located at, situate and being in Orange County and Brevard County, Florida as more fully described below:

Parcel 1:

Real property located at 665 S. Apollo Boulevard, Melbourne, Florida 32901, and described as follows:

A portion of the Northwest 1/4, Section 34, Township 27 South, Range 37 East, Brevard County, Florida, being more particularly described as follows:

From the intersection of the Easterly Right of Way line of Babcock Street and the Northeasterly Right of Way line of Apollo Boulevard in the City of Melbourne, Florida, run South 41 degrees 13' 04" East along the Northeasterly Right of Way line of Apollo Boulevard a distance of 535 feet to the Point of Beginning of the herein described parcel; thence North 48 degrees 46' 56" East a distance of 200 feet to the Southwesterly Right of Way line of the Florida East Coast Railroad; thence South 41 degrees 13' 04" East along said Railroad Right of Way line a distance of 215 feet; thence South 48 degrees 46' 56" West 200 feet to the Northeasterly Right of Way line of Apollo Boulevard; thence North 41 degrees 13' 04" West 215 feet to the Point of Beginning.  Subject to a Drainage Easement over the Northerly 15 feet and the Easterly 50 feet thereof.

Parcel 2:

Real property located at 250 N. Courtenay Parkway, Merritt Island, Florida 32953, and described as follows:

Commencing at the North quarter corner of Section 35, Township 24 South, Range 36 East, Brevard County, Florida, run South 89 degrees 59 minutes 40 seconds East along the North line of said Section 35, a distance of 63.74 feet to the East right of way line of State Road A1A; thence run South 0 degrees 0 minutes 40 seconds West along said East right of way line, 205 feet for a Point of Beginning; thence continue South 0 degrees 0 minutes 40 seconds West along said East right of way line, 219.45 feet; thence run North 51 degrees 5 minutes 40 seconds East 278.47 feet; thence run North 38 degrees 54 minutes 20 seconds West 57.24 feet; thence run North 89 degrees 59 minutes 40 seconds West 180.72 feet to the Point of Beginning.

Together with that certain easement for parking and ingress and egress as created in Warranty Deed recorded in Official Records Book 671, Page 78 and further described in Warranty Deed in Official Records Book 1584, Page 1038 and Agreement with respect to Rights in Easement dated August 27, 1996 and recorded September 5, 1996 in Official Records Book 3602, Page 3411, all of the Public Records of Brevard County, Florida.

Parcel 3:

Real property located at 214 East Marks Street, Orlando, Florida 32803, and described as follows:

East 70 feet of Lot 9 and East 10 feet of Lot 11, All of Lot 12, Block B, Magnolia Park Subdivision, according to the plat thereof recorded at Plat Book G, Page 126, in the Public Records of Orange County, Florida.

Lots 21 and 22, Sunshine Park, F.A. Lewters Addition to Orlando, according to the plat thereof recorded at Plat Book F, Page 58, in the Public Records of Orange County, Florida.

(Parcels 1, 2, and 3 are collectively referred to herein as the "Property")

14.    Plaintiff holds a lien on the Property for the total sum of the Indebtedness awarded above, superior to all claims or estates of the Defendants [and other lienholders or additional defendants named herein] on the Property.

15.    The Clerk of this Court shall sell the Property at public sale on _____, 2018, at 11:00 a.m. to the highest bidder for cash, except as

prescribed in paragraph 16, in accordance with Section 45.031, *Florida Statutes*, and Florida law, by electronic sale at  www.myorangeclerk.realforeclose.com. In accordance with Section 702.04, *Florida Statutes*, and the parties' Stipulation and Consent to Final Judgment, all of the Property that is located in Brevard County, Florida may be foreclosed in Orange County, Florida, and all foreclosure proceedings over the Property shall be had in this Court, except that notice of the sale must be published in every county wherein any of the Property lies. After final disposition of the suit, the Clerk of this Court shall prepare and forward a certified copy of the decree of foreclosure and sale and of the decree of confirmation of sale to the clerk of the circuit court of every county wherein any of the Property lies, to be recorded in the foreign judgment book of each such county, and the costs of such copies and of the record thereof shall be taxed as costs in this suit.

16.    Plaintiff shall advance all subsequent costs of this action and shall be reimbursed for them by the Clerk if Plaintiff is not the purchaser of the property for sale; provided, however, that the purchaser of the property for sale shall be responsible for the documentary stamps payable on the certificate of title.  If Plaintiff is the purchaser, the Clerk shall credit Plaintiff's bid with the total sum with interest and costs accruing subsequent to this Judgment, or such part of it as is necessary or appropriate to pay the bid in full.

17.    On filing the Certificate of Title, the Clerk shall distribute the proceeds of the sale, so far as they are sufficient, by paying: first, all of Plaintiff's costs; second, documentary stamps affixed to the Certificate; third, Plaintiff's attorneys' fees; fourth, the total sum due to Plaintiff, less the items paid, plus interest at the rate prescribed above from this date to the date of the sale; and by retaining any remaining amount pending the further order of this Court.

18.    On filing the Certificates of Sale, Defendants and all persons claiming under or against Defendants since the filing of the notice of lis pendens shall be foreclosed of all estate or

claim in the Property, except as to claims or rights under chapter 718 or chapter 720, *Florida Statutes,* if any.

19.    Upon the filing of the Certificate of Title, the person named on the Certificate of Title shall be let into possession of the Property.  If a Defendant remains in possession of the Property, the clerk shall without further order of the Court issue forthwith a writ of possession upon request of the person named on the Certificate of Title.

**IF THIS PROPERTY IS SOLD AT PUBLIC AUCTION, THERE MAY BE ADDITIONAL MONEY FROM THE SALE AFTER PAYMENT OF PERSONS WHO ARE ENTITLED TO BE PAID FROM THE SALE PROCEEDS PURSUANT TO THE FINAL JUDGMENT.**

**IF YOU ARE A SUBORDINATE LIENHOLDER CLAIMING A RIGHT TO FUNDS REMAINING AFTER THE SALE, YOU MUST FILE A CLAIM WITH THE CLERK NO LATER THAN 60 DAYS AFTER THE SALE. IF YOU FAIL TO FILE A CLAIM, YOU WILL NOT BE ENTITLED TO ANY REMAINING FUNDS.**

20.    Jurisdiction of this action is retained to enter further orders and judgments on other counts in the complaint that are proper.  Jurisdiction of this action is further retained to enter orders and judgments on any supplemental complaint to add an omitted party post-judgment, known as a re-foreclosure, to take such other actions as may be necessary to correct any title defect with respect to the foreclosed property, or to litigate any cross-claims.  Jurisdiction of this action is further retained to transfer this action to the Circuit Court in and for Brevard County, Florida for the purpose of completing a foreclosure sale of the Properties located in Brevard County, Florida.

**DONE AND ORDERED**, in Orlando, Orange County, Florida, this _____ day of
_____, 2018.


_____
Circuit Court Judge_____

# EXHIBIT "F"

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN
AND FOR ORANGE COUNTY,
FLORIDA

**SummitBridge National Investments
V LLC, a Delaware limited liability
company**

CASE NO.  2017 CA 2483

      **Plaintiff,**

v.

**Rafael Trespalacios a/k/a Rafael
Trespalacios, M.D., an individual,
THMIH, Inc., a Florida corporation,
Brevard Eye Center, Inc., a Florida
corporation, Brevard Surgery
Center, Inc., a Florida corporation,
Medical City Eye Center, P.A., a
Florida corporation, Steve Black, an
individual, and unknown tenants in
possession,**

      **Defendants.**

_____/

## STIPULATION AND CONSENT TO ENTRY OF FINAL JUDGMENT AGAINST RAFAEL TRESPALACIOS

Plaintiff, SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company ("Plaintiff"), and Defendant, Rafael Trespalacios a/k/a Rafael Trespalacios, M.D., an individual ("Defendant"), by and through their undersigned counsel, hereby stipulate and agree to the following (this "Stipulation"):

1.      Plaintiff is the owner and the holder of the Loan Documents,[1] and owner and holder of the original Notes.

2.      Defendant defaulted in his obligations under the Loan Documents by, among other things, failing to pay Plaintiff amounts due under the Loan Documents when due.

3.      As of March 1, 2017, the aggregate amount of principal and interest due under the Loan Documents with respect to each of the Loans was $11,720,646.02, consisting of unpaid principal of $11,597,316.76 and accrued and unpaid interest of $123,329.26, which amounts accrue interest at the rate of $2,085.68 per day, in addition to fees, penalties and costs owed under the Loan Documents that continue to accrue as incurred (the "Indebtedness").

4.      Due to the Defendants' failure to pay amounts owing under the Loan Documents as and when due, it was necessary for Plaintiff to employ its counsel of record to enforce Plaintiff's rights and remedies under the Loan Documents, including without limitation the filing of this action, for which Plaintiff has incurred costs and expenses, including attorneys' fees, which the Defendants are obligated to pay under the terms and conditions of the Loan Documents.

5.      Due to Defendants' defaults under the Loan Documents, Plaintiff is entitled to a final money judgment against Defendant.

_____

6.      The Court has jurisdiction over the parties and subject matter of this action.

7.      All allegations of the Plaintiff in the Verified Complaint are true and correct and are hereby admitted by Defendant.

8.      Defendant further withdraws and waives, with prejudice, any and all defenses to this action.  Defendant stipulates and agrees to entry of a final money judgment against Defendant in a form substantially similar to the Final Judgment attached hereto as **Exhibit 1** (the "Final Judgment").

9.      This Stipulation is being filed in connection with a Settlement Agreement entered into by and between Plaintiff and Defendant and approved by the United States Bankruptcy Court in and for the Middle District of Florida, Orlando Division, in the bankruptcy case of In re Brevard Eye Center, Inc., case no. 6:17-BK-01828-KSJ, and Defendant's default thereunder.

WHEREFORE, Plaintiff hereby requests the Court to enter the Final Judgment attached hereto in accordance with this Stipulation, enter such other and further orders the Court deems just and appropriate to carry out this Stipulation, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted this ___ day of ___, 2018,

Respectfully submitted,

_____

Richard A. Robinson, Esq.
Florida Bar Number: 41238
Primary Email: rrobinson@burr.com
Secondary Email: lcarnevale@burr.com
Jonathan M. Sykes, Esq.
Florida Bar Number: 73176
Primary Email:    jsykes@burr.com
Secondary Email:  lloving@burr.com
**BURR & FORMAN LLP**
200 S. Orange Avenue, Suite 800
Orlando, FL 32801
Telephone:  (407) 540-6600
Facsimile:  (407) 540-6601
**ATTORNEYS FOR PLAINTIFF**

_____

[Roy Kobert's signature block]

STIPULATED AND AGREED TO BY:

_____

Dr. Rafael Trespalacios

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on _____, 20___, a true and correct copy of the foregoing was filed with the Clerk of Court by using the Florida Courts E-Filing Portal which will send notice of electronic filing and complete service of the foregoing as required by Fla. R. Jud. Admin. 2.516 to:  **Roy S. Kobert, Esq.,** (Roy.Kobert@gray-robinson.com)**,** Gray Robinson, P.A., 301 E. Pine Street, Suite 1400, Orlando, FL 32802 and **Michael A. Nardella, Esq.,** (mnardella@nardellalaw.com), Nardella & Nardella, PLLC, 250 E. Colonial Drive, Suite 102, Orlando, FL 32801-1231

_____

Jonathan M. Sykes, Esq.

# **EXHIBIT 1**

Final Judgment

## **[Follows this Page]**

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA**

**SummitBridge National Investments V LLC, a Delaware limited liability company**

      **Plaintiff,**

v.

**Rafael Trespalacios a/k/a Rafael Trespalacios, M.D., an individual, THMIH, Inc., a Florida corporation, Brevard Eye Center, Inc., a Florida corporation, Brevard Surgery Center, Inc., a Florida corporation, Medical City Eye Center, P.A., a Florida corporation, Steve Black, an individual, and unknown tenants in possession,**

      **Defendants.**

_____/

**CASE NO.  2017 CA 2483**

## <u>STIPULATED CONSENT FINAL JUDGMENT AGAINST RAFAEL TRESPALACIOS</u>

THIS CAUSE comes before the Court on the Stipulation and Consent to Final Judgment Against Rafael Trespalacios filed by Plaintiff, SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company ("Plaintiff"), and Defendant, Rafael Trespalacios a/k/a Rafael Trespalacios, M.D., an individual ("Defendant"), the Court having reviewed the Stipulation and Consent

to Final Judgment and the pleadings on file, having reviewed the signatures of the parties on the Stipulation and Consent to Final Judgment, and having been otherwise duly advised in the premises, and it is hereby:

ORDERED AND ADJUDGED:

1.    The Court has jurisdiction of the subject matter and the parties. The allegations contained in Verified Complaint, including any and all amendments thereto, have been admitted by the Defendant and constitute competent evidence to support the Plaintiff's claims against the Defendant. Further, the equities are with the Plaintiff and judgment is due to be entered in Plaintiff's favor.

2.    The Stipulation and Consent to Final Judgment is hereby APPROVED.

3.    The address of the Plaintiff is 1700 Lincoln Street, Suite 2150, Denver, Colorado 80203.

4.    Defendant, Trespalacios, is an individual whose address is 4448 Reseda Way, Rockledge, Florida 32955, whose social security number ends in ████.

5.    Pursuant to the Stipulation and Consent to Final Judgment, the Court finds the amount due and owing to Plaintiff, and its successors and assigns, by and from Defendant, individually, as of the date of this Judgment, is $11,497,553.47, which amount shall bear interest at the statutory rate of 5.35% commencing on the date of this Consent Final Judgment, which interest shall be adjusted annually on January 1 of each year in accordance with the interest rate in effect on that date as

set by the Chief Financial Officer until the judgment is paid, pursuant to §55.03(3) Fla. Stat., and shall be increased in the amount of such further fees and costs as may be incurred in this action by Plaintiff, and its successors and assigns, FOR WHICH SUMS LET EXECUTION ISSUE INSTANTER AND FORTHWITH.

6.      It is further ordered and adjudged that Defendant shall complete under oath Florida Rule of Civil Procedure Form 1.977 (Fact Information Sheet), including all required attachments, and serve it on the Plaintiff's attorney or Judgment Creditor if Judgment Creditor is not represented by an attorney within forty-five (45) days from the date of this Judgment, unless his liability under this Judgment is satisfied or post-judgment discovery is stayed.

7.      Jurisdiction of this case is retained to enter further Orders as are proper including, without limitation, to compel the Judgment Debtor to complete Form 1.977, including all required attachments, and serve it on the Judgment Creditor's attorney or Judgment Creditor if the Judgment Creditor is not represented by an attorney.

8.      The Court further retains jurisdiction to hear any and all further matters that are necessary for the full and complete adjudication of this action.  The Court also retains jurisdiction over the parties and the subject matter to conduct such proceedings and enter such further orders as may be proper, including, but not limited to, orders concerning discovery in aid of execution and proceedings

supplementary, and to consider an award of attorneys' fees.

     **DONE AND ORDERED**, in Orlando, Orange County, Florida, this _____

day of _____, 2018.


                      _____
                      Circuit Court Judge_____

# EXHIBIT "G"

## PROMISSORY NOTE

$600,000.00                     Effective as of _____ ___, 201__ (the "Effective Date")

**FOR VALUE RECEIVED**, BREVARD EYE CENTER, INC., a Florida corporation; BREVARD SURGERY CENTER, INC., a Florida corporation; MEDICAL CITY EYE CENTER, P.A., a Florida corporation; and THMIH, INC., a Florida corporation (collectively, the "Borrowers," and each individually, a "Borrower"), promise to pay to the order of SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company, and its successors and assigns (the "Lender"), the principal sum of SIX HUNDRED THOUSAND and No/100ths Dollars ($600,000.00), together with interest as hereinafter stated.

    1.   <u>Definitions</u>.  As used in this Note, the following terms shall have the respective meaning indicated:

    a.   "Exit Note B" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $400,000.00.

    b.   "Exit Financing Note" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $250,000.00.

    c.   "Interest Rate Floor" shall mean Five and One Half Percent (5.50%) per annum.

    d.   "Prime Rate" shall mean the U.S. "Prime Rate" published in the Wall Street Journal from time to time. If such prime rate shall cease to be published or is published infrequently or sporadically, then the Prime Rate shall be (i) the rate of interest per annum established from time to time by Lender and designated as its base or prime rate, which may not necessarily be the lowest interest rate charged by Lender and is set by Lender in its sole discretion, or (ii) if Lender does not publish or announce a base or prime rate, or does so infrequently or sporadically, then the Prime Rate shall be determined by reference to another base rate, prime rate or similar lending rate index, generally accepted on a national basis, as selected by Lender in its sole and absolute discretion. Each change in such fluctuating interest rate shall take effect simultaneously with the corresponding change in the Prime Rate.

    e.   "Property" shall mean the property encumbered by and subject to the lien of the Security Agreement.

    f.   "Security Agreement" shall mean that certain Amended and Restated Security Agreement executed by the Borrowers in favor of Lender on or about even date herewith, which encumbers certain property of the Borrowers described therein. The Security Agreement shall secure this Note.

g.    "Settlement Agreement" shall mean that certain Settlement Agreement executed by the Borrowers and Lender on _____ ___, 2018, pursuant to which the Borrowers and Lender agreed, *inter alia*, to enter into the Security Agreement and this Note.

2.    Payments. Principal and interest shall be due and payable in lawful money of the United States of America at the principal office of Lender in _____, or at such other place or places as it or the holders hereof may from time to time hereafter designate in writing, as follows:

a.    Interest Rate. Interest shall accrue on the outstanding principal balance of this Note at a floating rate equal to the Prime Rate plus One Percent (1.00%) per annum (the "Interest Rate"). Interest shall be calculated on the basis of a 360 day year, for the actual number of days elapsed; provided, however, that in no event shall the Interest Rate be lower than the Interest Rate Floor.

b.    Monthly Payments. Commencing on January 1, 2019 and continuing on the 1st day of each month thereafter through the Maturity Date, the Borrowers shall pay monthly payments of principal based on the outstanding principal balance of this Note on January 1, 2019, amortized on a ten year amortization period, plus accrued interest hereunder at the Interest Rate.

c.    Maturity Date. Notwithstanding anything to the contrary herein, the entire outstanding principal balance, together with any accrued interest, shall be due and payable on January 1, 2024 (the "Maturity Date").

d.    Allocation. All payments made upon this Note shall be applied in any order Lender determines, in its sole discretion, to the following: (1) to accrued but unpaid interest, (2) to unpaid principal, (3) to reduce charges owed by the Borrowers that are neither principal nor interest, and (4) any partial prepayments of principal will be applied to installments due in the inverse order of their maturity and no such partial prepayment of principal will have the effect of postponing, satisfying, reducing or otherwise affecting any scheduled installment before the Note is paid in full.

3.    Late Charge. All installments of interest or payments of principal provided for in this Note shall be paid promptly when due and, if not paid within seven (7) calendar days after the due date thereof, shall be subject to a late charge in an amount equal to five percent (5%) of the payment due and shall be paid to Lender in addition to and at the time of payment of the delinquent installment or payment.

4.    Prepayment. The Borrowers shall have the right to prepay the principal balance of this Note, in whole or in part, without penalty at any time, upon payment of all interest accrued to date and other sums then due and payable pursuant to the provisions of this Note.

5.    Interest Limitation. Notwithstanding any other provision of this Note or of any instrument securing this Note or any other instrument executed in connection with the loan evidenced hereby, it is expressly agreed that the amounts payable under this Note or under the other aforesaid instruments for the payment of interest or any other payment in the nature of or which

would be considered as interest or other charge for the use or loan of money shall not exceed the highest rate allowed by law, from time to time, to be charged by Lender.  In the event the provisions of this Note or of any instruments referred to in this paragraph regarding the payment of interest or other payments which would be considered as interest or other charge for the use or loan of money operate to produce a rate that exceeds such limitation, then the excess over such limitation will not be payable and the amount otherwise agreed to be paid shall be reduced by the excess, so that such limitation will not be exceeded, and in the event any such payment is paid by Borrowers or received by Lender, whereby such limitation is exceeded, the amount of the excess shall constitute and be treated as a payment on the principal hereof and shall operate to reduce such principal by the amount of such excess, unless Borrowers shall notify Lender in writing that Borrowers desire to have such excess sum refunded to it.

6.    <u>Consent and Waiver</u>.  Each Borrower does hereby:  (a) consent to any forbearance or extension of the time or manner of payment hereof and to the release of all or any part of any security held by the Lender to secure payment of this Note, all without notice to or consent of that party; (b) agree that no course of dealing or delay or omission or forbearance on the part of the Lender in exercising or enforcing any of its rights or remedies hereunder or under any instrument securing this Note shall impair or be prejudicial to any of the Lender's rights and remedies hereunder or to the enforcement hereof and that the Lender may extend, modify or postpone the time and manner of payment and performance of this Note, may grant forbearances and may release, wholly or partially, any security held by the Lender as security for this Note and release, partially and wholly, any person or party primarily or secondarily liable with respect to this Note, all without notice to or consent by any party primarily or secondarily liable hereunder and without thereby releasing, discharging or diminishing its rights and remedies against any other party primarily or secondarily liable hereunder; and (c) waive notice of acceptance of this Note, and presentment, demand, protest, notice of dishonor and notice of protest and notices of any and all action at any time taken or omitted by the Lender in connection with this Note or any instrument securing this Note and waive all requirements necessary to hold that party to the liability of that party.

7.    <u>Cross Default</u>.  A default under this Note shall be and constitute a default under Exit Note B, Exit Financing Note, the Security Agreement, and the Settlement Agreement.  A default under Exit Note B, Exit Financing Note, the Security Agreement, and the Settlement Agreement shall also constitute a default under this Note.

8.    <u>Events of Default and Acceleration</u>.  The happening of any of the following events shall constitute a default hereunder ("Event of Default"):  (a) failure of Borrowers to pay any principal, interest or any other sums when due under this Note; or (b) a default shall occur in any provision of this Note, in any instrument securing this Note, in Exit Note B, in Exit Financing Note, or in the Settlement Agreement, except that an Event of Default shall not occur with respect to a non-payment default unless the Borrowers fail to cure such non-payment default within seven (7) calendar days after notice of such non-payment default.  Notice under this paragraph shall be effective upon delivery by first class mail or hand delivery to the Borrowers and Borrowers' counsel at Brevard Eye Center, Inc., 665 S. Apollo Blvd., Melbourne, FL 32901, and via email transmission to Borrowers' counsel at gaaronson@aspalaw.com and scapuano@aspalaw.com.

If an Event of Default shall occur hereunder, then at the option of the Lender, the entire principal sum then remaining unpaid together with accrued interest shall immediately become due and payable without notice or demand. While in default, the entire principal sum and accrued interest shall both bear interest from such default date at a rate equal to eighteen percent (18%); it being agreed that interest not paid when due shall, at the option of the Lender, draw interest at the rate provided for in this paragraph.

The Lender may, in addition, pursue each and every other right, remedy and power under this Note, Exit Note B, Exit Financing Note, the Security Agreement, or the Settlement Agreement, and pursue any other right or remedy available at law and in equity.

The remedies of Lender, as provided herein or in any document securing the Loan evidenced hereby, shall be cumulative and concurrent and may be pursued singularly, successively and together, at the sole discretion of Lender. No act of omission or commission of the Lender, including, specifically, any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same, such waiver or release to be effected only through a written document executed by Lender and then only to the extent specifically recited therein. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to or as a waiver or release of any subsequent right, remedy or recourse as to a subsequent event.

9.  <u>Attorneys' Fees</u>. All parties liable for the payment of this Note agree to pay the Lender reasonable attorneys' fees and costs, whether or not an action is brought, for the services of counsel employed after maturity or default to collect this Note or any principal or interest due hereunder or to protect the security, if any, or enforce the performance of any other agreement contained in this Note or in any instrument of security executed in connection with this loan, including costs and attorneys' fees on any appeal or in any proceedings under the federal Bankruptcy Code or in any postjudgment proceedings.

10.  <u>Set Off</u>. The Lender is hereby granted a lien upon and a security interest in all property of Borrowers now or at any time hereafter in the possession of the Lender as security for the payment of this Note, including, but not limited to, any balance or share of any credits, money, deposits, stocks, bonds, certificates of deposit, trust or agency account, and whenever any obligation under this Note matures or otherwise becomes due, whether by acceleration or otherwise, the Lender is hereby authorized to apply and set off against the balance hereunder owed, any such funds or property in possession of the Lender belonging to Borrowers in such order of application as the Lender may from time to time elect, without advance notice or consent of Borrowers. The Lender also shall have the right, immediately and without further action by it, to set off against the Note all money owed by the Lender in any capacity to Borrowers, whether or not due.

11.  <u>Florida Law; Venue; Time</u>. This Note constitutes a contract under the laws of the State of Florida and shall be enforceable in a court of competent jurisdiction in that state, regardless of in which state this Note is being executed. Borrowers consent and agree that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, or related to this Note, Exit Note B, Exit Financing Note, the Security Agreement, or any other document executed by Borrowers and delivered to Lender shall be litigated, in Lender's sole discretion and at the Lender's

sole election, only in courts having a situs within or whose jurisdiction includes Brevard County, Florida.  For the purpose of the foregoing, Borrowers hereby consent and submit to the jurisdiction of any local, state or federal court located within or whose jurisdiction includes Brevard County, Florida.  Time is of the essence in this Note.

12.    <u>Headings</u>.  The headings of the paragraphs contained in this Note are for convenience of reference only and do not form a part hereof and no way modify, interpret or construe the meaning of the parties hereto.

13.    <u>Security</u>.  This Note is secured by <u>inter alia</u>, the Security Agreement. It is expressly agreed that all of the covenants, conditions and agreements of the Borrowers under the Security Agreement are made a part of this Note and shall be included in the interpretation of this Note.

14.    <u>Sale or transfer of Note and Security Agreement</u>.  Lender may at any time in its sole discretion sell, transfer or assign the Note, the Security Agreement and/or Exit Note B and/or Exit Financing Note, and any and all servicing rights with respect thereto, or grant participations therein.

15.    <u>Compliance Agreement</u>.  For and in consideration of the funding or renewal of this loan by Lender, the Borrowers hereby agree to cooperate or re-execute any and all loan documentation deemed necessary or desirable in Lender's discretion, in order to correct or to adjust for any clerical errors or omissions contained in any document executed in connection with this loan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD EYE CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

    The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of BREVARD EYE CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)          _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD SURGERY CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of BREVARD SURGERY CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                    _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

MEDICAL CITY EYE CENTER, P.A.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of MEDICAL CITY EYE CENTER, P.A., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                            _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

THMIH, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this _____ day of _____, 2018, by _____, as _____ of THMIH, INC., a Florida corporation, on behalf of the corporation. He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                    _____
(Type, Stamp or Print Name)

My commission expires:

# EXHIBIT "H"

## PROMISSORY NOTE

$400,000.00                          Effective as of _____ ___, 201__ (the "Effective Date")

**FOR VALUE RECEIVED**, BREVARD EYE CENTER, INC., a Florida corporation; BREVARD SURGERY CENTER, INC., a Florida corporation; MEDICAL CITY EYE CENTER, P.A., a Florida corporation; and THMIH, INC., a Florida corporation (collectively, the "Borrowers," and each individually, a "Borrower"), promise to pay to the order of SUMMITBRIDGE NATIONAL INVESTMENTS V LLC, a Delaware limited liability company, and its successors and assigns (the "Lender"), the principal sum of FOUR HUNDRED THOUSAND and No/100ths Dollars ($400,000.00), together with interest as hereinafter stated.

1.    Definitions.  As used in this Note, the following terms shall have the respective meaning indicated:

a.    "Exit Note A" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $600,000.00.

b.    "Exit Financing Note" shall mean that certain promissory note executed by the Borrowers in favor of Lender on or about even date herewith in the amount of $250,000.00.

c.    "Property" shall mean the property encumbered by and subject to the lien of the Security Agreement.

d.    "Security Agreement" shall mean that certain Amended and Restated Security Agreement executed by the Borrowers in favor of Lender on or about even date herewith, which encumbers certain property of the Borrowers described therein. The Security Agreement shall secure this Note.

e.    "Settlement Agreement" shall mean that certain Settlement Agreement executed by the Borrowers and Lender on _____ ___, 2018, pursuant to which the Borrowers and Lender agreed to enter into the Security Agreement and this Note.

2.    Payments.  Principal and interest shall be due and payable in lawful money of the United States of America at the principal office of Lender in _____, or at such other place or places as it or the holders hereof may from time to time hereafter designate in writing, as follows:

a.    Interest Rate. Absent an Event of Default (as defined below), no interest shall accrue on any amounts due under this Note.

b.    Monthly Payments.  Commencing on February 1, 2024 and continuing on the 1st day of each month thereafter through the Maturity Date, the Borrowers shall pay monthly payments of five thousand five hundred fifty six and no/100ths dollars ($5,556.00) but the

last payment shall be $5,540.00.

c.    <u>Maturity Date</u>.  Notwithstanding anything to the contrary herein, upon receipt of the thirty-sixth (36th) payment described in Section 2(a) hereof, the entire outstanding principal balance shall be forgiven on February 1, 2027 (the "Maturity Date"). For the avoidance of doubt, absent an Event of Default, Borrower shall pay a total of $200,000.00 to Lender under this Note and the balance of the principal amount shall be forgiven.

d.    <u>Allocation</u>.  All payments made upon this Note shall be applied in any order Lender determines, in its sole discretion, to the following: (1) to accrued but unpaid interest, (2) to unpaid principal, (3) to reduce charges owed by the Borrowers that are neither principal nor interest, and (4) any partial prepayments of principal will be applied to installments due in the inverse order of their maturity and no such partial prepayment of principal will have the effect of postponing, satisfying, reducing or otherwise affecting any scheduled installment before the Note is paid in full.

3.    <u>Late Charge</u>.  All installments of interest or payments of principal provided for in this Note shall be paid promptly when due and, if not paid within seven (7) calendar days after the due date thereof, shall be subject to a late charge in an amount equal to five percent (5%) of the payment due and shall be paid to Lender in addition to and at the time of payment of the delinquent installment or payment.

4.    <u>Prepayment</u>.  The Borrowers shall have the right to prepay the principal balance of this Note, in whole or in part, without penalty at any time, upon payment of all interest accrued to date and other sums then due and payable pursuant to the provisions of this Note.

5.    <u>Interest Limitation</u>.  Notwithstanding any other provision of this Note or of any instrument securing this Note or any other instrument executed in connection with the loan evidenced hereby, it is expressly agreed that the amounts payable under this Note or under the other aforesaid instruments for the payment of interest or any other payment in the nature of or which would be considered as interest or other charge for the use or loan of money shall not exceed the highest rate allowed by law, from time to time, to be charged by Lender.  In the event the provisions of this Note or of any instruments referred to in this paragraph regarding the payment of interest or other payments which would be considered as interest or other charge for the use or loan of money operate to produce a rate that exceeds such limitation, then the excess over such limitation will not be payable and the amount otherwise agreed to be paid shall be reduced by the excess, so that such limitation will not be exceeded, and in the event any such payment is paid by Borrowers or received by Lender, whereby such limitation is exceeded, the amount of the excess shall constitute and be treated as a payment on the principal hereof and shall operate to reduce such principal by the amount of such excess, unless Borrowers shall notify Lender in writing that Borrower desires to have such excess sum refunded to it.

6.    <u>Consent and Waiver</u>.  Each Borrower does hereby:  (a) consent to any forbearance or extension of the time or manner of payment hereof and to the release of all or any part of any security held by the Lender to secure payment of this Note, all without notice to or consent of that party; (b) agree that no course of dealing or delay or omission or forbearance on the part of the Lender in

exercising or enforcing any of its rights or remedies hereunder or under any instrument securing this Note shall impair or be prejudicial to any of the Lender's rights and remedies hereunder or to the enforcement hereof and that the Lender may extend, modify or postpone the time and manner of payment and performance of this Note, may grant forbearances and may release, wholly or partially, any security held by the Lender as security for this Note and release, partially and wholly, any person or party primarily or secondarily liable with respect to this Note, all without notice to or consent by any party primarily or secondarily liable hereunder and without thereby releasing, discharging or diminishing its rights and remedies against any other party primarily or secondarily liable hereunder; and (c) waive notice of acceptance of this Note, and presentment, demand, protest, notice of dishonor and notice of protest and notices of any and all action at any time taken or omitted by the Lender in connection with this Note or any instrument securing this Note and waive all requirements necessary to hold that party to the liability of that party.

7.    Cross Default.  A default under this Note shall be and constitute a default under Exit Note A, Exit Financing Note, the Security Agreement, and the Settlement Agreement.  A default under Exit Note A, Exit Financing Note, the Security Agreement, and the Settlement Agreement shall also constitute a default under this Note.

8.    Events of Default and Acceleration.  The happening of any of the following events shall constitute a default hereunder ("Event of Default"):  (a) failure of Borrowers to pay any principal or any other sums when due under this Note; or (b) a default shall occur in any provision of this Note, in any instrument securing this Note, in Exit Note A, in Exit Financing Note, or in the Settlement Agreement; or (c) a change in control in the medical practices of the Borrowers without the consent of Lender, which consent shall not be unreasonably withheld, except that an Event of Default shall not occur with respect to a non-payment default unless the Borrowers fail to cure such non-payment default within seven (7) calendar days after notice of such non-payment default.  Notice under this paragraph shall be effective upon delivery by first class mail or hand delivery to the Borrowers and Borrowers' counsel at Brevard Eye Center, Inc., 665 S. Apollo Blvd., Melbourne, FL 32901, and via email transmission to Borrowers' counsel at gaaronson@aspalaw.com and scapuano@aspalaw.com.

If an Event of Default shall occur hereunder, then at the option of the Lender, the entire principal sum then remaining unpaid together with accrued interest shall immediately become due and payable without notice or demand.  While in default, the entire principal sum and accrued interest shall both bear interest from such default date at a rate equal to eighteen percent (18%); it being agreed that interest not paid when due shall, at the option of the Lender, draw interest at the rate provided for in this paragraph.

The Lender may, in addition, pursue each and every other right, remedy and power under this Note, Exit Note A, Exit Financing Note, the Security Agreement, or the Settlement Agreement, and pursue any other right or remedy available at law and in equity.

The remedies of Lender, as provided herein or in any document securing the Loan evidenced hereby, shall be cumulative and concurrent and may be pursued singularly, successively and together, at the sole discretion of Lender.  No act of omission or commission of the Lender, including, specifi-

cally, any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same, such waiver or release to be effected only through a written document executed by Lender and then only to the extent specifically recited therein. A waiver or release with reference to any one event shall not be construed as continuing, as a bar to or as a waiver or release of any subsequent right, remedy or recourse as to a subsequent event.

9.      Attorneys' Fees. All parties liable for the payment of this Note agree to pay the Lender reasonable attorneys' fees and costs, whether or not an action is brought, for the services of counsel employed after maturity or default to collect this Note or any principal or interest due hereunder or to protect the security, if any, or enforce the performance of any other agreement contained in this Note or in any instrument of security executed in connection with this loan, including costs and attorneys' fees on any appeal or in any proceedings under the federal Bankruptcy Code or in any postjudgment proceedings.

10.      Set Off. The Lender is hereby granted a lien upon and a security interest in all property of Borrowers now or at any time hereafter in the possession of the Lender as security for the payment of this Note, including, but not limited to, any balance or share of any credits, money, deposits, stocks, bonds, certificates of deposit, trust or agency account, and whenever any obligation under this Note matures or otherwise becomes due, whether by acceleration or otherwise, the Lender is hereby authorized to apply and set off against the balance hereunder owed, any such funds or property in possession of the Lender belonging to Borrowers in such order of application as the Lender may from time to time elect, without advance notice or consent of Borrowers. The Lender also shall have the right, immediately and without further action by it, to set off against the Note all money owed by the Lender in any capacity to Borrowers, whether or not due.

11.      Florida Law; Venue; Time. This Note constitutes a contract under the laws of the State of Florida and shall be enforceable in a court of competent jurisdiction in that state, regardless of in which state this Note is being executed. Borrowers consent and agree that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, or related to this Note, Exit Note A, Exit Financing Note, the Security Agreement, or any other document executed by Borrowers and delivered to Lender shall be litigated, in Lender's sole discretion and at the Lender's sole election, only in courts having a situs within or whose jurisdiction includes Brevard County, Florida. For the purpose of the foregoing, Borrowers hereby consent and submit to the jurisdiction of any local, state or federal court located within or whose jurisdiction includes Brevard County, Florida. Time is of the essence in this Note.

12.      Headings. The headings of the paragraphs contained in this Note are for convenience of reference only and do not form a part hereof and no way modify, interpret or construe the meaning of the parties hereto.

13.      Security. This Note is secured by inter alia, the Security Agreement. It is expressly agreed that all of the covenants, conditions and agreements of the Borrowers under the Security Agreement are made a part of this Note and shall be included in the interpretation of this Note.

14.    <u>Sale or transfer of Note and Security Agreement</u>.  Lender may at any time in its sole discretion sell, transfer or assign the Note, the Security Agreement and/or Exit Note A and/or Exit Financing Note, and any and all servicing rights with respect thereto, or grant participations therein.

15.    <u>Compliance Agreement</u>.  For and in consideration of the funding or renewal of this loan by Lender, the Borrowers hereby agree to cooperate or re-execute any and all loan documentation deemed necessary or desirable in Lender's discretion, in order to correct or to adjust for any clerical errors or omissions contained in any document executed in connection with this loan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD EYE CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of BREVARD EYE CENTER, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                    _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

BREVARD SURGERY CENTER, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of BREVARD SURGERY CENTER, INC., a Florida corporation, on behalf of the corporation. He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                    _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

MEDICAL CITY EYE CENTER, P.A.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of MEDICAL CITY EYE CENTER, P.A., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                          _____
(Type, Stamp or Print Name)

My commission expires:

THE UNDERSIGNED ACKNOWLEDGES THAT THE LOAN EVIDENCED HEREBY IS FOR COMMERCIAL PURPOSES ONLY AND NOT FOR PERSONAL, FAMILY HOUSEHOLD OR AGRICULTURAL PURPOSES.

**BORROWER**:

THMIH, INC.,
a Florida corporation

By:_____
Name:
Title:

(Company Seal)

STATE OF _____
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by _____, as _____ of THMIH, INC., a Florida corporation, on behalf of the corporation.  He/she is personally known to me ☐ OR produced a _____ Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)                     _____
                                  (Type, Stamp or Print Name)

My commission expires:

# EXHIBIT "I"

## AMENDED AND RESTATED
## SECURITY AGREEMENT

THIS **AMENDED AND RESTATED SECURITY AGREEMENT** ("**Security Agreement**") made effective as of _____ ____, 2018, from **BREVARD EYE CENTER, INC.,** a Florida corporation, having a mailing address of 665 South Apollo Boulevard, Melbourne, Florida 32901; **BREVARD SURGERY CENTER, INC.**, a Florida corporation, having a mailing address of 665 South Apollo Boulevard, Melbourne, Florida 32901; **MEDICAL CITY SURGERY CENTER, INC.**, a Florida corporation, having a mailing address of 665 South Apollo Boulevard, Melbourne, Florida 32901; **THMIH, INC.**, a Florida corporation, having a mailing address of 665 South Apollo Boulevard, Melbourne, Florida 32901 (herein, whether one or more, called "**Debtor**"), to **SUMMITBRIDGE NATIONAL INVESTMENTS V LLC**, a Delaware limited liability company, and its successors and assigns, having an address of _____ (herein, together with its successors and assigns, called "**Secured Party**" or "**SummitBridge**," and together with Debtor, the "**Parties**").

## W I T N E S S E T H:

**WHEREAS**, Debtor had previously entered into a loan (the "**Loan**") evidenced by that certain promissory note dated as of July 18, 2016, in the maximum original principal amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) (the "**Original Note**"), which Original Note was secured by that certain Commercial Security Agreement in favor of the Secured Party dated as of July 18, 2016 (the "**Original Security Agreement**"), pursuant to which Debtor granted a security interest in all of Debtor's Collateral (as such term is defined in the Original Security Agreement); and

**WHEREAS**, Debtor and the Secured Party have entered into that certain settlement agreement executed on or about the date hereof (the "**Settlement Agreement**"), pursuant to which, *inter alia*, the Debtor and Secured Party have agreed to amend and restate the Original Security Agreement and restructure the Loan.

**NOW, THEREFORE**, in consideration of loans, advances or other financial accommodations made or to be made by Secured Party to Debtor, and for other value received by Debtor, the parties hereto, intending to be legally bound, agree as follows:

1.    **Security Interest**.  Debtor grants to Secured Party a continuing security interest (the "**Security Interest**") in all accounts receivable, equipment, inventory, personal property, business assets and fixtures now owned or hereafter acquired by Debtor, and in all increases, parts, fittings, accessories, attachments, additions, and accessions thereto, substitutions and replacements therefore and in all proceeds thereof in any form, together with all records relating thereto, as more particularly described in ***Exhibit "A"*** attached hereto (the "**Collateral**").

2.    **Indebtedness Secured**.  This Security Agreement secures (a) that certain Six Hundred Thousand and 00/100 Dollars ($600,000.00) Note of even date herewith ("**Exit Note A**") (b) that certain Four Hundred Thousand and 00/100 Dollars ($400,000.00) Note of even date herewith ("**Exit Note B**") and (c) that certain Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) Note of even date herewith (the "**Exit Financing Note**", and together with Exit

Note A and Exit Note B, collectively, the "**Notes**" and each individually a "**Note**").   The borrowing relationship between Debtor and Secured Party is to be a continuing one and may cover numerous types of extensions of credit, loans, overdraft payments, or advances made directly or indirectly to Debtor under the Notes. Accordingly, this Security Agreement and the Security Interest created hereby secures payment of all obligations of any kind owing by Debtor to Secured Party arising from the Notes, whether now existing or hereafter incurred, direct or indirect, primary or secondary, sole or joint and several, contingent or non-contingent, liquidated or non-liquidated, or otherwise, and whether the obligations are from time to time reduced and thereafter increased or entirely extinguished and new obligations thereafter incurred, including, without limitation, any sums advanced and any expenses or obligations incurred by Secured Party pursuant to this Security Agreement (including attorneys' fees and costs as provided herein) or any other agreement concerning, evidencing or securing obligations of Debtor to Secured Party, and any liabilities of Debtor to Secured Party arising from any source whatsoever and all extensions, renewals and modifications thereof (collectively, the "**Indebtedness**").

3.     **Representations and Warranties of Debtor**.   Debtor represents and warrants and so long as this Security Agreement continues in force as provided in paragraph 7 hereof shall be deemed continuously to represent and warrant that:

(a)     Debtor is the sole and absolute owner of the Collateral free of all security interest and other encumbrances or claims, except for the security interests on the Collateral that existed prior to the Debtors' bankruptcy filing.

(b)     Debtor is authorized to enter into this Security Agreement and into the transactions evidenced by the Collateral.

(c)     The Collateral is used or bought for use primarily for business purposes.

(d)     By virtue of this Security Agreement and the perfection of the Security Interest as provided in paragraph 1 hereof, Secured Party has a valid, enforceable, and perfected security interest in the Collateral.

4.     **General Covenants of Debtor**.   So long as this Security Agreement continues in force as provided in paragraph 7 hereof, Debtor:  (a) will defend the Collateral against the claims and demands of all other persons at any time claiming the same; keep the Collateral free from all security interests or other encumbrances or claims whatsoever except the Security Interest and any security interests that existed prior to the execution of the Settlement Agreement, and will not sell, transfer, assign, deliver or otherwise dispose of any of the Collateral or any interest therein without the prior written consent of Secured Party, except for bona fide sales, assignments, transfers, or other dispositions in the ordinary course of business and dispositions of property which is obsolete and not used or useful in its business; (b) will not without the prior written consent of Secured Party create in favor of anyone other than Secured Party a security interest in any of the Collateral; (c) will notify Secured Party promptly in writing of any change in Debtor's address, name or identity from that specified above, and will permit Secured Party or its agents to inspect the Collateral at any time, wherever located, with reasonable prior notice to the Borrower exception in emergencies or default; (d) will keep the Collateral in good condition and repair, ordinary wear and tear and ordinary course dispositions excepted and will not use the

Collateral in violation of any provisions of this Security Agreement, of any applicable statute, regulation or ordinance or of any policy of insurance insuring the Collateral; (e) will notify Secured Party promptly in writing of any change in Debtor's address, name or identity specified above, of any change in the location or of any additional locations at which the Collateral is kept and of any change in the address at which records concerning the Collateral are kept; (f) in connection herewith will execute and deliver to Secured Party such financing statements and other documents, and take such other action as Secured Party may deem necessary or advisable to perfect the Security Interest created by this Security Agreement; (g) will pay or cause to be paid all taxes, assessments and other charges of every nature which may be levied or assessed against the Collateral or against any note or other instrument evidencing the Indebtedness provided that, unless any material item or property would be lost, forfeited or materially damages as a result thereof, no such charge or claim need to be paid if it is being diligently contested in good faith, if Lender is notified in advance of such contest and if Borrower establishes and adequate reserve or other appropriate provisions required by generally accepted accounting principles; (h) will keep the Collateral insured in amounts not less than the full insurable value thereof for the benefit of Secured Party (to whom loss shall be payable by New York Standard or Union Standard endorsements), in such companies and against such risks as may be satisfactory to or required by Secured Party (and each policy shall specifically provide that it may not be cancelled or modified adversely to the interests of Secured Party without 30 calendar days prior written notice to Secured Party), pay the cost of all such insurance, and deliver certificates evidencing such insurance to Secured Party, and Debtor assigns to Secured Party all right to receive proceeds of such insurance; (i) will prevent the Collateral or any part thereof from being or becoming an accession to other goods not covered by this Security Agreement; (j) unless the Collateral is specified in paragraph 3(e) as a fixture, will prevent the Collateral or any part of the Collateral from being or becoming a fixture; and (k) if any certificate of title may be issued with respect to any of the Collateral, Debtor will cause the Security Interest granted hereunder to Secured Party to be properly noted on the certificate and will deliver the original certificate to Secured Party.

5.    **Default**.

(a) Any of the following events or conditions shall constitute an event of default (**"Event of Default"**) hereunder: (i) non-payment when due whether by acceleration or otherwise of the principal of, or interest on any Indebtedness, time being of the essence, or failure of any Obligor (which term shall mean and include each Debtor and any endorser, surety, guarantor or other party liable for payment of, or pledging collateral as security for, any Indebtedness) to pay any sum due under any note or other instrument evidencing the Indebtedness or due by any Obligor to Secured Party under any other promissory note or under any security instrument or other written obligation of any kind now existing or hereafter created, subject to any applicable grace or cure period set forth in the applicable Loan Documents; (ii) failure by any Obligor to perform any obligations under this Security Agreement or any other agreement between any Obligor and Secured Party; (iii) death of any Obligor (unless a substitute obligor acceptable to Secured Party is provided to Secured Party within 30 calendar days of the date thereof); (iv) a commencement by the Borrower of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or the entry of a decree or order for relief in respect of the Borrower in a case under any such law or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrate (or other similar official) of the Borrower, or for any

substantial part of the property of Borrower, or ordering the wind-up or liquidation of the affairs of Borrower; or the filing and pendency for 30 calendar days without dismissal of a petition initiating an involuntary case under any such bankruptcy, insolvency or similar law, or the insolvency of any Obligor; (v) making a general assignment by any Obligor for the benefit of creditors, appointment of or taking possession by a receiver, trustee, custodian or similar official for any Obligor or for any assets of any such Obligor, (vi) the rendition of a final judgment against Borrower for the payment of damages or money in an amount in excess of $50,000.00, if the same is not discharge or if a writ of execution or similar process is issued with respect thereto and is not stayed within the time allowed by law for filing notice of appeal of the final judgment; (vii) material falsity in any certificate, statement, representation, warranty or audit at any time furnished to Secured Party by or on behalf of any Obligor, pursuant to or in connection with this Security Agreement or otherwise (including warranties in this Security Agreement) and including any omission to disclose any substantial contingent or liquidated liabilities or failure to disclose any material adverse change in any facts disclosed by any certificate, statement, representation, warranty, or audit furnished to Secured Party; (viii) issuing of any writ of attachment or writ of garnishment, or filing of any lien against the Collateral or the property of any Obligor; (ix) taking of possession of the Collateral or of any substantial part of the property of any Obligor at the instance of any governmental authority; (x) dissolution, merger, consolidation or reorganization of any Obligor; (xi) assignment or sale by Debtor of any equity in any of the Collateral, other than assignments, sales, dispositions and transfers occurring in the ordinary course, without the prior written consent of Secured Party; (xiii) cancellation of any guaranty with respect to any Indebtedness without the prior written consent of Secured Party; or (xiv) default by an Obligor under any other loan or indebtedness to Secured Party or to any other lender, which default continues past any applicable cure or grace period.

      (b)     Secured Party may declare all or part of the Indebtedness to be immediately due and payable without notice or demand upon the happening of any Event of Default. This paragraph is not intended to affect any rights of Secured Party with respect to any Indebtedness which may now or hereafter be payable on demand.

      (c)     Upon the happening of any Event of Default, Secured Party's rights and remedies with respect to the Collateral shall be those of a secured party under the Uniform Commercial Code and any other applicable law from time to time in effect. Secured Party shall also have any additional rights granted herein and in any other agreement now or hereafter in effect between Debtor and Secured Party. If requested by Secured Party, the Debtor, at its expense, will assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party.

      (d)     Debtor agrees that any notice by Secured Party of the sale or disposition of the Collateral or any other intended action hereunder, whether required by the Uniform Commercial Code or otherwise, shall constitute reasonable notice to Debtor if the notice is sent via e-mail to _____, or mailed by regular or certified mail, postage prepaid, at least ten (10) calendar days before the action to Debtor's address as specified in this Security Agreement, to counsel for the Debtor via e-mail to gaaronson@aspalaw.com and scapuano@aspalaw.com, and to any other address which Debtor has specified in writing to Secured Party as the address to which notices shall be given to Debtor.

(e)     Debtor shall pay all costs and expenses incurred by the Secured Party in enforcing this Security Agreement, realizing upon any Collateral and collecting any Indebtedness, including reasonable attorneys' fees whether suit is brought or not and whether incurred in connection with collection, trial, appeal, bankruptcy or otherwise, all of which costs and expenses shall be secured hereby, and shall be liable for any deficiencies in the event the proceeds of disposition of the Collateral do not satisfy the Indebtedness in full.   All such proceeds shall be applied without marshaling of assets (i) first to the expenses of retaking and preparing the Collateral for sale, including expenses of sale, (ii) next to other costs and attorneys' fees incurred by Secured Party in exercising its rights and remedies under this Security Agreement, and (iii) finally to the payment of interest and/or principal due on the Indebtedness, in such order and to such Indebtedness as Secured Party may determine.

(f)     All rights and remedies of Secured Party under this Security Agreement and under the Uniform Commercial Code shall be deemed cumulative and not in substitution of any other rights at law or equity with respect to the Collateral or the collection of the Indebtedness. Debtor hereby waives notice of any and all actions, forbearances, and omissions of any rights contemplated by this Section and consents to be bound thereby as effectively as if Debtor had agreed to do so in advance.

7.     **Miscellaneous**.

(a)     Debtor authorizes Secured Party without notice to Debtor and without affecting Debtor's obligations hereunder from time to time (i) to renew, extend, increase, accelerate or otherwise change the time for payment of the principal of or the interest on the Indebtedness or any part thereof; (ii) to take from any party and hold collateral (other than the Collateral) for the payment of the Indebtedness or any part thereof, and to exchange, enforce or release such collateral or the Collateral or any part thereof; (iii) to accept and hold any endorsement or guaranty of payment of the Indebtedness or any part thereof and to release or substitute any such endorser or guarantor, or any party who has given any security interest in any collateral as security for the payment of the Indebtedness or any part thereof or any party in any way obligated to pay the Indebtedness or any part thereof; and (iv) to waive or fail to enforce any of Secured Party's rights against Debtor or any such collateral or the Collateral; and (v) upon the occurrence of any Event of Default to direct the order or manner of the disposition of the Collateral and any other collateral and the enforcement of any endorsements and guaranties relating to the Indebtedness or any part thereof as Secured Party in its sole discretion may determine.

(c)     Debtor authorizes Secured Party to file any financing statement or statements relating to the Collateral (without Debtor's signature thereon) which Secured Party deems appropriate, and Debtor authorizes Secured Party as Debtor's attorney-in-fact to execute any such financing statement or statements in Debtor's name and to perform all other acts which Secured Party deems appropriate to perfect and to continue perfection of the Security Interest. At the option of Secured Party, this Security Agreement, or a photocopy thereof, shall be deemed to be a financing statement authorized to be filed in such jurisdictions where such filing will be given effect.

(c)    Debtor hereby irrevocably consents to Secured Party or its agents entering upon its premises for the purpose of either (1) inspecting the Collateral with reasonable prior notice except for emergency or (2) taking possession of the Collateral after any Event of Default; and Debtor hereby waives its right to assert against Secured Party or its agents any claim based upon trespass or any similar cause of action for entering upon its premises where the Collateral may be located.

(d)    After an Event of Default Secured Party may notify any party obligated to pay proceeds of the existence of the Security Interest and may also direct them to make payments of all proceeds to Secured Party.

(e)    Secured Party may demand, collect and sue for all proceeds (either in Debtor's name or Secured Party's name at the latter's option) with the right to enforce, compromise, settle or discharge any proceeds. Debtor irrevocably appoints Secured Party as Debtor's attorney-in-fact to endorse Debtor's name on all checks, commercial paper and other instruments pertaining to the proceeds.

(f)    Debtor authorizes Secured Party to collect and apply against the Indebtedness any refund of insurance premiums or any insurance proceeds payable on account of the loss of or damage to any of the Collateral and irrevocably appoints Secured Party as Debtor's attorney-in-fact to adjust and settle any insurance claim relating to the Collateral and to endorse any check or draft representing insurance proceeds.

(g)    As further security for the Indebtedness, Debtor grants to Secured Party a security interest in all property of the Debtor now or at any time hereafter in the possession of Secured Party in any capacity whatsoever, including, but not limited to, any balance or share of any deposit, trust or agency account; and with respect to all of such property, Secured Party shall have the same rights as it has with respect to the Collateral.  (ii) Without limiting any other right of Secured Party, whenever Secured Party has the right to declare any Indebtedness to be immediately due and payable (whether or not it has so declared), Secured Party may set off against the Indebtedness all monies then owed to Debtor by Secured Party in any capacity whether due or not and Secured Party shall be deemed to have exercised its right of set off immediately at the time its right to such election accrues.

(h)    Upon Debtor's failure to perform any of its duties hereunder Secured Party may, but it shall not be obligated to, perform any of such duties and Debtor shall forthwith upon demand reimburse Secured Party for any expense incurred by Secured Party in doing so, together with interest thereon at the highest rate permitted by applicable law.

(i)    No delay or omission by Secured Party in exercising any right hereunder or with respect to any Indebtedness shall operate as a waiver of that or any other right, and no single or partial exercise of any right shall preclude Secured Party from any other or future exercise of the right or the exercise of any other right or remedy.  Secured Party may cure any Event of Default by Debtor in any reasonable manner without waiving the Event of Default so cured and without waiving any other prior or subsequent Event of Default by Debtor.

(j)     Secured Party shall have no obligation to take and Debtor shall have the sole responsibility for taking any steps to preserve rights against all prior parties to any instrument or chattel paper in Secured Party's possession as proceeds of the Collateral. Debtor waives notice of dishonor and protest of any instrument constituting Collateral at any time held by Secured Party on which the Debtor is in any way liable and waives notice of any other action by Secured Party.

(k)     The rights and benefits of Secured Party under this Security Agreement shall, if Secured Party agrees, inure to any party acquiring an interest in the Indebtedness or any part thereof. Secured Party may from time to time honor drafts or otherwise advance funds to permit Debtor to purchase additional assets.  Any assets purchased with such funds shall become part of the Collateral.

(l)     The terms "Secured Party" and "Debtor" as used in this Security Agreement include the heirs, personal representatives, and successors or assigns of those parties. The terms "inventory", "accounts", "general intangibles" and "chattel paper" as used in this Security Agreement shall have the meanings given to such terms in the Florida Uniform Commercial Code.  Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

(m)     If more than one Debtor executes this Security Agreement, the term "Debtor" includes each of the Debtors as well as all of them, and their obligations under this Security Agreement shall be joint and several.

(n)     This Security Agreement is a continuing agreement which shall remain in force until it is marked "Cancelled" and returned to Debtor by Secured Party upon payment in full of all Indebtedness (and no further right on the part of the Debtor to obtain any advances or other disbursements from Secured Party) and, until such time, this Security Agreement shall continue to secure all of the Indebtedness and any extensions, renewals or modifications of the Indebtedness.

(o)     This Security Agreement shall be construed under and governed by the Florida Uniform Commercial Code and any other applicable Florida laws in effect from time to time.

(p)     This Security Agreement constitutes the complete agreement of the parties in regard to the matters set forth herein and this Security Agreement may not be modified or amended and no provision hereof shall be waived except by a writing signed by the party to be charged with such modification, amendment or waiver. This Security Agreement amends and restates all previous security agreements between and among the parties hereto.

(q)     Debtor agrees to provide Secured Party with Debtors' tax returns and quarterly financial statements in a form reasonably requested by Secured Party.  Financial statements for each quarter of the calendar year must be provided no later than the twentieth calendar day after the end of each quarter of the calendar year, and tax returns must be provided no later than the thirtieth calendar day after filing of said return.

8.    **Waiver**.  The Debtor hereby waives any rights Debtor may have to notice and a hearing before possession or sale of Collateral is effected by Secured Party by self-help, replevin, attachment, or otherwise.  Debtor further waives any right to a trial by jury in any civil action arising out of, or based upon, this Security Agreement or the Collateral.

9.    **Waiver of Venue and Jurisdiction**.  Debtor, whether or not a Florida resident, hereby waives any plea or claim of lack of personal jurisdiction or improper venue in any action, suit or proceeding brought upon to enforce this Security Agreement or the Debtor's obligations and liabilities hereunder.  The Debtor specifically authorizes any such action to be instituted and prosecuted in the Circuit Court in and for Brevard County, Florida, or any applicable United States District Court of Florida, at the election of Secured Party, where venue would lie and be proper against any Debtor.

**10.    Waiver of Jury Trial.  SECURED PARTY AND DEBTOR HEREBY KNOWINGLY VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS SECURITY AGREEMENT AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OF ACTIONS OR EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE SECURED PARTY ENTERING INTO THIS AGREEMENT.**

**IN WITNESS WHEREOF**, Debtor has duly executed this Security Agreement as of the date first above written.

Signed, sealed and delivered in the

_____

Print Name: _____

BREVARD EYE CENTER, INC.,
a Florida corporation


By: _____
Print Name:_____
As its: _____

_____

Print Name: _____


Signed, sealed and delivered in the

_____

Print Name: _____

BREVARD SURGERY CENTER, INC.,
a Florida corporation


By: _____
Print Name:_____
As its: _____

_____

Print Name: _____


Signed, sealed and delivered in the

_____

Print Name: _____

MEDICAL CITY EYE CENTER, INC.,
a Florida corporation


By: _____
Print Name:_____
As its: _____

_____

Print Name: _____


**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, Debtor has duly executed this Security Agreement as of the date first above written.

Signed, sealed and delivered in the      THMIH, INC.,
a Florida corporation

_____

Print Name: _____

     By: _____
     Print Name:_____
     As its: _____

_____

Print Name: _____

## EXHIBIT "A"

The Debtor hereby assigns and grants to the Secured Party a security interest in all of the following assets of the Debtor (collectively, the **"Collateral"**):

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(a)      all accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later;

(b)      all products and produce of any of the property described in this Collateral section;

(c)      all accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section;

(d)      all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement, or other process;

(e)      all records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

# EXHIBIT "J"

## CONTINUING UNCONDITIONAL AND ABSOLUTE GUARANTY AGREEMENT

This Continuing, Unconditional and Absolute Guaranty Agreement (hereinafter referred to as the "Guaranty"), is dated _____, and is made by DR. RAFAEL TRESPALACIOS, individually ("Guarantor") to SummitBridge National Investments V LLC, and its successors and assigns (hereinafter referred to as the "Lender").

WITNESSETH:

FOR VALUE RECEIVED In consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, and for the purpose of inducing Lender to accept (a) that certain Six Hundred Thousand and 00/100 Dollars ($600,000.00) Note of even date herewith ("Exit Note A"), (b) that certain Four Hundred Thousand and 00/100 Dollars ($400,000.00) Note of even date herewith ("Exit Note B"), and (c) that certain Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) Note of even date herewith (the "Exit Financing Note", and together with Exit Note A and Exit Note B, collectively, the "Notes" and each individually a "Note"), executed by Brevard Eye Center, Inc., Brevard Surgery Center, Inc., Medical City Eye Center, P.A., and/or THMIH, Inc. (collectively, the "Borrowers") in favor of Lender and in connection with confirmation of the Borrowers' chapter 11 plan (the "Plan") in the Borrowers' jointly administered bankruptcy cases pending in the United Stated Bankruptcy Court for the Middle District of Florida, Orlando Division, assigned lead case number 6:17-bk-01828-KSJ, which Notes Lender would not have accepted in connection with the Plan without this Guaranty, the Guarantor covenants and agrees with Lender as follows:

1.      The Guarantor has examined the Notes (collectively, the "Loan Documents") executed by Borrowers (and/or any of them) in connection with the Plan and does hereby uncondi-tionally and absolutely guarantee, jointly and severally, to the Lender and its successors and assigns of either this Guaranty or of any of the obligations secured hereunder, due performance and full and prompt payment, in accordance with their terms, of the Loan Documents including any amendments, renewals, modifications or extensions thereof, and does further agree that if the Notes are not paid in accordance with its terms, or if any of the sums or obligations that may hereafter become due to Lender under the Loan Documents are not paid and performed in accordance with their terms, the Guarantor will immediately do so. Guarantor further unconditionally and absolutely guarantees the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of (a) all obligations, liabilities and indebtedness of the Borrowers to the Lender related to the Loan Documents, however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, or due or to become due; (b) any and all extensions, renewals, modifications, or substitutions of the foregoing, and all expenses, including without limitation reasonable attorney's fees incurred for consultation, trial and appellate representation, if the Lender endeavors to collect from the Borrowers or any guarantor by law or through an attorney at law; (c) any indebtedness resulting from advances made on the Borrowers' behalf by Lender to protect or preserve the priority of its lien, if any, on any collateral pledged to secure the Liabilities; (d) all other charges and expenses, including without limitation late charges, and the payment of all costs, expenses, charges

1

and other expenditures required to be made by Borrowers, or which Borrowers agree to make, under the terms and provisions of the Loan documents. All such items (a), (b), (c) and (d) are herein collectively referred to as the "Liabilities."

2.      This is a continuing Guaranty and may not be assigned, revoked, modified, or amended by the Guarantor without Lender's written consent, and Guarantor acknowledges and agrees that full and adequate consideration for this Guaranty has been given by Lender and received by Guarantor.

3.      The obligations of this Guaranty include all of Borrowers' warranties, representations, obligations, duties and responsibilities under the Loan Documents either now or hereafter existing, and any renewals or extensions, in whole or in part, together with all damages, losses, costs, interest, charges, expenses including attorneys' fees, and liabilities of every kind, nature and description suffered or incurred by Lender arising in any manner of, or in any way connected with or growing out of the Loan Documents.

4.      The Guarantor hereby consents and agrees that Lender may at any time, either with or without consideration, surrender any property or other security of any kind or nature whatsoever held by it securing any indebtedness or liability covered by this Guaranty, or substitute for any collateral so held by it, or modify the terms of the Loan Documents securing payment of the principal indebtedness without notice to or further consent from the Guarantor, and such surrender, substitution or modification shall not in any way affect the obligation of the Guarantor hereunder.  The Guarantor further consents and agrees that Lender may at any time, either with or without consideration, grant extensions of time for performance under the Loan Documents without notice to the Guarantor and such extension shall not in any way affect the obligation of the Guarantor hereunder.

5.      The Guarantor hereby consents and agrees that Lender may, at any time, either with or without consideration, release the Borrowers or any endorser or any other guarantor of the Notes and Liabilities without notice to or further consent from the Guarantor, and such release shall not in any way affect the obligation of the Guarantor hereunder not so released.

6.      Lender shall have the right to proceed against the Guarantor without first proceeding against the Borrowers, or any property securing payment of the Notes or Liabilities, or any other Guarantor or endorser of the Notes or Liabilities, and may pursue all or any of its remedies at one or at different times.

7.      No delay, act or omission on the part of the Lender with respect to any right, power or privilege under the Loan Documents securing the same shall operate as a waiver of such privilege, power or right or as a waiver of any rights under the terms of this Guaranty or in any way affect or impair this Guaranty.

8.      This Guaranty shall be construed as an absolute and unconditional guarantee of payment and performance, without regard to the validity, regularity or enforceability of any

2

31718912 v1
31755314 v1

obligation or purported obligation of Borrowers.  Lender shall have its remedy under this Guaranty without being required to first resort to any security or to any other remedy or remedies to enforce payment or collection of the obligations hereby guaranteed, and may pursue all or any of its remedies at one or at different times.  The liability of Guarantor shall be separate and independent of the obligations of Borrowers, and separate or joint actions may be instituted by Lender against any one or all of the Guarantor or Borrowers, as Lender may choose.  Any action taken by Lender pursuant to the provisions herein contained or contained in the Loan Documents shall not release the party or parties to this Guaranty until all of the obligations of Borrowers to Lender are paid and performed in full.

9.      The Guarantor hereby waives and agrees not to assert or take advantage of: (a) any right to require Lender to proceed against Borrowers or any other person or entity or to proceed against or exhaust any security held by it at any time or to pursue any other remedy in its power before proceeding against the Guarantor; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of, or revocation hereof by other persons; (c) presentment, demand, protest and notice of any kind including, without limitation, notice of acceptance of this Guaranty, dishonor, the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of any other person or entity whomsoever, in connection with any obligation hereby guaranteed; (d) any defense based upon any election of remedies by Lender which destroys or otherwise impairs the subrogation rights of the undersigned or the right of the undersigned to proceed against Borrower for reimbursement, or both; (e) any duty on the part of Lender to disclose to the undersigned any facts it may now or hereafter know about Borrowers; (f) any defense arising by reason of any disability or other defense of Borrowers or by reason of the cessation from any cause whatsoever of the liability of Borrowers; or (g) any right or claim of right to cause a marshaling of Borrowers' assets or to require Lender to proceed against the Guarantor in any particular order.

10.      Guarantor hereby waives any claim, right or remedy which Guarantor may now have or hereafter acquire against Borrowers, which arises hereunder and/or from the performance by Guarantor hereunder, including, without limitation, any claim, remedy or right of subrogation, reimbursement, exoneration, indemnification, or participation in any claim, right or remedy of Lender against the Borrower or any security which Lender now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise, and waives any right to enforce any remedy which Lender now has or may hereafter have against Borrowers, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender, until payment in full of the Notes and Liabilities and satisfaction of all of Borrowers' obligations under the Loan Documents.

11.      Any indebtedness of Borrowers now or hereafter held by the Guarantor is hereby subordinated to the indebtedness of Borrowers to Lender.  Upon a default under the Loan Documents, any such indebtedness shall be collected, enforced and received by the Guarantor as trustee for Lender and be paid over to the Lender on account of the indebtedness of Borrowers to

3

Lender, but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guaranty.

12.     The Guarantor hereby agrees that until all of the terms, covenants and conditions of this Guaranty are fully performed, the Guarantors' obligations hereunder shall not be released, in whole or in part, by any act or thing which might, but for this provision, be deemed a legal or equitable discharge of a surety or guarantor, or by reason of any waiver, extension, modification, forbearance or delay or other act or omission of Lender or its failure to proceed promptly or otherwise, or by reason of any action taken or omitted or circumstances which may or might vary the risk of or affect the rights or remedies of the Guarantor, or by reason of any further dealings between Borrowers or Lender; and the Guarantor hereby expressly waives and surrenders any defense to liability hereunder based upon any of the foregoing acts, omissions, things, agreements or waiver of any of them, it being the purpose and intent of the parties hereto that the obligations of the Guarantor hereunder are absolute and unconditional under all circumstances.

13.     The Guarantor agrees to pay reasonable attorneys' fees, including but not limited to the fees and costs of paralegals, whether or not suit is filed and including such fees at state, federal, bankruptcy, trial and appellate courts, and all other costs and expenses which may be incurred by Lender in the enforcement of Borrowers' obligation and/or of this Guaranty.

14.     All notices which are required or permitted hereunder must be in writing and shall be deemed to have been given, delivered or made, as the case may be, (notwithstanding lack of actual receipt by the addressee): (i) when delivered by personal delivery; or (ii) three (3) business days after having been deposited in the United States mail, certified or registered, return receipt requested, sufficient postage affixed and prepaid; or (iii) one (1) business day after having been deposited with an expedited, overnight courier service (such as by way of example but not limitation, U.S. Express Mail, Federal Express or Purolator), addressed to the party to whom notice is intended to be given at the address set forth below:

> If to Dr. Trespalacios:
>
> > Dr. Rafael Trespalacios
> > 4448 Reseda Way
> > Rockledge, FL 32955
> >
> > **and**
> >
> > **Roy S. Kobert, Esq.**
> > **301 East Pine Street, Suite 1400**
> > **Orlando, Florida 32801**
>
> If to SummitBridge:

4

SummitBridge National Investments V LLC
c/o Summit Investment Management LLC
Attn: Senior Asset Manager
1700 Lincoln St., Suite 2150
Denver, CO 80203

Any party may change the address to which its notices are sent by giving the other party written notice of any such change in the manner provided in this Section, but notice of change of address is effective only upon receipt.

15.     This Guaranty shall inure to the benefit of the Lender, its successors and assigns, and shall bind the Guarantor, and the respective heirs, executors, administrators, legal representatives, successors and assigns of the Guarantor.

16.     Whenever the text of this instrument so requires, the use of any gender shall be deemed to include all genders, and the use of the singular shall include the plural.

17.     The Guarantor acknowledges that the making of the Loan by the Lender to the Borrower confers a real and substantial benefit to the Guarantor and is fully supportive of and valuable consideration for the execution of this Guaranty by the Guarantor.  The Guarantor further acknowledges that he is thoroughly familiar with the business and operations of the Borrowers.  The Lender shall have no duty to the Guarantor to observe the actions or financial conditions of the Borrowers or to monitor the performance of the Borrowers.  It is the intention of the parties that the Lender may rely completely on this Guaranty for its repayment of the Borrowers' indebtedness and obligations whether or not the Borrowers are creditworthy and whether or not it would be prudent to make loans and advances to the Borrowers or to permit the same to remain outstanding.  The Lender and its representatives shall have no duty to exercise diligence or care in and about the enforcement of the remedies or in respect to any other security for the Borrowers' obligations.

18.     This Guaranty shall be governed and controlled by Florida law.  The Guarantor, in order to induce the  Lender to accept this Guaranty, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agrees that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from this Guaranty shall be litigated, at Lender's election, only in courts having a situs within or whose jurisdiction includes Brevard County, Florida.  For the purpose of the foregoing, the Guarantor hereby consents and submits to the jurisdiction of any local, state or federal court located within or whose jurisdiction includes Brevard County, Florida.  The Guarantor, for themselves and any parties claiming under them, hereby waives any right that the Guarantor may have to transfer or change the venue of any litigation brought against the Guarantor in accordance with this paragraph.  The Guarantor acknowl-edges that the provisions of this paragraph have been fully discussed by the Guarantor and the Lender, that they bargained at arm's length and in good faith and without duress of any kind for the terms and conditions of this paragraph and that the provisions hereof shall be subject to no exceptions.  No party has in any way agreed with or represented to any other party that the provisions

5

of this paragraph will not be fully enforced in all instances. Wherever possible each provision of this guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this guaranty.

19. <u>WAIVER OF JURY TRIAL</u>.   THE UNDERSIGNED HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT THAT THE UNDERSIGNED MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE UNDERSIGNED OR LENDER IN CONNECTION WITH THIS GUARANTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER MAKING LOANS OR OTHER FINANCIAL ACCOMMODATIONS TO BORROWERS.

IN WITNESS WHEREOF, the Guarantor has caused these presents to be signed, sealed and delivered the day and year first above written.

**GUARANTOR:**

_____
Dr. Rafael Trespalacios, individually

STATE OF FLORIDA
COUNTY OF _____

The foregoing instrument was acknowledged before me this ____ day of _____, 2018, by Dr. Rafael Trespalacios, individually.  He is personally known to me ☐ OR produced a Florida Driver's License ☐ as identification.

_____
Notary Public

(NOTARY SEAL)

_____
(Type, Stamp or Print Name)

My commission expires:

6

# EXHIBIT "K"

## RELEASE OF DR. RAFAEL TRESPALACIOS

Effective as of the date of execution of this Release, SummitBridge National Investments V LLC ("SummitBridge"), hereby unconditionally, absolutely and irrevocably releases and discharges Dr. Rafael Trespalacios ("Trespalacios," and together with SummitBridge, the "Parties") of all claims, manners of action, causes of action, suits, debts, accounts, promises, warranties, damages and consequential damages, demands, agreements, costs, expenses, claims or demands whatsoever, of any kind or nature whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent, inchoate or matured, in law or in equity which SummitBridge now has or ever had against Trespalacios upon or by reason of any manner, cause or thing whatsoever on or at any time prior to the date of this Release, it being the intention of the Parties to reserve nothing whatsoever hereunder, and each of them, their peace and freedom from each and every of the released claims of whatever character and description; provided, however, (1) nothing in this Release shall be deemed or construed to be a release, waiver or discharge of the terms and conditions of the Guaranty Agreement by and between the Parties dated on or around _____ (the "Guaranty"), and any obligations guaranteed by Dr. Trespalacios in the Guaranty; (2) this Release shall only release Trespalacios and does not in any way release, waive, discharge, limit or impair any other rights or remedies any other person or entity.

IN WITNESS WHEREOF, SummitBridge hereby executes and delivers this Release as of the day and year written below.

Date of execution: _____

**SummitBridge National Investments V LLC**

By:_____
Its:_____